Receipt Number

55 1967

18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDO and
JEFFREY A. SUHRE on behalf of themselves and all
others similarly situated,

Plaintiffs,

v.

DETROIT MEDICAL CENTER, HENRY FORD HEALTH
SYSTEM, MCLAREN HEALTH CARE CORP, d/b/a
Mount Clemens Regional Medical Center, f/k/a
Mount Clemens General Hospital,
ST. JOHN HEALTH PARTNERS, OAKWOOD
HEALTHCARE INC., BON SECOURS COTTAGE
HEALTH SERVICES,

Defendants.

Case: 2:06-cv-15601
Assigned To: Rosen, Gerald E
Referral Judge: Majzoub, Mona K
Filed: 12-15-2006 At 08:37 AM
cmp CASON-MERENDO, ET AL V. DETROIT
MEDICAL CENTER, ET AL (TAM)

## CLASS ACTION COMPLAINT
## JURY TRIAL REQUESTED

Plaintiffs Pat Cason-Merendo and Jeffrey A. Suhre ("Plaintiffs"), by and through counsel, on behalf of themselves and all others similarly situated, bring this action against defendants for damages, and demand trial by jury, complaining and alleging as follows:

### *Nature of the Action*

1. Defendants, which own and operate hospitals in the Detroit-Warren-Livonia Metropolitan Statistical Area ("Detroit MSA" or "Detroit area"), have for years conspired among themselves and with other hospitals in the Detroit MSA to depress the compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2. In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the compensation

each is paying or will pay to its RN employees. The agreement to exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys. The exchange of this information itself has suppressed competition among Detroit-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3. Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Detroit-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Detroit MSA, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Detroit MSA has remained low and surprisingly stagnant. The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4. Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover for the compensation properly earned by RNs employed at Detroit-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein. Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

## *JURISDICTION AND VENUE*

5. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## *PARTIES*

7.     Plaintiff Pat Cason-Merendo is an RN who has been employed by Detroit Medical Center since November 2002 and currently resides within the Detroit MSA.

8.     Plaintiff Jeffrey A. Suhre is an RN who has been employed by Providence Hospital since November of 2002 and currently resides within the Detroit MSA.

9.     St. John HealthPartners ("St. John Health") is a member of Ascension Health and is comprised of numerous hospitals and medical facilities in southeast Michigan. St. John Health's principal place of business is located at 28000 Dequindre, Warren, Michigan 48092.

10.    Ascension Health is a Missouri corporation with its principal place of business located at 4600 Edmundson Road, St. Louis, Missouri 63134. Ascension Health is a parent corporation for health care systems and hospitals throughout the United States. It has affiliate hospitals and hospital systems throughout the United States and within the Detroit MSA, including St. John HealthPartners.

11.    St. John HealthPartners is a Michigan Corporation which owns and operates a number of hospitals located in the Detroit MSA including, but not limited to: St. John Detroit Riverview Hospital, a 285 bed hospital located at 7733 East Jefferson, Detroit, Michigan 48214; St. John Hospital and Medical Center, a 607 bed facility located at 22101 Moross Road, Detroit, Michigan 48236; St. John River District Hospital, a 68 bed facility located at 4100 South River Road, East China, Michigan 48054; St. John North Shores Hospital, a 96 bed facility located at 26755 Ballard Street, Harrison Township, Michigan 48045; St. John Oakland Hospital, a 210 bed hospital located at 27351 Dequindre Road, Madison Heights, Michigan 48071; Providence Hospital, a 384 bed hospital located at 16001 West Nine Mile Road, Southfield, Michigan 48075; Brighton Hospital, a 92 bed hospital located at 12851 East Grand River Avenue, Brighton, Michigan 48116; and St. John Macomb Hospital, a 376 bed facility located at 11800 East Twelve Mile, Warren, Michigan 48093. It is estimated that over 3,000 RNs are employed through St. John Health hospitals.

12. Defendant Henry Ford Health System ("Henry Ford Health") is a Michigan corporation with its principal place of business located at 1 Ford Place, Detroit, MI 48202. Henry Ford Health earns $3.05 billion in revenues annually, and $112 million in net income in 2005. See http://www.henryford.com/body.cfm?id=37460&oTopID=0. Henry Ford Health owns and operates health care facilities within the Detroit MSA which include, but are not limited to: Henry Ford Hospital, a 903 bed hospital located at 2799 W. Grand Blvd., Detroit, Michigan 48202; Henry Ford Wyandotte Hospital, a 344 bed hospital located at 2333 Biddle Avenue, Wyandotte, Michigan 48192; Henry Ford Bi-County Hospital, a 203 bed hospital located at 13355 East Ten Mile Road, Warren, Michigan 48089; Kingswood Hospital, a 100 bed hospital located at 10300 West Eight Mile Road, Ferndale, Michigan 48220.

