UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA, et al.,

    Plaintiffs,

v.

DETROIT MEDICAL CENTER, et al.,

    Defendants.

_____/

CIVIL ACTION NO. 06-15601

DISTRICT JUDGE GERALD E. ROSEN

MAGISTRATE JUDGE DONALD A. SCHEER

## ORDER

    Plaintiffs' Motion to Declare Attorney-Client Privilege Inapplicable to, or to Have Been Waived With Respect to, Document HFHS 0028705-706 was referred to the undersigned magistrate judge for hearing and determination. The parties appeared, by counsel, for hearing on September 9, 2008. Having reviewed Plaintiffs' Motion, together with Defendants' Response and Plaintiffs' Reply, and having heard the arguments of counsel, I find that the Motion should be denied.

    The Plaintiffs in this antitrust class action allege that the eight Defendant hospital systems have conspired to depress the compensation paid to registered nurses employed at Detroit area hospitals. The allegations specifically include a claim that the Defendants have conspired to share compensation information about their nurse employees. The document to which the instant Motion is addressed is a memorandum, dated August 25, 2003, from David Lee, in-house counsel for the Henry Ford Health System ("HFHS"), to three HFHS employees: Robert Riney (Senior Vice-President, Chief Human Resources Officer, Corporate Administrator), Diana Parkinson-Tripp (Vice-President, Compensation), William Peterson (Vice-President, Employee and Labor Relations), and John Hayden (Vice-

President, Organizational Development and Chief Learning Officer). Copies of the memorandum were also directed to three other HFHS in-house attorneys (Schlenberg, Berent and O'Connor). The first sentence of the memorandum ("Lee Memo") declares that its purpose is to direct the addressees' attention to potential anti-trust exposures of which the author had recently become aware. Mr. Lee explained that, during the discovery process in a certain class action litigation, unrelated to the instant case, in which HFHS and Beaumont Hospitals shared outside counsel under a joint defense arrangement, outside counsel had found several documents at Beaumont that summarized compensation rates at local health provider institutions for various employment positions in the medical field. Mr. Lee wrote that he had been told that the information was compiled by Beaumont and other providers through telephone conversations with counterparts at competing institutions, and/or through written surveys. He opined that the sharing of information in that manner was problematic from an antitrust prospective, and created a risk of enforcement action by the Department of Justice and/or the Federal Trade Commission. The memorandum explained that those institutions had jointly issued guidance regarding the sharing of price and compensation information among competing health care providers. The Lee Memo described an "antitrust safety zone", and summarized conditions under which health care providers could share information without violating federal law. Mr. Lee expressed his legal opinion regarding HFHS's information gathering methods and its compliance with safety zone requirements. He suggested that the addressees should meet with him to further discuss that subject matter.

    In the course of discovery in this action, HFHS produced to Plaintiffs a 289 page document entitled "2003 Compensation Manual" which had been assembled by Linda

Licus, a Senior Compensation Consultant employed by HFHS in its compensation department. Licus was responsible for nurse compensation at Henry Ford. A copy of the Lee Memo was included at page 158 of the Licus compensation manual. Across the top of the copy appeared the words "Confidential Memorandum Attorney-Client Work Product."

Plaintiffs discovered the copy of the Lee Memo while reviewing the documents produced by Defendants. Plaintiffs wrote to counsel for HFHS on June 3, 2008 to alert them that they had produced the memo during discovery. On June 5, 2008, counsel for HFHS responded, asserting that the memo "is protected under the attorney-client privilege, and that it was inadvertently produced." HFHS's counsel requested that the document be returned pursuant to a "claw back" provision in the Protective Order governing this case, and that Plaintiffs make no use it for any purpose in this litigation. Plaintiffs object to the HFHS request, and filed the instant Motion in conformity with the Protective Order.

The burden of establishing the existence of the privilege rests with the person asserting it. See In Re: Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 450 (6th Cir. 1983). Generally, the "attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties." In Re: Grand Jury Proceedings October 12, 1995, 78 F.3d 251, 254 (6th Cir. 1996). A client may waive the privilege by conduct which implies a waiver of the privilege or a consent to disclosure. United States v. Dakota, 197 F.3d 821, 825 (6th Cir. 1999) (citing In Re: VonBulow, 828 F.2nd 94, 104 (2nd Cir. 1987)).

