UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA and JEFFREY A.
SUHRE on behalf of themselves and others
similarly situated,

                             Plaintiffs,

       v.

DETROIT MEDICAL CENTER, HENRY
FORD HEALTH SYSTEM, MOUNT
CLEMENS GENERAL HOSPITAL, INC., ST.
JOHN'S HEALTH, OAKWOOD
HEALTHCARE, INC., BON SECOURS
COTTAGE HEALTH SERVICES, WILLIAM
BEAUMONT HOSPITAL d.b.a. BEAUMONT
HOSPITALS, and TRINITY HEALTH CORP.,

                            Defendants.

Case No. 06-15601

Hon. Gerald E. Rosen

Magistrate:  Donald A. Scheer

**PLAINTIFFS' MOTION TO STRIKE IMPROPER EXPERT OPINION EVIDENCE
PROFFERED BY DEFENDANT DETROIT MEDICAL CENTER.**

Plaintiffs move this Court to strike from Detroit Medical Center's Memorandum in
Support of Motion Seeking Deferral Of Plaintiffs' Motions For Preliminary Approval Or, At A
Minimum, Deferral Of Class Notice (Dkt No. 642), its Memorandum in Support of Motion for
Summary Judgment (Dkt. No. 358), and from its Reply in support of that motion (Dkt No. 504)
improper expert economic analysis presented without any support from any of Defendants' three
purported economic experts or any other basis for admissibility.  Specifically, Plaintiffs move to
strike one sentence on page 5 of DMC's Memorandum in Support of its Motion to Defer, Section
VII (D), pages 35-37, of DMC's Memorandum in Support of its Motion, and Section IV(B)(1)

(except two paragraphs and one diagram which merely present Prof. Rubinfeld's analysis), pages 20-24 of DMC's Reply.

DATED:  December 21, 2009

Respectfully submitted:

**KELLER ROHRBACK L.L.P.**

By:   /s/  Raymond J. Farrow
Mark A. Griffin
Raymond J. Farrow
Tana Lin
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1200 (Telephone)
(206) 623-3384 (Facsimile)

Daniel A. Small
Sharon K. Robertson
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.,
Suite 500 West
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

David P. Dean
Emilie S. Kraft
JAMES & HOFFMAN
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

Stephen Wasinger
STEPHEN F. WASINGER PLC
26862 Woodward Avenue, Suite 202
Royal Oak, MI 48067
Tel:  248-544-5100
Fax: 248-479-0391
Email:  sfw@sfwlaw.com

Arnold Levin
Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Daniel E. Gustafson
Brian Williams
GUSTAFSON GLUEK PLLC
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| PAT CASON-MERENDA and JEFFREY A. SUHRE on behalf of themselves and others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>DETROIT MEDICAL CENTER, HENRY FORD HEALTH SYSTEM, MOUNT CLEMENS GENERAL HOSPITAL, INC., ST. JOHN'S HEALTH, OAKWOOD HEALTHCARE, INC., BON SECOURS COTTAGE HEALTH SERVICES, WILLIAM BEAUMONT HOSPITAL d.b.a. BEAUMONT HOSPITALS, and TRINITY HEALTH CORP.,<br><br>       Defendants. | Case No. 06-15601<br><br>Hon. Gerald E. Rosen<br><br>Magistrate:  Donald A. Scheer |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
TO STRIKE IMPROPER EXPERT OPINION EVIDENCE PROFFERED
BY DEFENDANT DETROIT MEDICAL CENTER**

## **ISSUE PRESENTED**

Should the Court strike proffered evidence regarding expert economic issues presented by Defendant Detroit Medical Center ("DMC") with no basis in the record or support from any of Defendants' multiple economic experts, particularly in light of the fact that Plaintiffs' expert economist, as well as other proposed expert economists, has explained, in un-rebutted testimony, why this analysis fails the standards of economic science?

**Plaintiffs' Answer: Yes**

## <u>TABLE OF CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

**RULES**

- Fed. R. Evid. 602

- Fed. R. Evid. 701

- Fed. R. Evid. 702

- Fed. R. Evid. 201

**OTHER**

- ADVISORY COMMITTEE NOTES TO 2000 AMENDMENTS TO RULE 701.

**CASES**

- *United States v. White*, 492 F.3d 380 (6th Cir. 2007)

- *United States v. Ganier*, 468 F.3d 920 (6th Cir. 2006)

- *Donlin v. Philips Lightning North America Corp.*, 564 F.3d 207 (3d Cir. 2009)

- *Lifewise Master Funding v. Telebank*, 374 F.3d 917 (10th Cir. 2004)

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  STATEMENT OF FACTS .................................................................................3

  A.  The Evidence  At Issue .....................................................................................3

  B.  Expert Testimony Regarding The Unreliability Of This Evidence ...............................4

     1.  BLS Nurse Compensation Data Is A Biased Estimate Of The Level Of Hospital Staff Nurse Wages, As Economists, Including Economists Hired By Defendants In Related Nurse Wage Cases, Recognize..........................5

     2.  City-Specific Price Indexes Are Unreliable and Do Not Account For All The Reasons Wages May Differ As Between Cities............................9

III.  ANALYSIS .......................................................................................................11

  A.  Only Experts Can Offer Testimony Based Upon Material Other Than Personal Knowledge and No Expert Offers or Supports This Testimony.................................11

