**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PAT CASON-MERENDA and
JEFFREY A. SUHRE,

                Plaintiffs,                  Case No. 06-15601
                                            Hon. Gerald E. Rosen

v.                                      Magistrate Judge Donald A. Scheer

DETROIT MEDICAL CENTER, *et al.,*

                Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO**
**EXCLUDE THE EXPERT TESTIMONY OF ORLEY ASHENFELTER**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on         April 22, 2013        

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

Through the present motion, certain of the Defendants seek to exclude the

testimony of Plaintiffs' expert, Orley Ashenfelter, Ph.D., on the grounds that his

testimony fails to meet the admissibility standards set out in Fed. R. Evid. 702 and

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct 2786 (1993).[1]

---

[1]Specifically, the present motion was brought by Defendants Detroit Medical Center, Henry Ford Health System, Mount Clemens General Hospital, Inc., William Beaumont Hospital, and Trinity Health Corp.  Since this motion was filed, Plaintiffs have reached settlements with Defendants Mount Clemens General Hospital and William Beaumont Hospital, and the Court has granted its preliminary approval of these settlements.  In addition, Plaintiffs have more recently reached settlements with Defendants Henry Ford Health System and Trinity Health

Although Defendants have advanced a number of challenges to Dr. Ashenfelter's proposed expert testimony as summarized in his expert and rebuttal reports, they argue principally that Dr. Ashenfelter's "benchmark" analysis rests upon an unreliable methodology and is fatally undermined by unwarranted assumptions, oversimplifications, and leaps in logic. In response, Plaintiffs contend that the benchmark analysis employed by Dr. Ashenfelter has been widely used and accepted in antitrust suits, and that Defendants' various challenges to Dr. Ashenfelter's implementation of this methodology and his use and interpretation of data in the record are matters to be explored through cross-examination at trial.

Defendants' motion has been fully briefed by the parties. Having reviewed the parties' briefs and accompanying exhibits, the Court finds that the pertinent facts and legal arguments are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion sets forth the Court's rulings on this motion.

---

Corp., subject to the Court's preliminary approval of these settlements.

Against this backdrop of settlement negotiations, Defendant Detroit Medical Center evidently is the sole remaining party against which Plaintiffs are pursuing their claims in this case. Nonetheless, because certain of these settlements are awaiting preliminary approval, the Court will refer to the moving party as "Defendants" throughout the remainder of this opinion.

## II.  SUMMARY OF DR. ASHENFELTER'S PROPOSED EXPERT TESTIMONY

The underlying facts of this case have been thoroughly set forth in the Court's ruling on Defendants' summary judgment motion, *see Cason-Merenda v. Detroit Medical Center,* 862 F. Supp.2d 603, 606-23 (E.D. Mich. 2012), and need not be repeated here. Briefly, the two Plaintiff registered nurses ("RNs"), Pat Cason-Merenda and Jeffrey A. Suhre, allege that the Defendant health care institutions operating in the Detroit metropolitan area have violated § 1 of the federal Sherman Act, 15 U.S.C. § 1, by agreeing to regularly exchange compensation-related information among themselves in a manner that has reduced competition among Detroit-area hospitals in the wages paid to RNs.[2]  In pursuing this federal antitrust claim, Plaintiffs seek to recover on behalf of themselves and a class of RNs employed by the eight Defendant hospitals.

### A.    Dr. Ashenfelter's Qualifications

As stated in his expert report, Dr. Orley Ashenfelter is the Joseph Douglas Green Professor of Economics at Princeton University.  He received his Ph.D. in economics from Princeton in 1970, and he has received a number of awards and honors and authored or edited many books, journals, and articles in the course of his academic career.  Dr. Ashenfelter has proffered expert reports or given expert testimony in several antitrust

---

[2]Plaintiffs further allege that the Defendant health care providers have violated § 1 of the Sherman Act by conspiring among themselves and with other local hospitals to hold down the wages of RNs employed by these institutions.  In a March 22, 2012 opinion and order, however, the Court found that Defendants were entitled to summary judgment in their favor as to this claim, *see Cason-Merenda,* 862 F. Supp.2d at 628-41, leaving Plaintiffs' "rule of reason" claim in Count II of their complaint as the sole antitrust claim going forward in this litigation.

cases and proceedings, including a similar nurse wage suit brought in the Northern District of New York. *See Fleischman v. Albany Medical Center,* 728 F. Supp.2d 130, 145-50 (N.D.N.Y. 2010) (rejecting a defense challenge to Dr. Ashenfelter's proposed expert testimony in that case). In light of this extensive background, Defendants do not question Dr. Ashenfelter's qualifications to give expert testimony on economic issues of relevance to this litigation.

## B.   Dr. Ashenfelter's Initial Expert Report

Dr. Ashenfelter begins his expert report by summarizing the allegations of Plaintiffs' complaint, and by assuming, as requested by Plaintiffs' counsel, that Plaintiffs can prove their allegations of (i) a conspiracy among the Defendant hospitals to depress the compensation of their RNs,[3] and (ii) an agreement among the Defendant health care institutions to regularly exchange RN compensation data in a manner that resulted in reduced competition among Defendants in the market for RNs and a corresponding restraint in RN wages below competitive levels. Against this backdrop, Dr. Ashenfelter provides his opinions on three questions posed by Plaintiffs and their counsel:

- Whether it can be shown by common evidence that all or almost all of the members of the [plaintiff] class were harmed by the conspiracy?

- What is the aggregate total lost compensation suffered by members of the class and how can this aggregate sum be allocated across class

---

[3]As noted above, the Court has determined as a matter of law that the record developed during discovery fails to meet the evidentiary threshold for permitting a trier of fact to decide whether this alleged conspiracy existed. *See Cason-Merenda,* 862 F. Supp.2d at 641.

members to reflect each class member's individual losses?

•   Did the conspiracy lead to market power and anticompetitive outcomes in the market for jobs as RNs in hospitals in the Detroit [Metropolitan Statistical Area ("MSA")]?

(Defendants' Motion, Ex. A, Ashenfelter Report at ¶ 4.)