13. Henry Ford Health represents that it employs over 3,000 RNs in its various hospitals. http://www.henryford.com/body.cfm?id=38768.

14. Bon Secours Cottage Health Services is a joint venture between Bon Secours Health System of Marrriottsville, MD, and the Henry Ford Health System. Bon Secours Cottage Health System is headquartered at 468 Cadieux Road, Grosse Pointe, MI 48230. Bon Secours Cottage Health Services, operates Cottage Hospital located at 159 Kercheval Avenue, Grosse Pointe Farms, Michigan 48236 and Bon Secours Hospital located at 468 Cadieux Road, Grosse Pointe, Michigan 48230. These hospitals have a collective 175 bed capacity.

15. Defendant Detroit Medical Center ("Detroit Medical") is a Michigan corporation with its principal place of business located at 3663 Woodward Avenue, Suite 200, Detroit, Michigan 48201 and Corporate Offices at DMC Corporate Offices, 3990 John R, Detroit, MI 48201. Detroit Medical represents itself as the largest health care provider in southeast Michigan and has more than 2,000 licensed beds. See http://www.dmc.org/org_profile/. Detroit Medical owns and operates numerous health care facilities within the Detroit MSA which include, but are not limited to: Harper University Hospital located at 3990 John R, Detroit, Michigan 48201; Sinai-Grace Hospital located at 6071 W. Outer Drive, Detroit, Michigan 48235; Children's Hospital of Michigan located at 3901 Beaubien, Detroit, Michigan 48201;

- 4 -

Rehabilitation Institute of Michigan located at 261 Mack Avenue, Detroit, Michigan 48201; Detroit Receiving Hospital/University Health Center located at 4201 St. Antoine Blvd, Detroit, Michigan 48201; Huron Valley-Sinai Hospital located at 1 William Carls Drive, Commerce, Michigan 48382; and The Orthopaedic Specialty Hospital located at 30671 Stephenson Highway, Madison Heights, Michigan 48071. Approximately 2,300 RNs are employed through these hospitals.

16. Defendant Oakwood Healthcare Inc. ("Oakwood") is a Michigan corporation with its principal place of business located at 23400 Michigan Avenue, Dearborn, Michigan 48124. Oakwood owns and operates hospitals within the Detroit MSA including Oakwood Annapolis Hospital, a 259 bed hospital located at 33155 Annapolis Street, Wayne, Michigan 48184; Oakwood Heritage Hospital, a 233 bed hospital located at 10000 Telegraph Road, Taylor, Michigan 48180; Oakwood Hospital & Medical Center, a 632 bed facility located at 18101 Oakwood Blvd, P.O. Box 2500, Dearborn, Michigan 48124; and Oakwood Southshore Medical Center, a 183 bed hospital located at 5450 Fort Street, Trenton, Michigan 48183. In 2005, Oakwood recorded $2.0 billion in gross revenues and $902 million in total operating revenues. *See* http://www.oakwood.org/About/about_detail.asp?ContentId=272. Oakwood employs approximately 1,500 RNs through these hospitals.

17. Defendant McLaren Health Care Corp ("McLaren") is a Michigan Corporation located at G-3255 Beecher Rd. Flint, MI 48532. McLaren operates hospitals throughout the state of Michigan. In approximately July of 2006, McLaren merged with Mount Clemens General Hospital, now known as Mount Clemens Regional Medical Center ("Mount Clemens"). Mount Clemens is located at 1000 Harrington Street, Mount Clemens, Michigan 48043. Mount Clemens is a 288 bed facility and employs over 300 RNs.

## *CO-CONSPIRATORS*

18. Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

## CLASS ACTION ALLEGATIONS

19. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the Detroit MSA as an RN at any time from December 12, 2002 until the present.

20. Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants. As of 2005, there were at least thousands of full-time-equivalent RNs employed by the defendant hospitals and their co-conspirators during the aforementioned Class period. Thus, the Class is so numerous that joinder of all Class members is impracticable.

21. Questions of law and fact that are common to Plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a. Whether Detroit-area hospitals, including defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b. Whether the alleged conspiracy has been effective in depressing RN compensation;

c. Whether Detroit-area hospitals, including defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d. Whether defendants and the other Detroit-area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e. Whether the exchange of such information suppressed competition among Detroit-area hospitals in the compensation of RN employees, and depressed the compensation paid to such employees; and

  f.  The formula and data for estimating the amount by which Class members' compensation was depressed.

22. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, like all Class members, are RNs who have been employed by one or more of the Detroit-area hospitals during the Class period and have been damaged by the unlawful conduct alleged herein. Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

23. Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members. There are no material conflicts between Plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for Plaintiffs are experienced in antitrust class actions, and will vigorously assert Plaintiffs' claims and those of the other Class members.

24. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

### *INTERSTATE TRADE AND COMMERCE*

25. Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Michigan.

26. Each defendant named herein compensates the RNs it employs within the Detroit MSA in part with funds provided by insurance carriers and other health care providers that are located in states other than Michigan. These carriers and providers render payments to each named defendant by mailing funds across state lines.

27.     Each defendant named herein also compensates the RNs it employs within the Detroit MSA in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

28.     The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Detroit MSA Hospital RN Market

29.     The Detroit MSA is comprised of Detroit, Michigan, Warren, Michigan, Livonia, Michigan and their immediately surrounding towns and cities.

30.     Hospitals in the Detroit MSA employ approximately ten thousand full-time-equivalent RNs.

31.     This market is heavily concentrated. The named defendants employ approximately 55 % of the hospital RNs in the Detroit MSA.

### Conspiracy to Suppress RN Compensation

32.     Beginning before November 2002 and continuing to the present, defendants have conspired with each other and with other Detroit-area hospitals to depress the compensation paid to RNs employed at hospitals within the Detroit MSA.

33.     In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

a.      Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

b.      Agreeing not to compete, and not competing, with each other in the setting or RN employee compensation;

c.  Paying RN employees at the same or nearly the same rate as each other; and

d.  Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

34. In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

35. Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned and/or surveyed each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. These information exchanges have increased in frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year. Hospital administrators in the Detroit MSA have used this information to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

36. Several of the defendants and their co-conspirators conducted informal surveys of other hospitals in order to determine what wages those entities were providing to RNs.

37. Several of the defendants and their co-conspirators retained consultants such as Watson Wyatt Worldwide and Sullivan, Cotter and Associates, Inc. to conduct surveys of other hospitals in order to determine what wages those entities were providing to RNs.

38. Hospitals that cooperated in compiling these consultants' surveys would receive free copies of reports commissioned by their supposed rival hospitals.

39. The Michigan Health and Hospital Association ("MHA") releases periodic reports relating to benefits and salaries of Detroit areas hospitals, and the human resource departments of several of the defendants and their co-conspirators obtain and review these reports. Human resources employees can readily identify each surveyed hospital from identifying information contained therein including identification of the number of beds

provided for each listed hospital. Hospital administrators in the Detroit MSA have used this information to set RN compensation.

40.  Hospital recruiters and other hospital human resource personnel of the defendants and their co-conspirators met periodically in both formal and informal settings to discuss and exchange wage information for RNs in the Detroit area.

41.  Hospital recruiters attended meetings of various organizations in the Detroit area at which current wage information is shared. One example is the Health Care Recruiters Associations of Metro Detroit ("HCRAMD"). According to the HCRAMD website, since "the early 80's a group of Nurse Recruiters from local hospitals in the metropolitan Detroit area began meeting on a regular basis to share information and offer support and direction to each other. . . . Today, HCRAMD functions with over 50 members from 32 facilities", and meetings are held monthly. http://hcramd.hodes.com/index.asp. Hospital recruiters and administrators in the Detroit MSA exchanged wage information for RNs in the Detroit area, and used this information to set RN compensation.

42.  Through HCRAMD, defendant hospitals and other unnamed conspirators agreed that it would be in the interests of HCRAMD members to limit the use of recruitment incentives, such as sign-on bonuses, because such incentives financially hurt hospitals and led to "churning" of their nurses.

43.  Nurse wage data was also shared at meetings of the Michigan Organization of Nurse Executives ("MONE").

44.  During the class period, hospitals within the Detroit MSA have paid very similar RN compensation.

45.  Defendants' unlawful conspiracy has had the following effects, before and after the Class period:

a. Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Detroit area has been restrained;

b. Compensation for hospital RN employees in the Detroit MSA has remained at artificially low levels; and

c. Detroit area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

46. Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the U.S. Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and morality rates. Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to achieve it – they have not offered RNs competitive wages.

### *Injury to Plaintiffs and the Class*

47. During the Class Period (and before), plaintiff has suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I:
### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF
### SECTION 1 OF SHERMAN ANTITRUST ACT

48. Plaintiffs re-allege the allegations in paragraphs 1-47 as if set forth fully herein.

49. Beginning before November 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Detroit MSA, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

50. Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the Detroit MSA at artificially low levels.