Plaintiffs offer three arguments in support of their Motion to Declare Attorney-Client Privilege Inapplicable to the August 25, 2003 Memorandum. First, they claim that the document reveals no client confidences. Second, they assert that the document does not

3

constitute legal advice. Finally, they contend that any attorney-client privilege protection to which the document may have been entitled was waived by: (a) its voluntary disclosure by HFHS; and/or (b) its dissemination to employees with no decision making authority for the subject matter to which it pertains.

It is a generally accepted proposition that confidential communications of legal advice from an attorney to his client are within the attorney-client privilege, so as to minimize the risk of betraying privileged client communications to which the advice pertains. Commentators discussed two lines of authority on the level of protection afforded to attorney communications. Some courts apply a strict construction which affords protection only to the extent that the legal opinion expressed contains the confidential matter revealed in confidence by the client in seeking the opinion. A second line of authority embraces a more liberal rule which affords privilege protection to attorney communications containing legal advice to the client, regardless of whether it expressly reveals client confidences. See Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine (5th Ed. 2007) Volume 1, Pages 76-86.

> The broader application of the privilege to attorney communications is consistent with the concept that the purpose of the privilege is to encourage *two-way* communication in the context of an attorney-client relationship. Under this broader view of the privilege, it is just as important that a client receive candid legal advice as it is desirable that a client be forthcoming with the lawyer. Indeed, the very purpose of encouraging the client to be forthcoming is *so that* the client may receive candid legal advice. Accordingly, under the broader view, both kinds of communications are protected from disclosure - a client's communication to an attorney and an attorney's communication to the client.

Id., at Page 82. I conclude that the broader interpretation best serves the principle upon which the attorney-client privilege is based. That view was adopted by this court in Schenet v. Anderson, 678 F.Supp. 1280 (E.D. Mich. 1988) in which Judge Duggan asserted that "[a]n attorney's communications to a client may also be protected by the privilege, to the extent that they are based on or contain confidential information provided by the client, or legal advice or opinions of the attorney. 678 F.Supp. at 1281 (emphasis added). See also, Amway v. Proctor and Gamble Co., No. 1: 98cv726, 2001 U.S. Dist. LEXIS 4561, at *17 (W.D. Mich. Apr. 3, 2001).

Based upon my review of the Lee Memo, I am satisfied that it constitutes the communication of legal advice from the attorney author to management level agents of his corporate client. The declared purpose of the memo was to bring the client's attention to "potential antitrust exposures." Mr. Lee presented a brief factual basis for his concerns, a general explanation of the legal restrictions on information gathering, his assessment of the client's information gathering methods vis-a-vis those requirements, and a suggested course of action to address any shortcomings. In my view, the challenged memorandum is, in its entirety, the communication of legal advice from an attorney to his client.

In Schenet, Judge Duggan determined that an attorney's communication to a client is entitled to privilege protection not only to the extent that they contain legal advice or opinions of the attorney, but also "to the extent that they are based on or contain confidential information provided by the client . . .." 678 F.Supp. at 1281-82. HFHS maintains that the Lee Memo satisfies this alternative criteria as well. HFHS asserts that the challenged document was based upon a memorandum received by Mr. Lee from McDermott, Will and Emery ("MWE"), a lawfirm then acting as outside counsel for both

5

Henry Ford and Beaumont under a joint defense arrangement in an unrelated litigation. The MWE memorandum, dated August 12, 2003, was submitted to the court for *in camera* examination. Based upon that review, I find that the MWE memorandum is expressly based, in substantial part, upon information provided to the authors by John Hayden, in his capacity as Vice-President of Human Resources and former Medical Education Administrator for Henry Ford Health Systems. It is well established that a privileged disclosure by a client to an attorney is not stripped of such protection by communication of it among attorneys jointly representing the client. Natta v. Zletz, 418 F.2d 633, 637 n.3 (7th Cir. 1969); Cedrone v. Unity Sov. Ass'n, 103 F.R.D. 423, 429 (E.D. Pa. 1984). I am satisfied that the Lee Memo was based on confidential information provided by HFHS, through its agent, to MWE for the purpose of securing legal advice. Accordingly, I conclude that attorney-client privilege attaches to both the Lee Memo and the August 12, 2003 memo from MWE to Mr. Lee.