     1.  Legal Standard. ........................................................................................11

     2.  DMC's Testimony Is Inadmissible. ........................................................12

     3.  DMC's Authorities Presented To Justify Its Economic Analysis *Using* The ACCRA Price Index Are Inapposite And Merely Demonstrate The Index's Unreliability............................................15

  B.  No Judicial Notice May Be Taken Of Unreliable Testimony......................................18

IV.  CONCLUSION .................................................................................................19

## I.  INTRODUCTION

Plaintiffs move to strike certain improper economic analysis – specifically an analysis supposedly comparing nurse pay across certain United States cities without regard to the fact that the measure of nurse pay used for Detroit is completely incompatible with the measure used for other cities -- presented by DMC in its Memorandum in Support of Motion to Defer, its Memorandum in Support of Motion for Summary Judgment (Section VII (D)) and its Reply (Section IV(B)(1)) in Support of Summary Judgment.  While Plaintiffs responded the first time DMC asserted this improper testimony in its motion for summary judgment, DMC has continued to insert this improper evidence in several documents filed thereafter, necessitating this formal motion to strike.[1]  This evidence is improper expert opinion testimony presented by a non-expert witness (indeed not presented by any witness at all but merely by DMC's in-house attorney apparently wishing to act as a witness for DMC).  Hence, the analysis is inadmissible for the purpose of determining whether there are disputed issues of (admissible) fact preventing summary judgment.[2]  Despite retaining three economists in this matter, DMC does not rely upon analysis supported by any of these economists.  Instead DMC invents, without any basis or regard for economic principles, and without regard for any standard governing the admissibility of opinion testimony requiring expert knowledge, its own wayward theories, misusing data,

---

[1] Plaintiffs previously noted their intent to challenge this testimony.  Such a challenge to DMC's Motion to Defer has only recently become ripe, and Plaintiffs' motion as to DMC's various Summary Judgment pleadings is proper any time prior to the date of decision on those motions. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).

[2] This Court can, of course, only consider "facts that would be admissible in evidence" for the purpose of ruling on summary judgment.  Fed. R. Civ. P. 56(e)(1).

relying on unreliable economic principles, and reaching conclusions that have no support in any admissible evidence in this case.

In short, the material presented by DMC is grossly unreliable and inadmissible because: 1) it is not within the personal knowledge of any witness (indeed is not presented by any witness); 2) no expert has approved the validity of the analysis presented; 3) Plaintiffs' expert economist and an economist retained by the *defendants* in two other related nurse wage conspiracy matters have explicitly explained why the material presented by DMC does not represent reliable economics and is based upon unreliable data that does not measure what DMC represents it to measure; and 4) it is not based upon facts "so universally known that they cannot be the subject of dispute."  Notes to 1972 Proposed Rules, Fed. R. Evid 201.  By first presenting most of this material in a Reply brief, DMC apparently hoped to hide these inconvenient facts about DMC's reliance on improper, unreliable, and inadmissible testimony from the Court.  This should not be allowed, and this Court should not consider this inadmissible and unreliable material in ruling on any pending motion in this matter.[3]

---

[3] Had any economist retained by the Defendants presented such grossly unreliable testimony, Plaintiffs' economist would have had an opportunity to respond, and Plaintiffs would have had an opportunity to file a *Daubert* motion.  DMC cannot avoid this by springing unsupported economic analysis on Plaintiffs after discovery, including expert discovery, is closed. Plaintiffs' requested such an opportunity to respond through their experts should this Court grant, over Plaintiffs' objection, Defendants' motion for permission to submit a sur-rebuttal report.  Plaintiffs are certainly entitled to an opportunity to respond to these new expert opinions whether presented by Prof. Rubinfeld in his proposed sur-rebuttal or by DMC in its reply memorandum.

## II.  STATEMENT OF FACTS

### A.  The Evidence At Issue

In a Memorandum in support of its Motion for Summary Judgment ("DMC Mem" or "MSJ Memorandum"), DMC presents, without any support in the record, an analysis that purports to compare public data on "2006 mean nurse wages for cities close in size or geography to Detroit" with certain data computed from the records of these hospitals about how much they pay for the services of nurses who work in their hospitals.  DMC Mem. at Section IV(D). Specifically, DMC employs data compiled by the Bureau of Labor Statistics ("BLS") for average nurse wages in various metropolitan areas.  *Id*.  This analysis was not supported by any economic analysis presented by any of Defendants'[4] three economists who have offered testimony in this case, and DMC provided no discussion addressing whether the BLS data is, in fact, properly comparable to data representing pay to hospital staff nurses in Detroit.[5]

After Plaintiffs pointed out one of numerous obvious flaws with this inter-city analysis in their Consolidated Opposition to Summary Judgment[6] -- a failure to account for cost of living and quality of life differences across cities -- DMC multiplied the problem of relying on unreliable and unsupported economic analysis in its Reply ("MSJ Reply").  DMC's Reply

---

[4] "Defendants" refers to DMC, Henry Ford, Mt. Clemens, William Beaumont and Trinity Health Systems.  St. John, Oakwood and Bon Secours, have submitted no expert reports.