As to the first of these questions, Dr. Ashenfelter concludes that "all or almost all of the class was harmed by the alleged conspiracy," and that "this can be shown using evidence that is common to the class." (*Id.* at ¶ 11.) He gives three reasons for arriving at this conclusion. First, Dr. Ashenfelter observes that at each Defendant hospital, the "class members' wages, and most other elements of compensation, were determined in a common administered compensation system," and he reasons that "[e]xplicit or implicit cooperation among the defendants" in setting RN wages or sharing wage-related information "would have caused adjustments to the compensation systems." (*Id.* at ¶ 7.) The adjustments to these compensation systems, in turn, "would have affected the compensation of all or almost all individual class members." (*Id.*)[4]

Next, Dr. Ashenfelter uses econometric analysis to "show[] that relative labor supply to the various jobs in the [plaintiff RN] class is very elastic." (*Id.* at ¶ 8.)[5] From this he infers that "even if the alleged conspiracy directly affected a subgroup of the class,

---

[4]As noted in Plaintiffs' response to Defendants' motion, Defendants seemingly do not challenge this aspect of Dr. Ashenfelter's opinion.

[5]Later in his report, Dr. Ashenfelter explains that "[e]conomists say that the relative supply of workers to different jobs is 'highly elastic' if a small proportional change in relative compensation levels for the jobs will result in a large proportional change in the relative supply of workers to the jobs." (*Id.* at ¶ 98.)

such as a plausible benchmark group, pay for all jobs held by members of the class would have been depressed." (*Id.* at ¶ 8.)

Third, Dr. Ashenfelter employs a benchmark analysis as a class-wide method for both identifying and quantifying the impact of the alleged conspiracy upon members of the plaintiff class. As he explains:

> . . . [E]ach of the defendants makes extensive use of nurses supplied by temporary agencies ("agency nurses") to do work that would otherwise be performed by members of the class. In a competitive labor market an employer will pay each employee the amount that the employee adds to the firm's revenue. It is reasonable to infer that the value to the defendant hospitals of the work performed by agency nurses is at least as high as the fee paid by the hospital to the agency (otherwise it would not be profitable for the hospital to employ the agency nurses). As a result, the fee paid to the agency for an agency nurse is less than or equal to the marginal revenue product of that RN in that job. Therefore, the fee provides a conservative benchmark for the cost to a hospital of employing an RN in that job in a competitive market.

(*Id.* at ¶ 9 (footnote with citation omitted).)

This benchmark analysis, resting upon the Defendant hospitals' use of agency nurses, forms much of the basis for Defendants' various challenges to Dr. Ashenfelter's expert testimony. Dr. Ashenfelter explains that he has used this agency nurse benchmark "to calculate what each member of the class would have earned in the absence of the alleged conspiracy," and that this calculation "show[s] that almost all of the members of the class actually earned less than they would have in the 'but-for' world." (*Id.* at ¶ 10.) Accordingly, this analysis not only demonstrates, in Dr. Ashenfelter's view, that "all or almost all of the class was harmed by the alleged conspiracy and [that] this can be shown

using evidence that is common to the class," but it also "provides a measure of each class member's lost earnings." (*Id.* at ¶¶ 11-12.) Dr. Ashenfelter, therefore, relies on this benchmark to answer both the first and second questions posed by Plaintiffs' counsel, as this analysis makes it "possible both to calculate the aggregate amount of damages and allocate the total among individual class members in a reasonable way." (*Id.* at ¶ 12.)

As Dr. Ashenfelter recognizes in his report, the benefits and services received by a Defendant hospital through the use of an agency nurse are not precisely the same as those provided by a regular hospital-employed RN, so that it is necessary to adjust the rates paid for agency nurses to account for these differences. (*See id.* at ¶ 112.) Broadly speaking, he makes two such adjustments in his initial report. First, he subtracts from his agency fee benchmark certain human resources costs — including the cost of fringe benefits and the cost of payroll taxes and worker's compensation contributions — that the hospital would have to pay for its own RNs, but that agencies pay on behalf of their agency nurse employees who are brought in to perform RN work at the hospital. (*See id.* at ¶¶ 112-14.) Next, he attempts to quantify the value to a hospital of using an agency nurse to fill an RN vacancy on short notice, by looking to an instance in which Defendant Oakwood Healthcare Inc. set up an "internal agency" that "employed RNs to work at various Oakwood facilities as if they were working for an external agency." (*Id.* at ¶ 115.) Using data from this "internal agency" experience, Dr. Ashenfelter computes a 11.2 percent "premium" as representing the additional value provided by agency nurses performing more temporary or flexible RN services. (*Id.*)

7

Finally, turning to the third question posed by Plaintiffs' counsel, Dr. Ashenfelter "conclude[s] that the alleged conspiracy would have provided the defendants with market power and that this market power would have led to anticompetitive effects in the market." (*Id.* at ¶ 13.)  In support of this opinion, Dr. Ashenfelter points to data which, in his view, establish two anticompetitive effects in the relevant market, sub-competitive compensation and sub-competitive levels of RN employment.  (*See id.* at ¶¶ 13, 127-28.) Based on the principle that "evidence of anticompetitive effects is also evidence of market power because the anticompetitive effects could not exist in the absence of market power," he concludes that the Defendant hospitals must have exercised market power in order to produce the anticompetitive outcomes he has observed.  (*Id.* at ¶¶ 13, 126-27.)  In addition, Dr. Ashenfelter analyzes the Defendant institutions' collective market share in the relevant market — RN jobs at hospitals in the Detroit MSA — and opines that "if the defendants were to act cooperatively they would have sufficient market share to depress earnings and employment in the market." (*Id.* at ¶¶ 14, 129.)

## C.    Dr. Ashenfelter's Rebuttal Report

In his rebuttal report, Dr. Ashenfelter seeks to address the various challenges raised by Defendants' several experts — Professor Daniel L. Rubinfeld, Dean Edward A. Snyder, Professor Daniel S. Hamermesh, and Joseph Caracci, RN[6] — to the analysis and

---

[6]In separate motions that remain pending before the Court, Plaintiffs seek to exclude certain of the opinions offered by defense experts Rubinfeld and Snyder.  In addition, in an opinion and order dated October 18, 2010, the Court granted Plaintiffs' motion to exclude the testimony of defense expert Caracci.