51. As a result of the unlawful conspiracy alleged in this Count, Plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## COUNT II
## CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

52. Plaintiff re-alleges the allegations in paragraphs 1-51 as if set forth fully herein.

53. Beginning before November 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

54. This information-exchange agreement has reduced competition among Detroit-area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

55. The relevant geographic market for the claim alleged in this Count is the Detroit MSA, and the relevant service market consists of the services provided to hospitals by RN employees.

56. A slight decrease in RN compensation from a competitive level could be imposed collectively by the hospitals in the Detroit MSA without causing too many RNs to move to non-hospital employers within the Detroit MSA or to employers outside the Detroit MSA.

57. RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

58. Hospital RNs possess unique skill sets and gain industry-specific and employer-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers. As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge. Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

59. Detroit-area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Detroit MSA, but not about compensation paid to non-hospital RNs or RNs working outside the Detroit MSA. Detroit-area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Detroit area.

60. Defendants collectively have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

61. The information-exchange agreement has had the effect of suppressing competition among Detroit-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

62. The information regularly exchanged by Detroit-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

63. Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

64. The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages. With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

65. The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and

their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

66.     For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

67.     As a result of the unlawful agreement alleged herein to exchange RN compensation information, Plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## *PRAYER FOR RELIEF*

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.     The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. § 15(a);

D.     Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded post-judgment interest at the highest legal rate from and after the date of service of this Complaint;

E.     Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.      Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

STEPHEN F. WASINGER PLC

By: /s/ *signature*

Stephen Wasinger (P25963)
300 Balmoral Centre
32121 Woodward Avenue
Royal Oak, MI 48073
Tel: (248) 554-6300
sfw@sfwlaw.com

Co-Counsel for Plaintiffs

Mark A. Griffin
Raymond Farrow
KELLER ROHRBACK L.L.P.
1201 Third Ave., Suite 3200
Seattle, WA 98101
206) 623-1900

Charles P. Tompkins
COHEN MILSTEIN HAUSFELD & TOLL PLLC
1100 New York Avenue, NW,
Suite 500, West Tower
Washington D.C. 2005
(202) 408-4600

David P. Dean
JAMES & HOFFMAN
1101 17th Street, NW
Suite 510
Washington, DC 20036-4748
(202) 496-0500

Co-Counsel For Plaintiffs

Dated: December 13, 2006
KH091606

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: Wayne

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

## I. (a) PLAINTIFFS

PAT CASON-MERENDO and JEFFREY A. SUHRE

## DEFENDANTS

DETROIT MEDICAL CENTER, HENRY FORD HEALTH SYSTEM, MCLAREN HEALTH CARE CORP, ST. JOHN HEALTH PARTNERS, OAKWOOD HEALTH

(b) County of Residence of First Listed: Wayne

26163

County of Residence of First Listed: Wayne

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(C) Attorney's (Firm Name, Address, and Telephone Number)

Stephen Wasinger (P25963)
300 Balmoral Centre, 32121 Woodward Ave,
Royal Oak, MI 48073        (248) 554-6306

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PLA | DEF | | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury-Med. Malpractice | ☐ 620 Other Food & Drug | | [X] 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21: 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC |
| ☐ 150 Recovery of Overpayment and Enforcement of Judgment | ☐ 320 Assault Libel And Slander | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 368 Asbestos Personal Injury Product Liability | | | ☐ 470 Racketeer Influenced & ...tions |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 330 Federal Employers' Liability | | | vice |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 340 Marine / **PERSONAL PROPERTY** | | | modities/ |
| ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | Case: 2:06-cv-15601 | | allenge |
| ☐ 190 Other Contract | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | Assigned To: Rosen, Gerald E | | |
| ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | Referral Judge: Majzoub, Mona K | | Acts |
| | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | Filed: 12-15-2006 At 08:37 AM | | bilization Act |
| | | cmp CASON-MERENDO, ET AL V DETROIT | | Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | MEDICAL CENTER, ET AL (TAM) | | ation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / Habeas Corpus: | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights / ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multi district Litigation
- [ ] 7 Appeal to District Judge from Magistrate

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Complaint for violations of the Sherman Act, 15 U.S.C. Section 1 for conspiracy to depress compensation of registered nurses employed by the conspiring hospital

## VII. REQUESTED IN COMPLAINT:

[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$ DEMAND Greater than $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE

DOCKET NUMBER

DATE: December 12, 2006

SIGNATURE OF ATTORNEY OF RECORD: /s/ Wasinger

4110

...SUANT TO LOCAL RULE 83.11

1. Is this a case that has been previously dismissed?  ☐ Yes  ☒ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)  ☐ Yes  ☒ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____

Notes :