As I have concluded that the Lee Memo qualifies for attorney-client privilege protection, the question becomes whether or not the facts and circumstances surrounding its production by HFHS warrants a finding that the privilege has been waived. In deciding that issue, I accept Plaintiffs' position that, once disclosure of attorney-client communications has been made, "[t]he proponent of the privilege then must not only prove the disclosure was inadvertent but also has a burden of persuading the court that the privilege has not been waived." Plaintiffs' Brief, Page 12 (quoting Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc., 116 F.R.D. 46, 50 (M.D. N.C. 1987)).

**Voluntary Disclosure**

It is undisputed that HFHS produced the Lee Memo to Plaintiffs on November 5, 2007, in response to Plaintiffs' Request for Production of Documents. Plaintiffs assert that 3,241 documents (24,888 images) were produced on that date as part of a rolling document production. While the production was voluntary, Plaintiffs do not seriously contend that the Lee Memo was purposefully produced. Rather, the parties appear to agree that the production of the contested document was inadvertent.

Three distinguishable lines of authority have emerged in connection with the careless or inadvertent disclosure of privileged materials. See Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine (5th Ed. 2007). Commentators describe a traditional approach of "strict accountability" under which a careless or inadvertent disclosure was invariably determined to be a permanent waiver of the attorney-client privilege protection. See In Re: Sealed Case, 877 F.2nd 976, 980 (Fed. Cir. 1989); Ares-Serono, Inc. v. Organon Int'l B.V., 160 F.R.D. 1, 4 (D. Mass. 1994).

A few courts have taken a far more lenient approach, holding that an inadvertent disclosure in the absence of gross negligence would not constitute a waiver of the privilege. Such courts maintain that a waiver of attorney-client privilege may exist only through the client's knowing and intentional surrender of the privilege, and never by simple inadvertence. See Gray v. Bicknell, 86 F.3d 1472, 1483 (8th Cir. 1996); Kansas-Nebraska Natural Gas Co., Inc. v. Marathon Oil Co., 109 F.R.D. 12, 21 (D. Neb. 1983). The Court of Appeals of Michigan has adopted this approach in at least two decisions. Franzel v. Kerr Mfg. Co., 234 Mich.App. 600, 600 N.W. 2nd 66 (1999); Sterling v. Keiden, 162 Mich.App. 88, 412 N.W. 2nd 255 (1987).

A third, intermediate approach has developed, under which a court renders a determination regarding waiver upon an evaluation of the facts of the particular case in light of certain analytical factors. This court, (Judge Borman) has adopted the intermediate approach, based upon the factors of: (1) the reasonableness of the precautions taken in view of the extent of document production; (2) the number of inadvertent disclosures; (3) the magnitude of the disclosures; (4) any measures taken to mitigate the damage of the disclosures; and (5) the overriding interests of justice. <u>Grace Community Church v. Lenox Township</u>, 06-13526, 2007 U.S. Dist. LEXIS 64987 (E.D. Mich. August 31, 2007). I am persuaded that the intermediate, fact driven approach to determining the existence of waiver is appropriate in this case.

### 1. **Precautionary Measures**

Plaintiffs offer a number of arguments in support of their position that HFHS failed to employ adequate precautionary measures to prevent inadvertent disclosure of privileged materials. They declare that the two page memorandum in issue was one of only 3,241 documents (24,888 images) produced on November 7, 2007. They assert that Defendant was not under any time pressure, and could have taken greater care to avoid inadvertent disclosure of privileged documents. Plaintiffs note that the document in question was marked as privileged material, and should have been recognized as such. They point out that the Lee Memo was intermingled with non-privileged documents, suggesting a lack of care, and that it was transmitted to Plaintiffs' counsel by Defendant's attorneys, and thus was not produced through a "clerical error."