[5] One of Defendants' experts did conduct some analysis employing the BLS data, Rubinfeld Report at 148 (Exhibit 1 to the Declaration of Raymond J. Farrow in Support of Motion to Strike (Farrow Decl. Ex. 1")), analysis that Prof. Ashenfelter criticized in his Rebuttal Report. Ashenfelter Rebuttal at 73 (Farrow Decl. Ex. 2).  DMC neither cites to nor relies upon Prof. Rubinfeld's analysis in its memorandum, instead presenting its own entirely independent analysis of that data.

[6] Plaintiffs' Opposition also noted that DMC's analysis was improper expert testimony by a lay witness and should be disregarded under Federal Rules of Evidence 702, 703 and 705.

presented 4 pages of even more convoluted and completely new economic analysis of inter-city nurse pay, again without any support in the record.  MSJ Reply at 21-24.  In particular, this analysis was not supported by any economic analysis presented by any of Defendants' three economists who have offered testimony in this case.  DMC specifically relied upon calculations conducted by DMC's counsel employing "the ACCRA cost of living index produced by C2ER," MSJ Reply at 23 n.9, data constructed by a private lobbying entity, which has never been relied upon or presented by any expert economist in any analysis before this Court.

DMC continues its reliance on this improper opinion testimony in its Memorandum in Support of its Motion to Defer, referring in that memorandum (without citation) to the unsupported testimony presented in these prior briefs.  Mot Defer at 5 (discussing inter-city wage analysis citing to numbers derived by DMC in its MSJ Reply).[7]

**B.  Expert Testimony Regarding The Unreliability Of This Evidence.**

Defendants have presented reports by three academic economists to offer their opinions in this matter.  Defendants have further attempted, by motion opposed by Plaintiffs, to add a sur-rebuttal report from one of these economists, Prof. Rubinfeld.  Dkt Nos. 350 & 455.  Between them, those reports, including appendices, amount to approximately one thousand pages of proposed testimony and analysis.  None of Defendants' economists have testified that any of the analysis of inter-city wage differences presented by DMC in its MSJ Memorandum is reliable, and the analysis presented is not based upon any analysis included in any of Defendants' expert economists' reports.  Equally, none of these reports formed the basis for the economic analysis

---

[7] Henceforward, because this Memorandum contains no analysis itself and merely cites (by implication, if without explicit reference) back to the analysis in DMC's summary judgment reply, Plaintiffs will focus their discussion on the two summary judgment memoranda.

of inter-city wages employing cost of living adjustments in DMC's Reply.  Indeed, to the contrary, the only expert testimony before this Court regarding such an analysis, from Plaintiffs' expert, Professor Orley Ashenfelter, explains his extensive familiarity with the use of such data and the reasons why this analysis is unreliable.  Ashenfelter Deposition at 473:4-476:15 (Farrow Decl. Ex. 3).  One of Defendants' experts, Professor Rubinfeld, did conduct his own limited analysis using some of the BLS data relied upon by DMC, (Rubinfeld Report at ¶ 148 (Farrow Decl. Ex. 1)), an analysis whose massive flaws have been explained by Plaintiffs' economic expert, Prof. Orley Ashenfelter. Ashenfelter Rebuttal at 73 (Farrow Decl. Ex. 2).  Except for one quote that Plaintiffs do not challenge, DMC has not presented Prof. Rubinfeld's analysis nor used any of his data in support of its motion, but has instead conducted its own analysis apparently using some of the same data sources as did Professor Rubinfeld (since DMC has provided no backup it is impossible to know what exactly DMC relied upon, what data it used, what it did with that data, or anything else that would necessarily have been provided by any expert presenting such an analysis).

### 1. BLS Nurse Compensation Data Is A Biased Estimate Of The Level Of Hospital Staff Nurse Wages, As Economists, Including Economists Hired By Defendants In Related Nurse Wage Cases, Recognize.

DMC relies upon one data source for its analysis of inter-city nurse pay – a database compiled by the BLS which does not purport to measure the pay of hospital nurses in U.S. cities. DMC Mem. at 36 (table identifying source of data as "BLS DATA").  DMC then uses this data to compare, ignoring other factors that economic theory predicts should affect relative pay across cities, Plaintiffs' benchmark for competitive *hospital nurse* pay in Detroit with the average pay of *all nurses, including low-paid non-hospital nurses*, in other cities.  DMC's analysis comparing

the *BLS data* on pay for other cities with *hospital data* on pay for Detroit is unsupported by any expert testimony suggesting that its use of this data in this way reflects sound economic practice. *Id*. (citing no expert testimony supporting its economic analysis).   While Prof. Rubinfeld presented some analysis using this same BLS pay data, his primary analysis compared *the BLS measure* of nurse wages in Detroit with *the BLS measure* of wages in other cities.   Rubinfeld Report at ¶ 148 ("the actual mean and median wages for nurses in Detroit *as reported by BLS* were above the mean and median national RN wages.") (emphasis added).[8]

The BLS data employed by DMC in its unsupported analysis includes -- apparently unbeknownst to DMC -- compensation for *all* nurses defined using Standard Occupational Classification ("SOC") code for RNs, not just the *hospital staff* nurses at issue here.   *See* UNITED STATES DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS, NATIONAL COMPENSATION SURVEY – WAGES ("Beginning with the NCS wage bulletins published in September 2006, occupations were classified using the 2000 Standard Occupational Classification …") http://www.bls.gov/ncs/ocs/data.htm (last visited November 30, 2009).  (RJF Ex 4)   The SOC defines a Registered Nurse (occupation code 29-111) as follows:

> Assess patient health problems and needs, develop and implement nursing care plans, and maintain medical records. Administer nursing care to ill, injured, convalescent, or disabled patients. May advise patients on health maintenance and disease prevention or provide case management. Licensing or registration required. Include advance practice nurses such as: nurse practitioners, clinical nurse specialists, certified nurse midwives,

---

[8] Even though Prof. Rubinfeld's analysis is not a comparison of hospital nurse wages to hospital nurse wages across cities, so not entirely on point for the issues in this case, the inclusion of non-hospital nurses consistently in all cities at least plausibly means this comparison does not produce a biased estimate of what a hospital nurse to hospital nurse comparison would show. This is at least a proper apples to apples comparison of like to like, unlike DMC's apples (hospital nurse wage) to oranges (all nurse wage) comparison.