8

conclusions set forth in his initial report.  Most notably, Dr. Ashenfelter's rebuttal report reflects two changes to his agency benchmark analysis and figures to account for the points made by Defendants' experts.  First, Dr. Ashenfelter makes a further downward adjustment to his agency nurse benchmark — in an amount less than $0.10 per hour of nurse employment — to reflect additional human resources costs that the Defendant hospitals incur in employing class members but do not pay for agency nurses.  (*See* Defendants' Motion, Ex. B, Ashenfelter Rebuttal Report at ¶¶ 4, 39-40.)  Next, he increases his "flexibility premium" — a figure which, as noted earlier, is intended to quantify the value to a hospital of employing agency nurses who are willing to work "where and when they are needed," (*id.* at ¶ 3) — to 18 percent (from its initial value of 11.2 percent), to account for the observation in Professor Rubinfeld's expert report that not all of the RNs in Oakwood's "internal agency" were equally comparable to true agency nurses.  (*See id.* at ¶¶ 7, 64-67.)  In light of these adjustments, Dr. Ashenfelter has computed "total lost earnings for the class of $720.5 million as compared with $847.6 million in [his] first analysis of this question."  (*Id.* at ¶ 7.)

Roughly a month after his rebuttal report, Dr. Ashenfelter produced an errata sheet that corrects some of the figures found in his rebuttal report.  (*See* Defendants' Motion, Ex. F, Rebuttal Errata.)  For example, Dr. Ashenfelter has further increased his "flexibility premium" to 21.5 percent.  (*See id.* at 1.)  He has also lowered his overall

calculation of class damages from $720.5 million to $596.2 million.  (*See id.* at 2.)[7]

### III.  ANALYSIS

**A.      The Standards Governing Defendants' Motion**

In resolving Defendants' challenge to the proposed testimony of Plaintiffs' expert,

Dr. Orley Ashenfelter, the Court necessarily begins with the language of the pertinent

Federal Rule of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[8]  This Rule imposes upon the federal district courts a "basic

_____

[7]In their motion, Defendants point to a sur-rebuttal report prepared by one of their experts, Professor Rubinfeld, as purportedly showing that Dr. Ashenfelter's errata sheet makes "not merely corrections in arithmetic, but wholesale changes in his methodology."  (Defendants' Motion, Br. in Support at 8, 15-16.)  In an order dated March 31, 2010, however, the Court denied Defendants' request for leave to file the Rubinfeld sur-rebuttal report upon which they seek to rely in challenging Dr. Ashenfelter's errata, finding that this proposed report was not timely produced.  In addition, Plaintiffs strenuously object to the notion that Dr. Ashenfelter's errata sheet incorporates any changes in methodology, and instead assert that this addendum merely reflects some technical mathematical recalculations to correct an "inadvertent omission" of a variable and a "computational error" in the results reported in the rebuttal report.  (Plaintiffs' Response Br. at 8-9 & n.10 (characterizing Defendants' claim of a change in methodology as an "outrageous" and "demonstrably baseless allegation").)  While the Court finds it unnecessary to stray too far into this thicket, it would certainly appear that Dr. Ashenfelter's two-page errata, with its handful of changes to specific figures from his rebuttal report, would be a poor candidate for a Trojan horse of methodological changes to his underlying analytical approach.

[8]Since Defendants filed their motion, the language of this Rule has been amended, but the advisory committee notes for these amendments state that "[t]hese changes are intended to be stylistic only," and that "[t]here is no intent to change any result in any ruling on evidence admissibility."  Fed. R. Evid. 702, advisory committee notes to 2011 amendments.

gatekeeping obligation" to ensure that an expert's proffered testimony is both relevant

and reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S. Ct. 1167, 1174

(1999).

The Sixth Circuit has described a court's inquiry under Rule 702 as governed by

three mandatory requirements and a non-exclusive list of additional considerations:

> Parsing the language of the Rule, it is evident that a proposed
> expert's opinion is admissible, at the discretion of the trial court, if the
> opinion satisfies three requirements.  First, the witness must be qualified by
> "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.
> Second, the testimony must be relevant, meaning that it "will assist the trier
> of fact to understand the evidence or to determine a fact in issue."  *Id.*
> Third, the testimony must be reliable.  *Id.*  Rule 702 guides the trial court by
> providing general standards to assess reliability:  whether the testimony is
> based upon "sufficient facts or data," whether the testimony is the "product
> of reliable principles and methods," and whether the expert "has applied the
> principles and methods reliably to the facts of the case."  *Id.*  In addition,
> *Daubert* provides a non-exclusive checklist for trial courts to consult in
> evaluating the reliability of expert testimony.  These factors include:
> testing, peer review, publication, error rates, the existence and maintenance
> of standards controlling the technique's operation, and general acceptance
> in the relevant scientific community.

*In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 528-29 (6th Cir. 2008) (internal

quotation marks and citations omitted).  The Supreme Court has cautioned, however, that

the factors cited in *Daubert* "do *not* constitute a definitive checklist or test," and that they

"may or may not be pertinent in assessing reliability, depending on the nature of the issue,

the expert's particular expertise, and the subject of his testimony."  *Kumho Tire,* 526 U.S.

at 150, 119 S. Ct. at 1175 (internal quotation marks and citations omitted); *see also In re*

*Scrap Metal,* 527 F.3d at 529 (recognizing that "the *Daubert* factors are not dispositive in

11

every case and should be applied only where they are reasonable measures of the reliability of expert testimony" (internal quotation marks and citation omitted)). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire,* 526 U.S. at 153, 119 S. Ct. at 1176.

As this Court observed in an earlier antitrust suit, a court "must remain mindful of its limited gatekeeping role" under Rule 702. *In re Northwest Airlines Corp. Antitrust Litigation,* 197 F. Supp.2d 908, 914 (E.D. Mich. 2002). In particular, the "rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *In re Northwest Airlines,* 197 F. Supp.2d at 913 (internal quotation marks and citation omitted). Thus, *Daubert* emphasizes that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," and that "[t]hese conventional devices, rather than wholesale exclusion . . . , are the appropriate safeguards where the basis of [expert] testimony meets the standards of Rule 702." *Daubert,* 509 U.S. at 596, 113 S. Ct. at 2798.