HFHS, in response, emphasizes that the parties negotiated a protective order containing a clawback provision, in anticipation of the inadvertent production of privileged

8

documents. (See Docket Entry 61). The Order provides that a party who inadvertently produces a document which it has good reason to believe is protected by attorney-client privilege may request the return of the document. Defendant observes that the Advisory Committee Note regarding the 2006 amendment of Fed.R.Civ.P. 16 emphasizes that parties may agree that privileged information inadvertently produced may be recovered without waiver of the protection. The note states that "[i]n most circumstances, a party who receives information under such an arrangement cannot assert that production of the information waived a claim of privilege . . .." I conclude that the Stipulated Protective Order entered in this case evidences the parties mutual intent that inadvertent production of privileged matter would not constitute a waiver.

HFHS further responds to Plaintiffs' arguments by pointing out that it reviewed approximately 3.7 million pages of documentation, and produced approximately 1.4 million pages to Plaintiffs in fulfilling its discovery obligations. Defendant declares that it implemented a four step screening protocol to ensure against the disclosure of privileged matter. That protocol is described in the Response Brief. HFHS contests the proposition that it was under no time constraints by emphasizing the vast amount of documentary evidence which it was required to examine within the discovery deadlines imposed by the court. On balance, I conclude that Defendant took reasonable precautions to protect itself from the disclosure of privileged materials, and that the inadvertent disclosure of a single document should not be viewed as a waiver of the attorney-client privilege.

### 2. Number of Inadvertent Disclosures

The moving Plaintiffs concede that the Lee Memo is the only allegedly privileged document that has been inadvertently disclosed to this point. HFHS rightly observes that,

when the production is large and the number of inadvertent disclosures is small, such facts militate against a finding of waiver.  See FDIC v. Ernston Whinney, 137 F.R.D. 14, 17 (E.D. N. Tenn. 1991) (no waiver when 22 privileged documents disclosed among 2.3 million pages).  Under the facts of the instant case, I conclude that the inadvertent production of two pages out of 3.7 million pages reviewed, and 1.4 million pages produced, is a testament to the overall effectiveness of Defendant's screening protocol.  HFHS also notes that three additional copies of the Lee Memo were found and protected during the pre-productions screening.  In my view, these facts strongly support Defendant's position.

### 3. Magnitude of Inadvertent Disclosure

Plaintiffs argue that the disclosure in this case was "complete" as the entire Lee Memo was produced without redactions.  They cite case law for the proposition that, when disclosure is complete, "a court order cannot restore confidentiality and, at best can only attempt to restrain further erosion . . . [but] such an order requires a very strong showing with respect to the other factors . . .."  Parkway Gallery Furniture Co. Inc. v. Kittenger/Pennsylvania House Group, Inc., 116 F.R.D. 46 (M.D. N.C. 1987).

HFHS counters that Plaintiffs misapprehend the legal standard underlying the magnitude of disclosure factor.  They maintain that adoption of Plaintiffs' view would eviscerate the doctrine of inadvertent disclosure, since the production of an entire document would, in every case, weigh in favor of the receiving party.  Defendant maintains that the magnitude of disclosure factor actually "'analyzes how integrated the disputed documents have become in the litigation' and whether the parties and the courts have relied on them."  Defendant's Brief, Page 22 (citing Nilavar v. Mercy Health Sys. - W. Ohio, No. 3:99cv612, 2004 U.S. Dist. LEXIS 30531 (S.D. Ohio Mar. 22 2004)).  Defendant's

10

contend that, as Plaintiffs have not shown that the Lee Memo has been exposed to witnesses, or otherwise integrated into the fabric of this case, the magnitude of disclosure is not great, and the court should uphold the attorney-client privilege. They cite In Re: Grand Jury Investigation, 142 F.R.D. 276, 281 (M.D. N.C. 1992).  In that case, the disclosure under consideration was "complete" in the sense that the documents had been turned over in their entirety to an investigator for the government.  The court observed, however, that the reason for consideration of the extent of disclosure factor was to determine "whether any meaningful confidentiality can be restored."  Citing Hartford Fire Ins. Co. v. Garvey, 109 F.R.D. 323, 330 (N.D. Cal. 1985), the court explained that the "focus [is] on whether there still exists sufficient confidentiality that the court can preserve the privileged nature of the documents despite the disclosure." The judge determined that, although the documents were known to the government investigator, they had not been shown to witnesses or experts and, thus, had "not worked their way into the fabric of the case." He distinguished his case from In Re: Grand Jury Investigation of Ocean Transport, 604 F.2d 672 (D.C. Cir.), cert. denied, 444 U.S. 915 (1979) where the Court of Appeals found that it would be "unfair and unrealistic" to find privilege where the documents had been used by the government for several years and the Grand Jury was familiar with them.