> and certified registered nurse anesthetists. Advanced practice nursing is
> practiced by RNs who have specialized formal, post-basic education and
> who function in highly autonomous and specialized roles.

*Standard Occupational Classification Manual,* Executive Office of the President, Office of

Management and Budget, 2000, at p. 89.  (RJF Ex. 5)

This BLS data does not limit its measurement to the pay of hospital nurses, but rather

also includes pay to non-hospital nurses who consistently earn less than do hospital nurses, as

Defendants' own expert recognizes. *See* Rubinfeld Report at 22 (Un-numbered Chart) (Farrow

Decl. Ex. 1).[9]  As a result, the BLS measure of average nurse pay in a city *systematically*

*underestimates* hospital nurse wages in that city.  Indeed, in a related nurse wage matter

proceeding in Albany, New York, the *defendants'* expert, Professor Robert Willig, Professor of

Economics and Public Affairs at Princeton University, submitted an expert report in which he

analyzed the exact same BLS nurse compensation data that DMC has employed here.  Professor

Willig, because he understands this data, recognized that it is not appropriate to compare average

nurse wages from this BLS data to actual compensation data for hospital staff nurses in Albany[10]

because the BLS data is compiled for a category of nurses that includes both hospital and non-

hospital nurses.  Recognizing, as a professional economist would, that this means that BLS data

would be a biased under-estimate of the level of hospital staff nurse wages in any given MSA,

Professor Willig explained how he tried to adjust the BLS data in a manner consistent with sound

---

[9] This difference can be large because a significant fraction of all nurses work outside hospitals
Rubinfeld Report page 22 Table 9 (Farrow Decl. Ex. 1) (showing that according to NSSRN
Data for 2004, 40.3% of nurses work outside the hospital setting), and for the commonest non-
hospital jobs nurses earn only 86% of what hospital nurses earn.  *Id.*

[10] The class of nurses Prof. Willig analyzed in Albany is identical to that at issue here.

economic analysis, in an attempt to construct a measure that compared apples to apples (hospital

staff nurses to hospital staff nurses), not to oranges (all nurses, including non-hospital nurses):

> Since BLS wages are based on the average RN wage for hospital and non-hospital RNs and include RNs that are class and non-class members, I … compare wages [in other cities to hospital wages in Albany] after adjusting each of the mean wages by the ratio of average earnings as calculated from the defendant hospital data … to the average RN wage for Albany in the BLS data.  Since the average earnings in the Defendants' data are higher than the mean RN wage for Albany in the BLS data, this scales *up* the wages for all MSAs in the BLS data.

Report of Professor Robert D. Willig, submitted in *Cullen v. Albany Medical Center*, No. 06-765

(N.D.N.Y, September 4, 2009) at p.166 (emphasis added) (Farrow Decl. Ex. 6).[11]

Unlike the appropriate adjustments recognized by this professional economist, which

"scales up the wages for all MSAs in the BLS data"[12] to account for the non-comparability of the

jobs covered before comparing these measures of wages to any measure of hospital nurse wages

derived from hospital payroll data, DMC presents an analysis directly comparing the raw average

nurse wage data produced by the BLS for other cities (an average wage for hospital and non-

hospital nurses) with average hospital nurse wages in Detroit derived from these Defendants'

databases.  Because the BLS measure of hospital wages for other cities is a downward biased

estimate of what hospital nurses earn in those cities, DMC concludes, incorrectly, that Prof.

---

[11] While the Willig Report has been designated in its entirety as "Highly Confidential," defendants in the *Cullen* matter have agreed that the specific material quoted above does not disclose any confidential information and may be quoted publicly.  Farrow Decl. ¶ 2 and Ex. 7.

[12] The difference is significant.  For example, Prof. Ashenfelter's Rebuttal Report reports that the average compensation of a Detroit acute care hospital staff nurse over the years 2002-2006 was $30.27 (Ashenfelter Rebuttal Report at ¶ 7 (as amended by errata)) whereas Table R2 of Prof Ashenfelter's Rebuttal Report shows that the average reported wage for Detroit nurses using BLS data for 2002-2006 is $28.41 (and also demonstrates that Detroit nurse wages are inexplicably low when properly compared to the national average).  (Farrow Decl., Ex. 8).

Ashenfelter's benchmark wage for hospital nurse wages in Detroit is high compared to a what DMC thinks is a measure of what hospital nurses are paid in selected other MSAs.  That is precisely the sort of error that can arise when non-experts try to offer expert testimony that the Federal Rules of Evidence are designed to prevent.