**B.    Defendants' Challenges to Dr. Ashenfelter's Benchmark Analysis Go Only to the Weight, and Not the Admissibility, of His Proposed Testimony, and Therefore Must Be Left for the Trier of Fact to Resolve.**

As observed earlier, the lion's share of Defendants' challenges to Dr. Ashenfelter's proposed expert testimony focus on his benchmark analysis, through which he looks to

12

the Defendant hospitals' use of nurses supplied by outside agencies to both demonstrate the impact of the alleged antitrust conspiracy upon the members of the plaintiff RN class and calculate the damages incurred by the plaintiff class.  Accordingly, the Court turns first to Defendants' various critiques of Dr. Ashenfelter's benchmark analysis, and then addresses the handful of remaining issues raised in Defendants' motion.

As a threshold matter, Defendants do not dispute that the "benchmark" or "yardstick" approach adopted by Dr. Ashenfelter in formulating his expert opinion is a "well accepted" method of proving antitrust damages.  *Fishman v. Estate of Wirtz,* 807 F.2d 520, 551 (7th Cir. 1986); *see also Conwood Co. v. United States Tobacco Co.,* 290 F.3d 768, 793 (6th Cir. 2002); *Home Placement Service, Inc. v. Providence Journal Co.,* 819 F.2d 1199, 1205-06 (1st Cir. 1987).  Indeed, this Court held in a prior antitrust suit that an economic expert produced by the plaintiff air travelers would be permitted to present his benchmark analysis to the trier of fact, both as a means of showing that the defendant airlines had engaged in monopolistic pricing and as a measure of the damages purportedly suffered by the plaintiff class as a result of the defendants' allegedly anticompetitive conduct.  *See In re Northwest Airlines,* 197 F. Supp.2d at 922-30.  Under this benchmark approach, "the plaintiff's experience in a hypothetical free market" that would exist in the absence of the defendant's antitrust violation is determined by reference to "the experience of a comparable [participant] in an actual free market." *Fishman,* 807 F.2d at 551.

As this Court has recognized, the benchmark chosen by Plaintiffs and their expert

13

"must be sufficiently comparable to the market under consideration to permit the conclusion that price differences are the product of antitrust violations, and not other factors." *In re Northwest Airlines,* 197 F. Supp.2d at 922; *see also Home Placement Service,* 819 F.2d at 1206 ("Central to this so-called 'yardstick' approach . . . is the requirement [that] the plaintiff identify a sufficiently comparable firm (the 'yardstick') against which it can measure its quantum of damages."). This requirement of sufficient comparability, however, does not demand strict identity between the benchmark and the hypothetical free market that Plaintiffs and their expert seek to describe, because "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566-67, 101 S. Ct. 1923, 1929 (1981). "Markets need not be wholly identical to serve useful and reliable purposes . . . in determining what a market would do in the absence of an antitrust violation," *In re Northwest Airlines,* 197 F. Supp.2d at 929, and Plaintiffs and their expert need only produce sufficient evidence of comparability "as to permit a legitimate comparison by the trier of fact," *Home Placement Service,* 819 F.2d at 1206.

Against this backdrop, the admissibility of Dr. Ashenfelter's benchmark approach turns on two questions: (i) whether the fees paid by the Defendant hospitals for agency nurses are sufficiently comparable to the wages paid to RNs employed by those hospitals, such that the former may be used as a benchmark for what the latter would be in the absence of Defendants' alleged antitrust violation, and (ii) whether Dr. Ashenfelter's

analysis sufficiently accounts for the ways in which agency fees differ from in-house RN wages.  The first of these questions need not be addressed at any length, because Defendants have largely failed to suggest any reason why agency nurse fees should be categorically ineligible for consideration as a benchmark for competitive RN wages. Defendants' only apparent argument on this point is that Dr. Ashenfelter's reliance on agency nurse fees is methodologically unsound "because he failed to investigate the temporary nurse agency industry that is the source of his benchmark."  (Defendants' Motion, Br. in Support at 10.)  Yet, as the Court explained in an earlier ruling in this case, "the internal operations of and costs incurred by a nurse staffing agency play no role in Dr. Ashenfelter's analysis."  *Cason-Merenda v. Detroit Medical Center,* No. 06-15601, 2010 WL 8583308, at *4 (E.D. Mich. Oct. 18, 2010).  Rather, nurse agencies are merely a "black box" in this analysis, into which Defendants pay sums of money in exchange for workers who "have the same qualifications as [the RNs employed by the Defendant hospitals] and work side-by-side with their employee nurses providing the same essential care-giving services to their patients."  (Plaintiffs' Response Br. at 14.)  Accordingly, Defendants have failed to explain the need for Dr. Ashenfelter to investigate the temporary nurse agency industry, much less suggest how this lack of investigation undermines his benchmark analysis.

Turning to the second question, Defendants contend as a general matter that Dr. Ashenfelter has failed to make the "substantial adjustments" that purportedly are necessary to ensure that his agency fee benchmark is "reasonably comparable" to the

15

wages that RNs would receive in the absence of Defendants' allegedly anticompetitive conduct. (Defendants' Motion, Br. in Support at 10-11.) In advancing this argument, Defendants begin with the broad assertion that Dr. Ashenfelter failed to "consider the differences between the fee to an agency and a wage to a nurse," but instead merely "equated the two, ignoring the fact . . . that a fee to any agency, like a price paid to any company, covers more than the wages of the nurse employed by the agency." (*Id.* at 11.) To the extent, however, that Defendants suggest that Dr. Ashenfelter made no adjustments whatsoever in determining how an agency fee should compare to RN wages, Plaintiffs correctly observe that this assertion "is, quite simply, untrue." (Plaintiff's Response Br. at 15.) As noted above, Dr. Ashenfelter explicitly acknowledges in his initial expert report that "in hiring members of the class, the defendants incur costs in addition to the class members' monetary compensation that they do not incur when contracting to hire a nurse from an agency," and he recognizes that it therefore is necessary to "adjust these agency rates to arrive at a corresponding figure for hourly earnings of members of the class." (Defendants' Motion, Ex. A, Ashenfelter Report at ¶ 112.)