In the case at bar, Plaintiffs have made no use of the Lee Memo.  In fact, they were precluded from doing so by the terms of the Stipulated Protective Order.  Presumably, therefore, the Lee Memo has been exposed only to Plaintiffs' attorneys.

> Of course, the minds of the . . . attorney and investigator cannot be expunged, but the documents can be protected from becoming, in themselves, evidence in the case.  The restoration of privilege that would be effected by a court order would not be meaningless or an empty gesture.  In the court's

11

>   evaluation, this factor, the extent of disclosure, does not compel a finding of waiver if other factors weigh in favor of non-waiver.

In Re: Grand Jury Investigation, 142 F.R.D. at 281.  In my view, the facts of the instant case warrant a finding that no waiver occurred.

### 4. Mitigation of Damage

Plaintiffs observe that HFHS took no steps to discover or mitigate the effect of its inadvertent disclosure of privileged communications until the disclosure was brought to their attention by Plaintiffs, almost seven months later.  Movants rely upon my opinion in McGee v. Parker Hannafin Corp., 2007 U.S. Dist. LEXIS 77427, which they claim presented a similar factual situation.

In response, HFHS notes that it took immediate action to protect its privileged materials after learning of their inadvertent disclosure.  Defendant maintains that McGee is inapposite, as the defendant in that case produced confidential materials long before any litigation commenced, only to realize its error when the Plaintiff attached privileged communications to her Complaint.  HFHS argues that, unlike the defendant in McGee, it negotiated a Protective Order containing a clawback provision early in the case, and aggressively pursued its rights under that agreement immediately upon receiving notice of its mistake.

I find that the Defendant has the stronger argument.  While there was no evidence of a mitigation effort in McGee, HFHS took affirmative action to mitigate any damage resulting from inadvertent disclosure of confidential materials by negotiating a Protective Order containing provisions for the return of such materials.  To their credit, Plaintiffs carefully observed the terms of that Order.  Plaintiffs offered no suggestion as to what

additional mitigation efforts Defendant should have undertaken.  As stated above, I find that the inadvertent disclosure of a single document among 1.4 million pages of discovery production suggests a substantial effort to protect confidential information.  The negotiation of the Protective Order was a clear and timely effort to ensure the protection of attorney-client communications for all parties to this case.  I find for the Defendant on this issue.

### 5. Interests of Justice

Plaintiffs contend that fairness considerations weigh in favor of a finding of waiver in this case because the Lee Memo "goes to the very heart of the claims" in the Complaint.  I certainly agree that, stripped of its privileged character, the contested document could prove valuable to Plaintiffs in proving their claims.  That circumstance, however, is typical in cases involving the inadvertent disclosure of confidential communications.  In my view, the value of such material to the receiving party is not, in itself, an appropriate basis for a finding of waiver.

Defendant cites United States ex rel Bagley v. TRW, Inc., 204 F.R.D. 170 (C.D. Cal. 2001) for the proposition that "a party to whom privileged documents are produced inadvertently . . . has no inherent 'fairness' interest in keeping them, unless the producing party waited so long to address the problem after having been informed of it that the receiving party reasonably changed its position in reliance upon their continued availability."  I agree with that position.  HFHS emphasizes that the Lee Memo has not been used by Plaintiffs in the instant case, by reason of the Protective Order provisions.  In the absence of evidence that the document has been so "woven into the fabric of the case," I conclude that a finding of waiver is not in order.

13

**Improper Disclosure Within HFHS**

Plaintiffs argue that HFHS's dissemination of the Lee Memo to employees with no decision making authority for the subject matter of that document warrants a finding of waiver of the attorney-client privilege. They note that the document was disseminated to persons other than the addressees. In particular, the copy which was inadvertently disclosed to Plaintiffs was in the custody of Linda Licus, a senior compensation analyst with no managerial responsibilities or decision making authority. Plaintiffs argue that Ms. Licus had no need to know the specific contents of the document in issue. They maintain that "the crux of the information contained in the [Lee Memo] easily could have been passed on to a compensation analyst like Ms. Licus without passing on the memorandum itself." They suggest that HFHS could have issued a simple policy statement dictating the procedures to be followed in sharing compensation information.