>    **2.   City-Specific Price Indexes Are Unreliable and Do Not Account For All The Reasons Wages May Differ As Between Cities.**

In DMC's Reply, DMC compounds the error in using BLS data as a measure of hospital nurse wages in other cities, by making an effort to adjust for other differences between cities that can account for inter-city earnings differentials, with a measure that an expert economist would recognize as unreliable.  DMC uses a price index apparently produced by a non-government private professional membership organization, C2ER, (*see* Farrow Decl, Ex. 8, http://www.coli.org/AboutUs.asp (last visited December 1, 2009)), known as the ACCRA index. MSJ Reply n.9.  DMC's counsel uses this data despite knowing that expert economists do not consider adjustments using data such as this to be reliable.  Defendants' attorneys specifically questioned Prof. Ashenfelter, one of the world's leading experts in the field of labor economics, at his deposition about the use of city-specific price indexes to account for factors causing wages to vary between cities such as those used by DMC in its Reply, and Prof. Ashenfelter explained:

>    Q.    Why didn't you use cost of living -- a measure of cost of living directly?
>
>    A.    Well, cost of living measures are the Census Bureau does not -- or rather the BLS does not provide -- they  have something they call CPIs for cities but they -- they historically those are treated as reliable for movements and changes over time.  So *if you go look at the CPIs for cities*, they're gonna be benchmarked to a particular period and they aren't gonna be -- ***they'll tell you about growth of the CPI in one city compared to another, but they won't tell you about the level***.  Now there are some other indexes of, um, cost of living indexes across cities.  These are --

*these are, there's always a problem in doing those because they're all plagued by what you're going to use for the weights, the expenditure weights that you're going to put in*.  So people in one city don't have the same pattern of expenditures as those in another city.  There's always this question of which set of cities to use to make the comparison.  So *there are some measures that are made, uh, of, um, of differences across cities in that they try to make some adjustments for this, but they're generally considered as -- as, uh, their purposes are usually pretty restricted for what you want to use them for*.  Now, the advantage of using another wage rate is that they're much more data collected on them, they're available in lots of places and they should reflect both the cost of living differences and any amenity differences that are evaluated by workers as being desirable, so you actually kind of get two -- two adjustments in for the price of one and you have more widely available and reliable data.  So theoretically I think this is -- that the -- some -- some benchmark for wages is a better way to do it.

Q.    Now, did you examine any cost of living indexes that are purport to measure city versus city cost of living in connection with your work here?

A.    No.

Q.    *Have you ever examined any of them* [cost of living indexes that are purport to measure city versus city cost of living] *in detail?*

A.    *As I say, I gave you kind of a long lecture about how they're constructed, and so I certainly have, yes, at one time or another.*

Q.    Could you name any such index?

A.    Well, there are these indexes that are used like to adjust for poverty rates and things.  They're normally, um, purchasing power parity indexes you might call them in the modern guise, just as they're used to make adjustments for differences in prices across countries, but then there's -- always treacherous to do that because when you -- you have to always put weights on the prices, so if one city has very high priced housing, people will substitute away from housing, so the expenditure share in that city will be different from another city.  So *you're kind of always faced with this problem going across cities that you have to think about what you're going to use for the expenditure shares, and those are normally kind of fudged in order to create cost of living difference measures across cities*.

Ashenfelter Deposition at 473:4-476:15 (emphasis added) (Farrow Decl, Ex. 3)

### III.  ANALYSIS

**A.  Only Experts Can Offer Testimony Based Upon Material Other Than Personal Knowledge, and No Expert Offers or Supports This Testimony.**

>    **1.  Legal Standard.**

Federal Rule of Evidence 602 requires that, in order to be admissible, testimony must be based upon evidence "sufficient to support a finding the witness has personal knowledge of the matter…."  Fed. R. Evid. 602.  Rule 602 explicitly includes one exception to the personal knowledge requirement for experts testifying under Rule 703.  Such experts, and only such appropriately qualified experts, may testify based upon "facts or data … of a type reasonably relied upon by experts in the field."  Fed. R. Evid. 703.  Rule 701 governs opinion testimony by lay witnesses and explicitly encompasses the personal knowledge requirement that applies to *all* lay witness testimony.[13]  Fed. R. Evid. 701(a).  The testimony at issue here is presented by DMC through no witness at all, but entirely as testimony of its attorneys, grounds alone for striking this testimony.[14]  However, setting aside this obvious defect, Plaintiffs will analyze this testimony as if presented under Rule 701 which requires:

>    If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the

---

[13] The Rules of Evidence intentionally "nowhere define 'opinion' or 'inference', …bestow[ing] on the courts considerable discretion to determine the scope of Rule 701."  Wright & Gold, FEDERAL PRACTICE AND PROCEDURE EVIDENCE § 6253 at 116.  However "if a court concludes that the testimony does not contain opinions or inferences, the testimony *must* be rationally based upon perception in the sense it must be relevant under Rule 401 and *must* satisfy the personal knowledge requirement or Rule 602."  *Id.* (emphasis added).  Because this testimony obviously fails this standard, not being remotely based upon personal knowledge, Plaintiffs will analyze it as opinion testimony, the only colorable basis for its admission.

[14] The testimony is certainly not based upon any personal knowledge of those attorneys.

determination of a fact in issue, and (c) not based upon scientific, technical, or other specialized knowledge within the scope of Rule 702.