Nonetheless, Defendants maintain that the adjustments made by Dr. Ashenfelter are inadequate in a number of respects. First, they contend that Dr. Ashenfelter failed to thoroughly review the records of the Defendant hospitals in order to fully account for the human resources costs these hospitals avoided by using agency nurses. As explained above, however, Defendants' argument on this point ignores the adjustments outlined in

16

Dr. Ashenfelter's initial report to account for these costs, (*see* Ashenfelter Report at ¶¶ 113-14), as well as the further adjustment made in his rebuttal report to reflect additional human resources costs identified by Defendants and their expert, Professor Rubinfeld, (*see* Defendants' Motion, Ex. B, Ashenfelter Rebuttal Report at ¶¶ 36-40, 67 n.50).[9]

---

[9]At various points in their motion, Defendants suggest that it was somehow "improper" for Dr. Ashenfelter to use his rebuttal report as an opportunity to correct inaccuracies or infirmities that Defendants and their experts had identified in his initial report. (*See, e.g.,* Defendants' Motion, Br. in Support at 12-13 & n.6, 15-16 (characterizing the rebuttal report as an impermissible "do-over").)  Yet, as Plaintiffs observe, "it would be odd indeed if the law prevented an expert from taking on board the suggestions for refinements put forward by another expert commenting on his opinion."  (Plaintiffs' Response Br. at 27.)  Indeed, the Federal Rule governing initial and supplemental discovery disclosures — including the disclosure of expert testimony — expressly requires a party to "supplement or correct" such a disclosure "if the party learns that in some material respect the disclosure . . . is incomplete or incorrect," Fed. R. Civ. P. 26(e)(1), and Defendants do not contend that Plaintiffs and their expert failed to make the necessary supplementation or correction within the established time limit for doing so.

To be sure, there can come a point that an expert's supplemental submission amounts to such a "dramatic, pointed variation" from his initial report as to exceed the permissible purpose of supplementation or correction under Rule 26(e)(1).  *Keener v. United States,* 181 F.R.D. 639, 641 (D. Mont. 1998); *see also In re Ready-Mixed Concrete Antitrust Litigation,* 261 F.R.D. 154, 159-60 (S.D. Ind. 2009) (striking an expert submission that was "not 'supplemental,' as contemplated by Rule 26," but instead "employ[ed] a host of new detailed analyses . . . . , none of which was developed in the original [expert] report").  Under these circumstances, the courts have recognized that overbroad "supplementation" under the guise of Rule 26(e)(1) would undermine the purposes of the expert disclosure provisions set forth in subsection (a)(2) of the Rule, which are intended to "prevent unfair surprise at trial" and "prevent[] experts from 'lying in wait' to express new opinions at the last minute, thereby denying the opposing party the opportunity to depose the expert on the new information or closely examine the expert's new testimony."  *Minebea Co. v. Papst,* 231 F.R.D. 3, 5-6 (D.D.C. 2005).

Dr. Ashenfelter's rebuttal report does not trigger these concerns.  It does not alter the fundamental benchmark approach adopted in Dr. Ashenfelter's initial report, nor does it advance any new theories as to impact or damages.  Rather, Dr. Ashenfelter has merely refined his analysis and corrected or augmented some of his calculations in response to certain of the points raised by Defendants' experts upon their review of his initial report.  The courts have explained that the filing of such a supplemental report "that fully informs the recipient of the anticipated testimony of the expert" without "belatedly send[ing] the case on a wholly different tack" accomplishes the "very purpose" of Rule 26(e), which is "to prevent surprise at trial."  *Talbert v.*

While Defendants point to Professor Rubinfeld's sur-rebuttal report as describing still more costs that Dr. Ashenfelter should have deducted in arriving at his estimate of the "but-for" wages that would have been paid to Plaintiffs in the absence of Defendants' alleged antitrust violations, the Court has determined that this sur-rebuttal report was untimely produced and cannot be considered. In any event, Dr. Ashenfelter's efforts to account for the Defendant hospitals' human resources costs are "based upon facts in the record," and Defendants' challenges to the completeness of Dr. Ashenfelter's review of this record and the accuracy of his resulting adjustments do not warrant the wholesale exclusion of Dr. Ashenfelter's testimony as unreliable, but instead are matters to be "tested on cross-examination and subjected to further scrutiny and criticism by Defendants' own expert" at trial. *In re Scrap Metal,* 527 F.3d at 530-31; *see also In re Northwest Airlines,* 197 F. Supp.2d at 927 ("[T]o the extent that Defendants and their experts have applied a similar methodology and merely reached a different conclusion, such a 'battle of the experts' must be resolved by the trier of fact.").

Similarly, Defendants' challenge to the accuracy of Dr. Ashenfelter's "flexibility premium" — an adjustment to the agency fee that is intended to account for the additional value provided by agency nurses who perform more temporary or flexible RN services,

---

*City of Chicago,* 236 F.R.D. 415, 421, 424 (N.D. Ill. 2006); *see also Crowley v. Chait,* 322 F. Supp.2d 530, 540 (D.N.J. 2004) (observing that "*Daubert* does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes," but that, to the contrary, such error correction "strengthens the quality of the expert report"). Nor can Defendants claim any prejudice from any "last minute" disclosures in Dr. Ashenfelter's rebuttal report, where they had the opportunity to depose him after the production of this report. Thus, the Court rejects Defendants' characterization of this rebuttal report as an improper "do-over."

(*see* Ashenfelter Report at ¶ 115) — does not provide a basis for excluding Dr. Ashenfelter's proposed testimony as unreliable.  As noted earlier, Dr. Ashenfelter's initial report estimated this flexibility premium as 11.2 percent, (*id.* at ¶ 115), but he revised this figure to 18 percent in his rebuttal report, (*see* Ashenfelter Rebuttal Report at ¶ 67), and then to 21.5 percent in the errata to his rebuttal report, (*see* Defendants' Motion, Ex. F, Errata Sheet at 1).  Notably, this 21.5 percent figure exceeds the 19.5 percent flexibility premium estimated by Defendant's expert, Professor Rubinfeld, (*see* Defendants' Motion, Ex. H, Rubinfeld Report at ¶ 137 n.175), and incorporates the sole substantive critique offered by Professor Rubinfeld to Dr. Ashenfelter's calculation of this premium.