Defendant HFHS rejects the proposition that attorney-client privilege is limited to communications from an attorney to corporate employees with managerial responsibilities or decision making authority. They cite the Supreme Court's opinion in Upjohn Company v. United States, 449 U.S. 383 (1981), as a rejection of the "control group test." Upjohn dealt with communications from corporate employees to corporate counsel. In that context, the court observed that:

> [i]n the corporate context, . . . it will frequently be employees beyond the control group as defined by the court below - "officers and agents . . . responsible for directing [the company's] actions in response to legal advice" - who will possess the information needed by the corporation's lawyers. Middle level - and indeed lower-level - employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed

14

>by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.

449 U.S. at 391.  The court observed that the attorney-client privilege "exists to protect . . . the giving of professional advice to those who can act on it."  Id., at 390.

Although the instant case involves a communication <u>from</u> corporate counsel <u>to</u> the client corporation, the principle remains the same.  The "control group" employees to whom the Lee Memo was addressed permitted it to be forwarded to Licus, a non-managerial employee.  Defendant, however, contends that Licus had a "need to know" the antitrust compliance advice contained in the document.  There is support in the record for that contention.  Licus is responsible for making recommendations to management concerning the pay structure and rates for nurses.  She prepares draft wage step structures on an annual basis for review by Henry Ford's Chief Nurse Executive Counsel.  One of several data sources analyzed in making those recommendations is published survey data.  (Licus Declaration, Paragraphs 4, 11).  The Lee Memo contains legal advice regarding the manner in which such data should be gathered in order to avoid antitrust restrictions.  The copy of the Memo which was inadvertently produced to Plaintiffs had been part of a compensation manual maintained and utilized by Licus.  There is no evidence that the manual was available to any other person. That Henry Ford management personnel would forward the advice of its counsel to subordinate employees in a position to employ the advice contained in the performance of their assigned duties is, in my view, fully consistent with the purposes underlying the attorney-client privilege.  In the absence of evidence of abuse of that privilege, I find no basis upon which to conclude that a waiver occurred by reason of Licus' possession of the memorandum.

My conclusion is the same with respect to the other compensation department employees who received the Lee Memo (Parkinson-Tripp, Harland and Lumetta).  I am satisfied that each recipient had a "specific authority for the subject matter of the legal advice," and a responsibility to apply the advice rendered by Mr. Lee.  See Wrench LLC v. Taco Bell Corp., 212 F.R.D. 514, 517 (W.D. Mich. 2002).

### Conclusion

The Supreme Court, in Upjohn, determined that the scope of attorney-client privilege is best accomplished on a case by case basis.  Based upon my assessment of the facts of the instant case, I am satisfied that HFHS did not waive its attorney-client privilege by its inadvertent production of the Lee Memo, or by its dissemination of that document to non-management custodians whose duties involved the application of the advice contained in it.  It is important to note, as did the Court in Upjohn, that the attorney-client privilege only protects disclosure of communications, and it does not protect the underlying facts known independently by those to whom the attorney-client advice was disseminated.  While I find that the copy of the Lee Memo inadvertently produced to Plaintiffs must be returned, in accordance with the Stipulated Protective Order, nothing in my ruling serves to preclude Plaintiffs' inquiry into the underlying facts of Defendants' participation in wage surveys or other exchanges of wage data..


For all of the above reasons, Plaintiffs' Motion to Declare Attorney-Client Privilege Inapplicable to, or to Have Been Waived With Respect to Document HFHS 0028705-706 is denied.

        s/Donald A. Scheer
        DONALD A. SCHEER
        UNITED STATES MAGISTRATE JUDGE

DATED: February 24, 2009

_____

## CERTIFICATE OF SERVICE

I hereby certify on February 24, 2009 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on February 24, 2009: **None.**

        s/Michael E. Lang
        Deputy Clerk to
        Magistrate Judge Donald A. Scheer
        (313) 234-5217