Rule 701 was amended in 2000 to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." ADVISORY COMMITTEE NOTES TO 2000 AMENDMENTS. *See also, United States v. White*, 492 F.3d 380, 400-01 (6th Cir. 2007) ("the drafters intended to preclude a party from surreptitiously circumventing the reliability requirements set forth in Rule 702….") (internal quote omitted). As a result, lay testimony must "result[] from a process of reasoning familiar in everyday life" as opposed to a process "which can be mastered only by specialists in the field … [because] call[ing] for specialized skill or expertise." *Id*. at 401 (quoting ADVISORY COMMITTEE NOTES and *State v. Brown*, 836 S.W.2d 530, 549-50 (Tenn. 1992)).

As Wright and Gold further observe, "a witness who offers opinions based upon … data obtained outside court by means other than … firsthand observation … can only testify as an expert witness since Rule 701 does not permit lay opinion on [this] basis." Wright & Gold, FEDERAL PRACTICE AND PROCEDURE EVIDENCE § 6253 at 118. Wright and Gold further explain that "Rule 702 suggests that the opinion should be classified as expert opinion if the witness arrived at the opinion through the application of special skill or erudition beyond the realm of common knowledge." *Id*. at 119.

## 2. DMC's Testimony Is Inadmissible.

Defendants designated and produced massive reports by three economists, yet not one of them has offered testimony that forms the basis for the economic analysis carried out by DMC's in-house counsel. This is telling and unsurprising given how hopelessly devoid of economic logic are the unsupported opinions offered by DMC's lawyers. DMC's use of BLS RN

compensation data for various cities, claiming (at least by implication) this data measures average acute care hospital staff nurse compensation in those cities, is unsupported and, in fact, directly contrary to the facts.  DMC's use of a wholly unreliable city cost of living index published by C2ER is equally unsupported by any testimony supporting DMC's use of such measures as a reliable way of measuring anything.  Indeed, DMC's lawyers disingenuously present to the Court unsupported economic theories about how to account for economic factors that cause wages to differ between cities without informing the Court that when DMC's attorneys asked Prof. Ashenfelter about those theories, Prof. Ashenfelter definitively explained why they made no sense and why certain data presented by those lawyers to this Court are considered unreliable by economists.  Ashenfelter Deposition at 473:4-476:15.  This Court cannot and should not consider such unreliable opinion testimony without the support of any testifying expert to provide an adequate foundation to justify its admission.

There can be no question that understanding how the BLS measures wages for employment category SOC 29-111 and whether that data is appropriate as a measure of hospital staff nurse pay is not "a process of reasoning familiar in everyday life."  There can equally be no question that understanding how to control for intercity differences that affect wages in a way that properly allows one to compare wages across cities is not "a process of reasoning familiar in everyday life."  Neither is an understanding of the fine nuances of how price indexes are constructed, which of many possible price indexes is the most appropriate for any given purpose, or whether price indexes compiled for entirely different purposes are the most appropriate way to account for the factors that can cause the general level of wages to differ across cities.[15]

---

[15] See Ashenfelter Deposition at 473:4-476:15.

No court of which Plaintiffs are aware has ever allowed any lay witness to testify about such matters requiring specialized economic training and understanding. Indeed, unsurprisingly courts recognize that specialized economic expertise is required as to even simpler analysis than that at issue here. For example in *Donlin v. Philips Lightning North America Corp.*, 564 F.3d 207 (3d Cir. 2009), the court found that the district court had abused its discretion in allowing a lay witness to testify as to the relatively simple matter of computing present values.[16] The court explained, of the witness, "she had never performed a present-value discounting calculation prior to the day before trial, [and] Donlin testified that she received instructions from her lawyer the night before regarding the proper discount rate." *Id*. at 217. The court specifically noted that this was properly deemed a matter for expert testimony in part because: "Some disagreement exists even among experts as to the methodology used to discount an award to present value." *Id*. at 217 n.5. No less is true of the appropriate use of price indexes or the most appropriate way to compare prices (or wages) across different geographic locations as to which DMC offers unsupported testimony here. *See* Ashenfelter Deposition at 473:4-476:15 (explaining why economists recognize differences as to appropriate use of price indexes). Interestingly, whereas here DMC is speaking not through any witness but directly through its attorneys, in *Donlin* the court recognized that it was improper for the defendant's attorneys to coach the witness as to what to say. How much more improper then to not even pretend to present this expert opinion testimony through even a coached witness.

In *United States v. Ganier*, 468 F.3d 920 (6th Cir. 2006), the Sixth Circuit panel also rejected the admissibility of lay testimony where the witness merely testified about "running

---

[16] Almost any pocket calculator includes a single keystroke that will carry out such computations.

commercially available software, obtaining results, and *reciting* them." *Id.* at 922 & 925 (emphasis added). Even mere recitation (not analysis) of output from a commercial software package was deemed beyond a "process of reasoning familiar in everyday life." How much more so of the economic and statistical analysis carried out by DMC's attorneys. As the Tenth Circuit recently explained, "[t]he heart of expert testimony is the foundation. Whether a witness can parrot the results of a model does not mean that he is qualified to explain how the model works or to opine on the statistical validity or interpretation of the results." *Lifewise Master Funding, v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004); *see also, Brown v. Am. Honda Motor Co.,* 939 F.2d 946, 952 (11th Cir. 1991) (concluding that presentation of statistics, "without an analytic foundation, are virtually meaningless"). Even if the raw BLS data and raw ACCRA data were admissible, there is no question that DMC has proffered no witness with knowledge of how this data was constructed, limitations on its proper use, whether this data is appropriate for the use to which DMC has put it, or whether DMC's model of how to correct for inter-city wage differentials is valid. DMC's ability to "parrot the results" of some ratios it has computed does not mean those ratios are meaningful or admissible.