To be sure, Defendants point to errors in the statistical analysis through which Dr. Ashenfelter sought to address Professor Rubinfeld's critique — errors that Dr. Ashenfelter acknowledged and attempted to correct in the errata to his rebuttal report — and they further maintain that Dr. Ashenfelter's estimated flexibility premium, even as revised and increased in his rebuttal report and errata, still remains an "inadequate deduction" that fails to adequate capture all of the differences between wages paid to RN employees and fees paid for agency nurses.  (Defendants' Motion, Br. in Support at 16.)  Yet, as stated by Defendants' own expert, Professor Rubinfeld, these are "data and implementation flaws" that reflect Dr. Ashenfelter's purported "fail[ure] to account appropriately for deductions from the agency bill rate" paid by the Defendant hospitals "for items such as agency margins or actual premium[s] earned by agency nurses relative to internal pool nurses or permanent employees."  (Rubinfeld Report at ¶ 133 & n.163.)

19

Along the same lines, Defendants assert in their motion that these purported flaws in Dr. Ashenfelter's expert analysis have led him to "overstate[]" the damages allegedly suffered by the plaintiff class.  (Defendants' Motion, Br. in Support at 16.)  These quarrels with the accuracy of Dr. Ashenfelter's calculations, as opposed to his underlying benchmark approach to estimating RN wages in the absence of Defendants' alleged antitrust violations, must be left for the trier of fact to resolve, and do not provide a basis for the exclusion of Dr. Ashenfelter's testimony under Rule 702.  *See Conwood Co.,* 290 F.3d at 794 (holding that an expert's failure to consider additional variables identified as important by an opposing party's expert normally affects only the probative value of the expert's testimony, and not its admissibility).

Moving beyond the issue of the specific adjustments that Dr. Ashenfelter made (or failed to make) to his agency fee benchmark, Defendants next contend that the "one size fits all" nature of this benchmark disqualifies it as a reliable measure of RN wages in a market free from Defendants' alleged antitrust conspiracy.  As Defendants observe, Dr. Ashenfelter's benchmark approach generates a single "but-for" wage figure encompassing all nurses who worked at a given Defendant hospital in a given year.  In reality, however — and as Dr. Ashenfelter acknowledged at his deposition, (*see* Defendants' Motion, Ex. D, Ashenfelter  3/31/2009 Dep. at 342-43) — RN wages vary widely within a hospital, or even a single department, and this presumably would remain true in the "but-for" world in which the Defendant hospitals had not engaged in an alleged antitrust conspiracy.  In Defendants' view, this disjunction between Dr.

20

Ashenfelter's benchmark and the real world disqualifies Dr. Ashenfelter's analysis as a reliable account of the antitrust injury allegedly suffered by the plaintiff class, where this analysis would "lead[] to bizarre and arbitrary results" such as, for example, the most experienced nurses having the smallest damages.  (Defendants' Motion, Br. in Support at 18.)

Plaintiffs correctly point out, however, that this critique of Dr. Ashenfelter's benchmark analysis derives from its nature as an admittedly conservative estimate of "but-for" RN wages.  Because Dr. Ashenfelter's benchmark rests upon the fees paid by the Defendant hospitals for agency nurses, it measures only the value of "generic" nursing services provided by these agency nurses, and Dr. Ashenfelter has acknowledged that this may result in "understat[ing] the losses of experienced nurses" as compared to the losses suffered by their less experienced counterparts.  (Ashenfelter Rebuttal Report at ¶ 72; *see also* Ashenfelter 3/31/2009 Dep. at 345-48.)  As Plaintiffs observe, so long as Dr. Ashenfelter is able to persuade the trier of fact that his benchmark provides a truly conservative estimate of but-for RN wages — an assertion that Defendants, of course, are free to challenge, both through cross-examination and through the testimony of their own experts — this will suffice to establish that Defendants' alleged antitrust violations had a common impact on the members of the plaintiff class, even if this benchmark might not accurately measure the precise harm suffered by each individual class members.  It follows that Dr. Ashenfelter's testimony is admissible as to this issue of common impact.

Moreover, the Court agrees with Plaintiffs that this acknowledged imprecision in

Dr. Ashenfelter's approach does not preclude him from testifying with sufficient reliability as to the damages suffered by the plaintiff class.  When questioned on this subject at his deposition, Dr. Ashenfelter recognized that it was "certainly possible" to construct a benchmark that attempted to more precisely measure the variance in "but-for" wages paid to nurses with differing levels of experience, skill, and training who work at the same Defendant hospital, but he opined that this approach would be less reliable due to the "potential . . . arbitrariness of the assumptions" he would need to make and the resulting introduction of "potential error that [he] wouldn't be able to quantify." (Ashenfelter 3/31/2009 Dep. at 344-45.)  Again, if the trier of fact accepts this testimony, as well as Dr. Ashenfelter's more general characterization of his approach as providing a "lower bound estimate" of the losses suffered by the members of the plaintiff class, (*id.* at 345), the Defendant hospitals will not be called upon to pay damages in excess of the harm inflicted on the plaintiff class as a result of their alleged antitrust violations.  As Plaintiffs aptly observe, Defendants' stated concern over this purportedly "arbitrary" feature of Dr. Ashenfelter's analysis surely does not arise from any notions of "unfairness" to some class members, such as highly experienced nurses, who "may receive damages that underestimate their 'true' losses," but instead seeks to ensure, through the wholesale exclusion of Dr. Ashenfelter's testimony, that the members of the plaintiff class "can never recover anything for their injuries."  (Plaintiffs' Response Br. at 31.)  The Court finds nothing in Rule 702 or the case law that would mandate this result; to the contrary, in *In re Scrap Metal,* 527 F.3d at 534, the Sixth Circuit upheld an

aggregate measure of damages in an antitrust suit that rested upon a "uniform-impact" theory similar to that advanced by Dr. Ashenfelter here.