**3. DMC's Authorities Presented To Justify Its Economic Analysis *Using* The ACCRA Price Index Are Inapposite And Merely Demonstrate The Index's Unreliability.**

DMC attempts to justify its use of a specific price index (the ACCRA index) in its Reply to conduct a complex economic analysis correcting for factors that cause wages to differ across cities by pointing to two courts which have discussed the use of the same index. MSJ Reply at 23 n.9. Neither so much as supports the admissibility of the raw data that DMC employs, and

certainly neither remotely supports admission of DMC's improper expert testimony *using* this index in an economic analysis without any foundation for that analysis.

In *In re Marriage of Lana Kay Wilson Fronk*, 250 Mont. 291, (Mont. 1991), the court, in evaluating whether a former spouses' child support payments should be adjusted, first explicitly noted that "[defendant] Wilson gave several examples of how he is personally affected by the high cost of living in Alaska." *Id*. at 196. The court then explained that "where there is evidence presented that shows there is substantial disparity between the value of the dollar in different locales, the Court may *in equity* need to make appropriate adjustments." *Id*. (emphasis added). The court then concludes that in pursuing this equitable remedy, the trial court did not abuse its discretion in using a particular price index (the ACCRA index) to do rough justice in determining an appropriate adjustment to Mr. Wilson's child support payments. This analysis does not remotely support the admissibility of DMC's complex economic analysis using this data without support from any qualified expert here. First, in affirming the trial court's use of the ACCRA index, the *Wilson* court actually seems confused into believing that the index is a government statistic, since it cites to the Montana Census and Economic Information Center as the source of this data, and treats it as a "public record" admissible under Rule 803(8). *Id*. (citing M.R. Evid. 803(8), the public record exception to the hearsay rule, as the basis for admissibility). The *Wilson* court was apparently unaware this index is in fact the product of a private organization with no government affiliation so is not the product of any "public office or agency" (M.R. Evid. 803(8)) at all. But more importantly, irrespective of whether the *Wilson* court incorrectly found the data admissible under Rule 803(8), the fact that the *Wilson* court believed that, as matter of equity, in order to provide some way of quantifying the admissible

evidence -- based upon testimony discussing matters of personal knowledge -- about the high cost of living in Alaska, this index provided a means of providing rough justice, appropriately adjusting one individual's child support payments, does not in the slightest suggest that the same court would consider it admissible here as a means of carrying out a technically complex analysis adjusting wages to account for the economic factors that cause wages to differ across metropolitan areas in order to properly compare the level of average compensation levels of a category of employees across multiple U.S. cities.[17]

DMC's reliance on *TFWS Inc v. Beltway Fine Wine and Spirits*, 315 F. Supp. 2d 775 (D. Md. 2004), is truly puzzling. While that court reports various data compiled by ACCRA[18] supposedly reflecting liquor prices in Maryland and Delaware, the court notes that ACCRA itself states that "[s]mall differences [between areas] should not be construed as ... even indicating correctly which area is more expensive." *Id*. at 778 (quoting from an ACCRA document described as a "warning" to users of ACCRA price data). Confirming this "warning," wherever the *TFWS* court compares the ACCRA data with actual transaction data, it consistently finds that the actual data shows Delaware liquor prices to be higher than those in Maryland whereas the ACCRA data showed the exact opposite. *See id*. at 778-779 (ACCRA showed Delaware prices above Maryland's for liquor whereas actual transaction data showed the opposite); *id*. at 779

---

[17] The mere fact that the *Wilson* court found the raw ACCRA data admissible (albeit, based upon a misunderstanding of the source of that data) does not speak at all to the admissibility of an analysis using that data in an improper and inappropriate way.

[18] It is unclear from the limited discussion in the opinion if this data was introduced via expert testimony or not. There is discussion of some expert economic testimony about relative prices across the states, *id*. at 782 n.8, but without reference to the ACCRA data.

(same for wine prices); *id.* at 781-82 (anecdotal data contradicted ACCRA price comparison across states). All that *TFWA* seems to teach is how unreliable this ACCRA price data can be.

### B.  No Judicial Notice May Be Taken Of Unreliable Testimony.

Rule 201 permits a court to take "judicial notice of adjudicative facts." This rule requires that the fact "be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. None of this is true here.

The BLS data used by DMC is an unreliable measure of hospital nurse compensation in other cities because it, quite simply, does not measure average hospital nurse pay. This BLS data on nurse compensation measures average compensation of a group of nurses that includes not just the acute care hospital nurses at issue in this case, but also non-hospital nurses who typically earn less than do hospital nurses. Comparing the average pay of a member of this class of hospital staff nurses (or the estimated but-for pay of a member of this class of hospital nurses) to the average pay of all nurses, including non-hospital nurses, in other cities is a classic "apples to oranges" comparison, as Prof. Willig recognized, explained, and accounted for in his economically supported analysis presented by the defendants in Albany. A proper analysis of whether hospital nurse wages in Detroit are higher or lower than elsewhere is, even ignoring other factors that affect wage differences across cities, certainly not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The "fact" of what average hospital staff nurse wages are in other cities is certainly subject to reasonable dispute, is certainly not "generally known," and is not capable of determination by

simple reference to any unquestionable source.[19]  The "fact" of what publicly available measure is suitable for use in comparing nurse wages across cities is equally not generally known nor capable of determination by simple reference to any unquestionable source.