Next, Defendants challenge the reliability of Dr. Ashenfelter's benchmark analysis as purportedly dependent upon a theory of "collusive price discrimination" that is "completely unsupported by the facts." (Defendants' Motion, Br. in Support at 20.) As Plaintiffs point out in response, however, the phrase "collusive price discrimination" appears nowhere in Dr. Ashenfelter's initial or rebuttal reports, nor is it accurate to say that his benchmark analysis "relies" on any such theory of "collusive price discrimination." Rather, Dr. Ashenfelter merely mentions the economic behavior of price discrimination in his rebuttal report in response to a point raised by Defendants' experts — or, as Dr. Ashenfelter puts it, to explain "how it could be that the defendant hospitals are willing to pay so much more for agency nurses than they are willing to pay their regular RNs." (Ashenfelter Rebuttal Report at ¶ 31.) This discussion of price discrimination, then, is largely peripheral to Dr. Ashenfelter's benchmark analysis, and it should be left to the trier of fact to resolve this "battle of the experts" and determine the adequacy of Dr. Ashenfelter's explanation in response to the critique of Defendants' experts.

Defendants next contend that Dr. Ashenfelter's benchmark analysis rests on an unfounded assumption that the Defendant hospitals make "extensive" use of agency nurses, (Ashenfelter Report at ¶ 103), without any effort to confirm the validity of this assumption. Yet, in the very next paragraph of his expert report, Dr. Ashenfelter cites

23

record evidence of the millions of dollars spent annually by the Defendant hospitals for agency nurses and the large numbers of hours worked by agency nurses at the Defendant hospitals during the relevant period.  (*Id.* at ¶ 104.)  While Defendants fault Dr. Ashenfelter for failing to compare the Defendant hospitals' use of agency nurses to the use rate of agency nurses at hospitals elsewhere in the country, Plaintiffs correctly observe that Dr. Ashenfelter's benchmark analysis does not require that the word "extensive" be construed as "more than in other cities."  (Plaintiffs' Response Br. at 37.)  Rather, the evidence of Defendants' significant use of agency nurses provides a sufficient basis in the record for allowing the trier of fact to consider Dr. Ashenfelter's benchmark analysis and determine the weight it should be given.

Finally, Defendants assert that Dr. Ashenfelter's admitted failure to test the methodology underlying his benchmark analysis renders this analysis unreliable and inadmissible.  Yet, while the *Daubert* standard includes testing as one of the factors a court may consider in determining the admissibility of an expert's testimony, both the Supreme Court and the Sixth Circuit have emphasized that the factors cited in *Daubert* "do *not* constitute a definitive checklist or test," and that "the Rule 702 inquiry [i]s a flexible one."  *Kumho Tire,* 526 U.S. at 150, 119 S. Ct. at 1175 (emphasis in original) (internal quotation marks and citations omitted); *see also In re Scrap Metal,* 527 F.3d at 529.  More specifically, although a lack of testing may render an expert's opinion unreliable where the expert's theory "easily lends itself to testing and substantiation," *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 870 (7th Cir. 2001), the courts have

24

recognized that this *Daubert* factor may not apply as well, if at all, to the social sciences, in which theories are less susceptible to "ideal experimental conditions and controls," *United States v. Simmons,* 470 F.3d 1115, 1123 (5th Cir. 2006); *see also Isely v. Capuchin Province,* 877 F. Supp. 1055, 1065-66 (E.D. Mich. 1995) (permitting a psychological expert to testify regarding repressed memory, despite the expert's acknowledgment that her theory of repressed memory "cannot be tested empirically"); *Voilas v. General Motors Corp.,* 73 F. Supp.2d 452, 461 (D.N.J. 1999) (observing that outside the hard sciences, "theories are often not subject to testing or experimentation" (internal quotation marks and citation omitted)).

In this case, Defendants evidently suggest that Dr. Ashenfelter could have tested his benchmark approach by examining agency fees and nurse wages paid by hospitals outside the Detroit metropolitan area. As Plaintiffs observe, however, Defendants' own expert, Professor Rubinfeld, attempted to perform such an analysis, and Dr. Ashenfelter has rejected this analysis as "unreliable" in light of the lack of credible data as to "what agencies charge in cities other than Detroit." (Ashenfelter Rebuttal Report at ¶ 58.) Although the trier of fact certainly need not credit Dr. Ashenfelter's view that such a test cannot be reliably conducted due to the limited available data as to agency fees paid by hospitals in other markets, this nonetheless is another "battle of the experts" that is not appropriate for resolution in the context of a Rule 702 motion to exclude an expert's testimony.

**C.     Defendants' Remaining Challenges to Dr. Ashenfelter's Economic Analysis**

25

**Do Not Warrant the Exclusion of His Proposed Expert Testimony on These Subjects.**

As observed earlier, the bulk of Defendants' challenges to Dr. Ashenfelter's proposed expert testimony are directed at the benchmark approach through which he proposes to demonstrate the common impact of Defendants' alleged antitrust violations upon the members of the plaintiff class and the damages suffered by the class. Beyond these critiques, however, Defendants also contend that other aspects of Dr. Ashenfelter's economic analysis are subject to exclusion under Rule 702 as unreliable. The Court disagrees, and instead finds, once again, that these remaining challenges must be left for resolution by the trier of fact.

As the first of these challenges, Defendants argue that Dr. Ashenfelter's analysis of the utilization rate of RNs in the Detroit metropolitan area should be excluded because of his purported failure to account for alternative explanations for the low utilization rate identified in his expert report. Dr. Ashenfelter opines in his report that this low utilization rate in the Detroit area, as compared to "mean RN utilization in other [U.S.] cities," supports the conclusion that "utilization of RNs is below the competitive level" in the Detroit metropolitan area, and thus "provides further confirmation that fewer RNs are working in hospital jobs [in the Detroit area] than would be expected in the absence of the alleged information exchange conspiracy." (Ashenfelter Report at ¶¶ 128, 130, 144.) In Defendants' view, however, Dr. Ashenfelter has failed to identify a reliable basis for the conclusion he draws from this utilization analysis, where the record reveals that at least

26

thirty other cities encompassed within this analysis have RN utilization rates lower than Detroit's.  This suggests, according to Defendants, that these low utilization rates in Detroit and several other cities might well be attributable to factors other than an alleged antitrust conspiracy — unless, of course, one is prepared to assume that the hospitals in these other cities have engaged in similar antitrust violations — yet Dr. Ashenfelter acknowledges that he did not look into the possible causes of the low utilization rates in other cities, and thus could not say whether factors apart from allegedly anticompetitive conduct might be responsible for these low rates.