As to DMC's efforts to correct for inter-city differences that can create wage differentials (such as cost of living and quality of life issues), Prof. Ashenfelter explained at length why the use of a city-specific cost of living index is fundamentally unreliable for that purpose.  DMC's own authority, *TFWS*, 315 F. Supp. 2d 775, merely serves to illustrate how unreliable this data is and why economic expertise is required to evaluate whether this data is appropriate for the usage to which DMC puts it.  Again, it cannot be ignored that of the three economists retained by Defendants, not one has proposed an analysis remotely akin to what DMC presents here.

Finally, the "fact" of what is a reasonable way to measure cost of living and quality of life differences across cities is equally certainly not a matter beyond reasonable dispute, is equally not generally known, and is equally not capable of determination by simple reference to any unquestionable source.[20]  DMC's entirely unreliable methods of analyzing inter-city wages are not only "subject to reasonable dispute" but are in fact wrong, misleading, and improper.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court strike the above-identified improper expert analysis presented by DMC without any basis in the facts of

---

[19] While BLS data may be highly regarded, it is certainly the case that one can "reasonably question" the accuracy of using BLS data measuring average wages for *all* nurses, as defined by SOC  29-111, as a measure of average wages of *acute care hospital staff* nurse wages.

[20] As the 1972 Advisory Committee Notes to Rule 201 explain "the tradition has been one of caution in requiring that the matter be beyond reasonable controversy.  This traditional circumspection appears to be soundly based, and no reason to depart from it is apparent."

this case.   This material is inadmissible opinion testimony offered by a lay witness, it is

unreliable and unscientific, and it relies upon no basis that could give rise to this Court taking

judicial notice of any of the supporting "facts," let alone the means of use of those "facts."  This

testimony demonstrates conclusively why opinion testimony about matters beyond the general

knowledge of the public requires authentication through qualified experts – DMC's use of this

data is utterly unreliable, misleading, and ignores obvious defects in the data employed.  Because

no expert has analyzed this data it is impossible for this Court to know what a proper analysis of

inter-city pay differences would show.   This Court cannot base any decision on such wholly

unreliable analysis of inappropriate data.

Respectfully submitted:

**KELLER ROHRBACK L.L.P.**

By:  /s/  Raymond J. Farrow
Mark A. Griffin
Raymond J. Farrow
Tana Lin
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1200 (Telephone)
(206) 623-3384 (Facsimile)

Daniel A. Small
Sharon K. Robertson
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, N.W.,
Suite 500 West
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

David P. Dean
Emilie S. Kraft
**JAMES & HOFFMAN**
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

Stephen Wasinger
**STEPHEN F. WASINGER PLC**
26862 Woodward Avenue, Suite 202
Royal Oak, MI 48067
Tel:  248-544-5100
Fax: 248-479-0391
Email:  sfw@sfwlaw.com

Arnold Levin
Charles E. Schaffer
**LEVIN, FISHBEIN, SEDRAN &
BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Daniel E. Gustafson
Brian Williams
**GUSTAFSON GLUEK PLLC**
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA and JEFFREY A.
SUHRE on behalf of themselves and others
similarly situated,

                               Plaintiffs,

        v.

DETROIT MEDICAL CENTER, HENRY
FORD HEALTH SYSTEM, MOUNT
CLEMENS GENERAL HOSPITAL, INC., ST.
JOHN'S HEALTH, OAKWOOD
HEALTHCARE, INC., BON SECOURS
COTTAGE HEALTH SERVICES, WILLIAM
BEAUMONT HOSPITAL d.b.a. BEAUMONT
HOSPITALS, and TRINITY HEALTH CORP.,

                            Defendants.

Case No. 06-15601

Hon. Gerald E. Rosen

Magistrate:  Donald A. Scheer

## CERTIFICATE OF SERVICE

       I hereby certify that on December 21, 2009 I served the attached document(s) on the parties listed below as indicated:

**VIA ECF**

| | | |
|---|---|---|
| Alethea A. Wilson | Charles N. Raimi | Patricia C. Schabath |
| Sandra D. Hauser | Amy J. Carletti | David Marx, Jr. |
| David L. Hanselman, Jr. | Stephen Y. Wu | Terrence J. Miglio |
| Gouri G. Sashital | David A. Ettinger | Peter E. Boivin |
| Jill L. Marr | Margo Weinstein | Christopher Q. King |
| Corey M. Shapiro | Howard B. Iwrey | Fred K. Herrmann |
| Shari Ross Lahlou | Bethany M. Wimsatt | Thomas M.J. Hathaway |
| David A. Hardesty | Bruce L. Sendek | Michael R. Shumaker |
| Toby G. Singer | Michael R. Turco | Mark T. Nelson |
| Sheldon H. Klein | Catherine F. Wenger | |
| David B. Gunsberg | | |

                                      s/ Raymond J. Farrow
                                      Raymond J. Farrow