As Plaintiffs observe, however, this argument reads Dr. Ashenfelter's RN utilization study in isolation, rather than as part of a larger overall analysis in which Dr. Ashenfelter relies upon ***both*** Detroit's relatively low RN utilization rate ***and*** the purportedly depressed RN wages paid by the Defendant Detroit-area hospitals to conclude that the Detroit-area RN market suffers from each of "the two anticompetitive effects that can be expected to result from an exercise of market power in a labor market." (Ashenfelter Report at ¶¶ 125-28.)  This addresses, at least indirectly, the only alternative explanation specifically identified by Defendants and their experts — namely, that low RN utilization may also be attributable to "higher than competitive wages."  (Defendants' Motion, Br. in Support at 7.)  Because Dr. Ashenfelter's finding of depressed RN wages rules out this alternative, his utilization analysis is not subject to exclusion on the ground that it fails to account for this alternative explanation for low RN utilization in the Detroit area.  In any event, and as observed earlier, any such purported failure to address and rule

27

out other possible causes of the injury allegedly suffered by the plaintiff class affects only the weight, and not the admissibility, of Dr. Ashenfelter's proposed expert testimony.  *See Conwood Co.,* 290 F.3d at 794; *see also Jahn v. Equine Services, PSC,* 233 F.3d 382, 390 (6th Cir. 2000) ("The fact that several possible causes might remain uneliminated only goes to the accuracy of the conclusion, not to the soundness of the methodology." (internal quotation marks, alteration, and citation omitted)).

Next, Defendants challenge Dr. Ashenfelter's analyses of the relevant geographic and product markets as based on insufficient investigation or data.  Yet, as a threshold matter, Plaintiffs point out — and the Court likewise has recognized in an earlier ruling in this case — that "proof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects."  *Cason-Merenda,* 862 F. Supp.2d at 648 (internal quotation marks and citation omitted).  Because Dr. Ashenfelter's benchmark analysis, "if credited, serves as direct proof of a detrimental impact upon the wages paid to RNs by the Defendant hospitals," any purported weaknesses in Dr. Ashenfelter's analysis of the relevant market and of the Defendant hospitals' share of that market would not defeat Plaintiffs' remaining rule-of-reason claim.  862 F. Supp.2d at 648.

In any event, the Court finds that the purported weaknesses identified by Defendants in Dr. Ashenfelter's market analysis affect only the weight, and not the admissibility, of Dr. Ashenfelter's proposed testimony on this subject.  Defendants do not dispute that the elasticity analysis upon which Dr. Ashenfelter primarily relies, (*see*

28

Ashenfelter Report at ¶¶ 152-54), is an accepted method for defining a relevant geographic market.[10]  While Defendants suggest additional factors Dr. Ashenfelter should have considered in his market analysis, this sort of challenge is amenable to exploration on cross-examination of Dr. Ashenfelter at trial.  Similarly, to the extent that Defendants' experts have proffered a different analysis and definition of the relevant geographic market, Dr. Ashenfelter has in turn identified a number of purported flaws in this analysis, (*see* Ashenfelter Rebuttal Report at ¶¶ 127-39), and the resulting "battle of the experts" must be resolved by the trier of fact.  Finally, as to Defendants' contention that Dr. Ashenfelter's definition of the relevant product market is undermined by his failure to properly consider whether this market should be narrower — *e.g.,* broken into subclasses of RNs in different hospital departments — or broader — *e.g.,* expanded to include RNs in non-hospital settings — Plaintiffs observe that the definition of a product market is driven by "economic realities and industry practice."  *Spirit Airlines, Inc. v. Northwest Airlines, Inc.,* 431 F.3d 917, 933 (6th Cir. 2005).  As this Court has previously recognized, "to see that Dr. Ashenfelter's exclusion of non-hospital RNs [from the relevant product market] was reasonable, one need look no further than the Defendant hospitals' own conduct in commissioning and conducting wage surveys" that nearly

---

[10]Defendants do take issue, however, with Dr. Ashenfelter's failure to conduct an econometric study of the elasticity of the supply of nurses.  Yet, Dr. Ashenfelter testified at his deposition that he chose not to do so because "there just wasn't enough data . . . to do something that would be transparent and credible," (Ashenfelter 1/6/2009 Dep. at 149), and Plaintiffs point out that "none of Defendants' three economists have attempted any such analysis to support their discussion of market definition," (Plaintiffs' Response Br. at 42).

always sought "information only on what other *hospitals* [we]re paying their *hospital* nurses." *Cason-Merenda,* 862 F. Supp.2d at 648-49 (emphasis in original) (internal quotation marks and citation omitted).

Finally, Defendants challenge the admissibility of an "inverse elasticity" analysis performed by Dr. Ashenfelter, from which he concludes that collusion to depress the wages of a "substantial subgroup" within the RN class would result in lower wages for all jobs in the class. (*See* Ashenfelter Report at ¶¶ 95-102.) Again, however, this challenge rests in part on Dr. Ashenfelter's purported failure to include certain variables in his analysis, and such omissions affect only the probative value of this analysis. To the extent that Defendants fault Dr. Ashenfelter for failing to consider cross-elasticity of the supply of nurses among specific pairs of hospital departments — *e.g.,* between the medical-surgical and intensive care units, (*see* Defendants' Motion, Br. in Support at 30) — Plaintiffs correctly respond that it is irrelevant, for purposes of Dr. Ashenfelter's analysis, to know how many nurses would move from one specific department to another in response to changes in wages; rather, it only matters whether nurses would move generally among departments in response to this change.[11] Dr. Ashenfelter cites a basis in the record for his calculation of this "inverse elasticity" figure, (*see* Ashenfelter Report at ¶ 102), and Defendants remain free to cross-examine him as to other record evidence that

---

[11]Plaintiffs further suggest that "it would require an unfathomable amount of data" to conduct the specific department-pair analysis proposed by Defendants. (Plaintiffs' Response Br. at 43.)

would undermine this calculation.  *See McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797,

801 (6th Cir. 2000) (emphasizing that "mere weaknesses in the factual basis of an expert

witness' opinion bear on the weight of the evidence rather than on its admissibility"

(internal quotation marks, alteration, and citation omitted)).

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' April 24,

2009 motion to exclude the expert testimony of Orley Ashenfelter (docket #349) is

DENIED.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  April 22, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on April 22, 2013, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135

31