UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA and )
JEFFREY A. SUHRE on behalf of )
themselves and others similarly situated, )   Case No. 06-15601
                        Plaintiffs, )
        v. )   Hon. Gerald E. Rosen
 )
VHS of MICHIGAN, INC., d.b.a. )   Magistrate: Donald A. Scheer
DETROIT MEDICAL CENTER, )
HENRY FORD HEALTH SYSTEM, )
MOUNT CLEMENS GENERAL )
HOSPITAL, INC., )
ST. JOHN HEALTH, OAKWOOD )
HEALTHCARE INC., BON SECOURS )
COTTAGE HEALTH SERVICES, )
WILLIAM BEAUMONT HOSPITAL )
and TRINITY HEALTH CORP. )
 )
                        Defendants. )
_____ )

## PLAINTIFFS' MOTION FOR FINAL APPROVAL
## OF SETTLEMENTS WITH HENRY FORD HEALTH SYSTEM,
## WITH MOUNT CLEMENS GENERAL HOSPITAL, INC.,
## WITH WILLIAM BEAUMONT HOSPITAL AND WITH TRINITY
## HEALTH CORP.

## AND

## FOR APPROVAL OF PLAN OF ALLOCATION

Plaintiffs move the Court for an Order approving the terms of four

Settlement Agreements between members of certain Stipulated Settlement Classes

and (1) Henry Ford Health System, (2) Mount Clemens General Hospital, Inc., (3)

William Beaumont Hospital and (4) Trinity Health Corp., as described herein. The

Settlements provide for payments to members of the Settlement Classes of $8,443,973, $2,036,791, $11,342,904, and $5,144,257 respectively. Each of these settlements was reached after years of vigorous litigation including extensive fact and expert discovery and through multiple, lengthy processes involving arms-length negotiations. Each of the four settlements was negotiated in part with the assistance of the Court-appointed Settlement Master, Judge Layn Phillips, ret. Each Settlement provides significant benefits to the Class, while removing the risk and delay associated with further litigation against the settling defendant. For ease of reference, the four Settlement Agreements are attached as Exhibits 1-4 to the Declaration of Raymond Farrow in Support of Plaintiffs' Motion for Final Approval of Settlements and in Support of Plan of Allocation ("Farrow Decl.").

Plaintiffs also seek Court approval of a proposed Plan of Allocation for the monies collected in these four settlements along with the relevant parts of the funds previously collected from three other settling defendants, St. John, Oakwood, and Bon Secours. This distribution will allocate among class members either:

(1) $34,475,925 less the amount of attorneys fees and other costs approved by the Court (this being the total funds collected to date that can be distributed without a Court ruling on class certification consistent with certain provisions in some settlement agreements that limit when money can be distributed to members of the class); or

(2) $37,876,335 less the amount of attorneys fees and other costs approved by the Court (this being the total amount of non-contingent funds collected to date that can be distributed if the Court rules on class certification prior to the time of distribution, depending on how the Court rules); or

(3) $48,059,400 less the amount of attorneys fees and other costs approved by the Court (this being the amount that will be available for distribution if, before the date of the proposed distribution, the Court issues a decision certifying a litigation class similar to the Settlement Class previously certified in association with the approval of the settlement with St. John before the date of the distribution).

Dated Friday, August 09, 2013

Respectfully submitted:

**KELLER ROHRBACK L.L.P.**

By: /s/Mark A. Griffin
Mark A. Griffin
Lynn L. Sarko
Raymond J. Farrow
Tana Lin
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1200
Fax: (206) 623-3384

Daniel A. Small
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.,
Suite 500 West
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

Sharon K. Robertson
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine St., 14th Floor
New York, NY. 10005
Tel: (212) 758-3042
Fax: (212) 838-7745

David P. Dean
JAMES & HOFFMAN
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

Stephen Wasinger
STEPHEN F. WASINGER PLC
26862 Woodward Avenue, Suite 100
Royal Oak, MI 48067
Tel: 248-544-5100
Fax: 248-479-0391

Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Daniel M. Cohen
CUNEO GILBERT & LADUCA LLP
106-A S. Columbus Street
Alexandria, VA 22314
Tel: (202) 789-3960
Fax: (202) 789-1813

Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
120 So. 6th Street, Ste. 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA and )
JEFFREY A. SUHRE on behalf of )
themselves and others similarly situated, )    Case No. 06-15601
Plaintiffs, )
v. )    Hon. Gerald E. Rosen
)
VHS of MICHIGAN, INC., d.b.a. )    Magistrate: Donald A. Scheer
DETROIT MEDICAL CENTER, )
HENRY FORD HEALTH SYSTEM, )
MOUNT CLEMENS GENERAL )
HOSPITAL, INC., )
ST. JOHN HEALTH, OAKWOOD )
HEALTHCARE INC., BON SECOURS )
COTTAGE HEALTH SERVICES, )
WILLIAM BEAUMONT HOSPITAL )
and TRINITY HEALTH CORP. )
)
Defendants. )
_____ )

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF SETTLEMENTS WITH HENRY FORD HEALTH SYSTEM,
WITH MOUNT CLEMENS GENERAL HOSPITAL, INC.,
WITH WILLIAM BEAUMONT HOSPITAL AND WITH TRINITY
HEALTH CORP.**

**AND**

**FOR APPROVAL OF PLAN OF ALLOCATION**

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    BACKGROUND ....................................................................................3

          1.     Settlement Negotiations and Investigation ...............................4

          2.     The Settlement Classes ..........................................................4

          3.     The Settlement Amounts.........................................................5

          4.     Other Benefits to the Settlement Classes................................5

          5.     The Releases ..........................................................................6

     B.    Preliminary Approval and Notice to the Class.................................6

III.    THE COURT SHOULD APPROVE THE SETTLEMENTS. ....................9

     A.    The Risk of Fraud or Collusion........................................................10

     B.    The Complexity, Expense and Likely Duration of the
          Litigation ..........................................................................11

     C.    The Amount of Discovery Engaged in by the Parties.......................11

     D.    The Likelihood of Success on the Merits.........................................12

     E.    The Opinions of Class Counsel and Class
          Representatives....................................................................12

     F.    The Reaction of Absent Class Members...........................................13

     G.    The Public Interest...........................................................................17

IV.    Certification of the Settlement Classes Is Warranted................................18

     A.    The Requirements of Rule 23(a) Are Readily Satisfied
          Here. ...................................................................................18

B.     The Requirements of Rule 23(b)(3) Are Readily Satisfied
       Here. ..................................................................................................19

V.     The Proposed Plan of Allocation Should Be Approved.............................23

A.     The Proposed Plan of Allocation and Proposed Claim
       Forms..................................................................................................26

B.     The Plan of Allocation is Fair, Reasonable, and
       Adequate.............................................................................................30

VI.    Conclusion ................................................................................................31

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.      Whether the Court should approve the Henry Ford Settlement.

2.      Whether the Court should approve the Mt. Clemens Settlement.

3.      Whether the Court should approve the Trinity Health Settlement.

4.      Whether the Court should approve the William Beaumont Settlement.

5.      Whether the Court should approve the proposed plan of allocation of the settlement fund.


**<u>Plaintiffs' Response To All Questions</u>:**

**YES**

## STATEMENT OF
## MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)

*Int'l Union v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)

*In re Whirlpool Corp. Front Loading Washer Prods. Liability Litig.*, No. 10-4188, -- F.3d --, 2013 WL 3746205 (6th Cir. July 18, 2013)

*Carson v. American Brands, Inc.*, 450 U.S. 79 (1981)

*Rankin v. Rots,* ("*In re KMART ERISA Litig*") No. 02-71045, 2006 UWL 1876538 (E.D. Mich. June 27, 2006)

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.,* 248 F.R.D. 483 (E.D. Mich. 2008)

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003)

*In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007)

*Cason-Merenda v Detroit Medical Center*, Opinion and Order Denying Defendants' Motion to Exclude the Expert Testimony of Orley Ashenfelter, No. 06-15601 ECF No. 793.

# TABLE OF AUTHORITIES

Cases

*Am. Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974).........................................................................17

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)....................................................................23, 25

*Carnegie v. Household Int'l., Inc.*,
  376 F.3d 656 (7th Cir. 2004) ..........................................................26

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981)...........................................................................9

*Comcast Corp. v. Behrend*,
  133 S.Ct. 1426 (2013)..................................................................22, 25

*Fischer Bros., Inc. v. Mueller Brass Co.*,
  630 F. Supp. 493 (E.D. Pa. 1985)....................................................10

*Fleischman v. Albany Med. Ctr.*,
  No. 06-765, 2008 WL 2945993 (N.D.N.Y. July 28, 2008)..............18

*Geyer v. USX Corp.*,
  896 F. Supp. 1440 (E.D. Mich. 1994) .............................................15

*In re Auto. Refinishing Paint Antitrust Litig.*,
  617 F. Supp. 2d 336 (E.D. Pa. 2007)...............................................10

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508  (E.D. Mich. 2003) ...........................................13, 19

*In re Chambers Dev. Sec. Litig.*,
  912 F. Supp. 822 (W.D. Pa. 1995)...................................................12

*In re Delphi Corp. Sec., Derivative &"ERISA" Litig.*,
  248 F.R.D. 483 (E.D. Mich. 2008) ..................................................23

*In re Foundry Resins Antitrust Litig.*,
   242 F.R.D. 393 (S.D. Ohio 2007) .................................................. 21, 23, 24, 25

*In re Ins. Brokerage Antitrust Litig.*,
   579 F.3d 241 (3d Cir. 2009) .........................................................24, 25

*In re Linerboard Antitrust Litig.*,
   321 F. Supp. 2d 619 (E.D. Pa. 2004) ............................................10

*In re Linerboard*,
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ............................................11

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................12

*In re Packaged Ice Antitrust Litig*,
   2011 U.S. Dist. LEXIS 150427 (E.D. Mich. Dec. 13, 2011) ..........................14

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) .........................................................23

*In re Telectronics Pacing Sys., Inc.*,
   137 F. Supp. 2d 985 (S.D. Ohio 2001) ..........................................10

*In re Whirlpool Corp. Front Loading Washer Products Liability
   Litig.*,
   -- F.3d --, 2013 WL 3746205 (6th Cir. July 18, 2013).........................1, 20, 21

*Int'l Union v. General Motors Corp.*,
   497 F.3d 615 (6th Cir. 2007) ...........................................................9

*Kogan v. AIMCO Fox Chase, L.P.*,
   193 F.R.D. 496 (E.D. Mich. 2000) .................................................13

*Levya v. Medline Indus., Inc.*,
   716 F.3d 510 (9th Cir. 2013) .........................................................25

*Rankin v. Rots*,
   No. 02-71045, 2006 WL 1876538 (E.D. Mich. June 28, 2006)..................9, 13

*Rosiles-Perez v. Superior Forestry Serv., Inc.*,
250 F.R.D. 332 (M.D. Tenn. 2008) ..................................................26

*Taft v. Ackermans*,
No. 02-7951, 2007 WL 414493 (S.D.N.Y. Jan 31, 2007)...............31

*Thacker v. Chesapeake Appalachia, L.L.C.*,
695 F. Supp. 2d 521 (E.D. Ky. 2010)..............................................31

*Wesely v. Spear*,
711 F. Supp. 713 (E.D.N.Y. 1989) ..................................................11

Rules

Fed. R. Civ. P. 23 ...................................................................................15

Fed. R. Civ. P. 23(a)...............................................................................18

Fed. R. Civ. P. 23(b)(3)................................................................ 19, 20, 21

Fed. R. Civ. P. 23(e)..............................................................................1, 8

Other Authorities

Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS §
12.10 (3d. ed. 1992).......................................................................27

Manual for Complex Litig., Third § 30.47 (2003) ................................28

## I.   INTRODUCTION

Pursuant to Fed. Rule Civ. P. Rule 23(e), Plaintiffs Pat Cason-Merenda and

Jeffrey Suhre, on behalf of themselves and the certified Settlement Classes

(collectively "Plaintiffs"), respectfully submit this Memorandum in support of their

motion for final approval of four settlements with: Henry Ford Health Services

("Henry Ford" or "HFHS"); Mt. Clemens General Hospital, ("Mt. Clemens" or

"MCGH"); Trinity Health Corp. ("Trinity" or "THC"); and William Beaumont

Hospital ("Beaumont" or "WBH") (jointly "Settling Defendants"). In aggregate

these Settlements secure a cash payment of $26,967,925.

For the reasons set forth below, each Settlement is fair, reasonable, adequate,

and in the best interest of the proposed Settlement Classes, and Plaintiffs

respectfully request that the Court grant their request for final approval of each of

the Settlements. Further, this Court's prior decisions to certify essentially identical

settlement classes is directly applicable to the decision whether to certify these

classes, a decision that is only reinforced by the Sixth Circuit's recent decision in

*In re Whirlpool Corp. Front Loading Washer Products Liability Litig.*, -- F.3d --,

2013 WL 3746205 (6th Cir. July 18, 2013), and this Court's recent ruling denying

Defendants' challenge to the testimony of Prof. Orley Ashenfelter, which

testimony will be used at trial against the sole remaining defendant, VHS of

Michigan, Inc., d.b.a. Detroit Medical Center ("Vanguard"),[1] to demonstrate how

impact and damages can be proven on a class-wide basis.

In addition, Plaintiffs propose to allocate all the monies collected from these

four Settlements as well as the appropriate amounts collected from the previous

three settling Defendants. This distribution will allocate among class members one

of the following sums:[2]

- $34,475,925 less the amount of attorneys fees and other costs

    approved by the Court (this being the total funds collected to date that

    can be distributed without a Court ruling on class certification

    consistent with certain provisions in some settlement agreements that

    limit when money can be distributed to members of the class); or

- (2) $37,876,335 less the amount of attorneys fees and other costs

    approved by the Court (this being the total amount of non-contingent

---

[1] The trial may actually be against Tenet, "one of the largest investor-owned health care delivery systems in the nation," because it was recently announced that the $9.1 billion for-profit corporation Tenet, which earned over $1.2 billion in 2012, is purchasing the $5.9 billion for-profit corporation Vanguard, which earned over $575 million in 2012, including purchasing Detroit Medical Center. *See* Declaration of Raymond J. Farrow ("Farrow Decl.) Exs. 10–13.

[2] As explained below, because the proposed claim forms merely serve to determine the percentage of the total fund available to be paid to each class member the claims forms do not need to be amended depending on the amount to be distributed. If any of the St. John settlement funds become available for distribution later (which amount could be $13,583,475, $10,183,065, or $3,400,410 depending on how this Court rules on class certification and when), then a separate mailing of additional monies can be carried out based on the same *pro-rata* allocations already established through this claims process.

funds collected to date that can be distributed if the Court rules on

class certification prior to the time of distribution, depending on how

the Court rules); or

- (3) $48,059,400 less the amount of attorneys fees and other costs

  approved by the Court (this being the amount that will be available

  for distribution if, before the date of the proposed distribution, the

  Court issues a decision certifying a litigation class similar to the

  Settlement Class previously certified in association with the approval

  of the settlement with St. John before the date of the distribution).

Plaintiffs believe that the *pro-rata* allocation further described below, which

reflects the manner in which each settlement amount was computed and

negotiated, is the most appropriate means of allocating these funds.

## II.   BACKGROUND
### A.   The Litigation

Plaintiffs filed this lawsuit in December of 2006, amending the Complaint in

June of 2007 to add Beaumont and Trinity as defendants. Since that time, this case

has proceeded through intense litigation. All discovery, including expert discovery,

has been completed. The Court has denied a Motion to Dismiss filed by Trinity, an

early Motion for Summary Judgment filed by Mt. Clemens,[3] and two Motions for

---

[3] A subsequent Motion for Summary Judgment filed by Mt. Clemens was denied
without prejudice as moot in light of the settlement that is now before the Court.

Summary Judgment, one filed jointly by the Settling Defendants and one filed by Vanguard. Because this Court is well aware of the history of this litigation, which has been set forth in multiple prior motions, Plaintiffs will not repeat it here.

### B.  The Settlements

#### 1.  Settlement Negotiations and Investigation

Each of the four agreements was the result of extensive arm's-length negotiations between experienced counsel assisted by the court-appointed Settlement Master, Judge Layn Phillips, Ret. Each series of discussions was founded on a full understanding of the strengths and weaknesses of the case against each Settling Defendant obtained through discovery, Plaintiffs' extensive pre-filing investigation, substantial economic analysis of impact and damages issues, and a full airing of the parties' arguments via summary judgment and class certification motions that were fully briefed at the time these settlements were negotiated.

#### 2.  The Settlement Classes

The Henry Ford and Mt. Clemens Settlement Classes are each defined as:

> All registered nurses who provided direct patient care in short term acute care facilities exclusive of supervisory, managerial, or advanced practice nurses, and who were employed by Defendants within the Detroit Michigan Metropolitan Statistical Area at any time from December 12, 2002 through December 12, 2006.

HFHS Agreement at ¶ 21; MCGH Agreement at ¶ 23 (Farrow Decl. Exs. 1 & 2).

The Beaumont and Trinity settlement classes are identical except that they include

nurses employed through June 15, 2007 (reflecting the fact that these Defendants were not named in the original complaint and were first named in the Third Amended Complaint filed in June of 2007).

> All registered nurses who provided direct patient care in short term acute care facilities exclusive of supervisory, managerial, or advanced practice nurses, and who were employed by Defendants within the Detroit Michigan Metropolitan Statistical Area at any time from December 12, 2002 through June 15, 2007.

WBH Agreement at ¶¶ 6, 21; THC Agreement at ¶¶ 6, 21 (Farrow Exs. 3 & 4).

### 3. The Settlement Amounts

The Settlement Agreements provide that Henry Ford will pay $8,443,973 in cash for the benefit of the Henry Ford Settlement Class; Mt. Clemens will pay $2,036,791 in cash for the benefit of the Mt. Clemens Settlement Class; Trinity will pay $5,144,257 in cash for the benefit of the Trinity Settlement Class; and Beaumont will pay $11,342,904 in cash for the benefit of the Beaumont Settlement Class.[4] HFHS Agreement at ¶ 20; MCGH Agreement at ¶ 22; THC Agreement at ¶ 20; WBH Agreement at ¶ 20.

### 4. Other Benefits to the Settlement Classes

All Settling Defendants have provided, and have agreed in the future, to provide various levels of cooperation with regard to the continuing litigation.

---

[4] Each of these agreements includes a provision permitting the Defendant to terminate the Settlement Agreement if more than ten percent of the Settlement Class opted out (HFHS Agreement. at ¶ 42; MCGH Agreement at ¶ 52; THC Agreement at ¶ 43; WBH Agreement at ¶ 43). These have been rendered irrelevant by the minimal number of opt outs. *See* Farrow Decl. at ¶ 5.

### 5.  The Releases

In exchange for the above consideration from the Settling Defendants, Plaintiffs have agreed for themselves and on behalf of each Settlement Class to release and discharge the Settling Defendant from any and all claims against it arising out of the facts, occurrences, transactions or other matters alleged in the Class Action that relate in any way to any anticompetitive conduct by the Settling Defendant concerning class members' monetary compensation, non-monetary compensation, recruitment, employment and/or retention in short term acute care facilities in Detroit as registered nurses in the Class. HFHS Agreement at ¶39; MCGH Agreement at ¶41; THC Agreement at ¶39; WBH Agreement at ¶39.[5]

### B. Preliminary Approval and Notice to the Class

1.     Plaintiffs moved for preliminary approval of the Beaumont settlement on April 20, 2012 (ECF No. 746), the Mt. Clemens settlement on June 22, 2012 (ECF No. 759), the Henry Ford settlement on March 22, 2013 (ECF No. 786), and the Trinity settlement on April 2, 2013 (ECF No. 789). On March 12, 2013 and May 16, 2013, the Court entered orders granting preliminary approval of each Settlement. ECF Nos. 784, 785, 798, & 799. Pursuant to the Court's Orders, on June 5, 2013, 27,836 copies of the Court-approved Notice were mailed to

---

[5] In all cases, the agreements carefully do not release claims arising from any class member's period of employment at any Defendant hospital as an RN in a position outside those included in the settlement class -- such as when employed as an advanced practice nurse or in a managerial or supervisory position.

Settlement Class members using the address information provided by Defendants as part of the discovery in this matter supplemented by use of various additional sources.[6] Declaration of Stacey Roe (ECF No. 800) at ¶¶ 9-10; Farrow Decl. ¶ 10.[7] The Notice and Summary Notice, approved by this Court, explained the procedures by which class members could exclude themselves from one or more of the Settlement Classes or object to one or more of the settlements and provided notice of the September 12, 2013, hearing on final approval of the settlements and related matters. On July 10 a supplemental mailing was made to a subset of the Trinity of Beaumont classes who had not received the prior mailing.[8] *Id.* The Notice also

---

[6] These sources included data obtained from the Michigan Department of Community Health used to update and supplement address information from Defendants' databases. Farrow Decl. at ¶ 6. In addition, the Court-appointed Claims Administrator used the U.S. Postal Service National Change of Address Database to update all address information provided. Declaration of Stacey Roe ("Roe Decl.") at ¶ 9 (ECF No. 800). Plaintiffs also obtained updated address information directly from each Settling Defendant and used that data to update previous address lists. Farrow Decl. ¶ 6. In some cases, due to ambiguity whether a nurse appearing on the updated list was an existing nurse at a new address or a new nurse to be included in the class (or an existing nurse with a new name due to marriage, divorce or just an inconsistent record (e.g., Sue versus Susan), Plaintiffs added addresses even though this may have resulted in duplicate mailing to the same person. This, plus the fact that approximately 950 nurses who only worked during 2007 are in the Beaumont and Trinity settlement classes but were not in any of the previous settlement classes (*see* footnote 8) accounts for the growth in the size of the address list from the first mailing in 2010. *Id.*

[7] Plaintiffs' Counsel also cooperated with each settling defendant to organize the mailing of all appropriate materials to all appropriate authorities as required by the Class Action fairness Act. Roe Decl. ¶ 5-6; Farrow Decl. ¶ 12.

[8] These people were staff nurses hired at the hospitals between December 12, 2006 and June 15, 2007. These people are members of the Trinity and Beaumont

provided a toll free telephone number at Keller Rohrback which Class Members should call to get any questions about the settlements answered and employees of Keller Rohrback responded to all calls made to that number. Farrow Decl. ¶ 10.

Only 21 class members (out of over 23,000[9]) have requested exclusion from one or more of the Settlement Classes. Farrow Decl. at ¶ 5. Plaintiffs' Counsel have not yet received any objection to the proposed Settlements from any member of any settlement class, although the deadline for filing such objections is not until August 23, 2013. One comment on the settlement has been filed with the Court. ECF No. 804. This comment was filed by Jennifer Grigsby, a Beaumont employee who is not a member of any of the settlement classes because she only ever worked as an advanced practice nurse. Ms. Grigsby had previously communicated her

---

settlement classes but not of any other settlement class and so were not part of previous class mailing lists. As a result, this information had to be separately extracted from the databases produced by Defendants. While an effort had been made to do this for the original mailing it became clear that not all these nurses had been mailed the first notice. In total, an additional 956 Notices were sent on July 10, 2013 (some of these were likely duplicative of prior mailings for the reason explained in the previous footnote). As with the updated address lists, when there was any potential ambiguity in whether a nurse was a new addition to the class or a duplicate of prior entry with a different address or name, Plaintiffs erred on the side of sending duplicative notices. Farrow Decl. ¶ 10.

[9] As explained above, although approximately 27,000 notices were mailed, based on the payroll and other human resources data produced by Defendants during the course of this litigation, Plaintiffs believe the class contains less than 24,000 members - the additional mailings are almost certainly duplicates arising from Plaintiffs' decision to err on the side of sending the same nurse notices at multiple addresses (or under multiple names) rather than risk failing to send a notice to an actual member of the class.

concerns to Plaintiffs' counsel. Farrow Decl. Ex. 5.

### III.   THE COURT SHOULD APPROVE THE SETTLEMENTS.

Pursuant to Fed. R. Civ. P. 23(e), a class action settlement must be approved

by the Court before a case may be dismissed or compromised.

> Before approving a settlement, a district court must
> conclude that it is "fair, reasonable, and adequate."
> Several factors guide the inquiry: (1) the risk of fraud or
> collusion; (2) the complexity, expense and likely duration
> of the litigation; (3) the amount of discovery engaged in
> by the parties; (4) the likelihood of success on the merits;
> (5) the opinions of class counsel and class
> representatives; (6) the reaction of absent class members;
> and (7) the public interest.

*Int'l Union v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting

Fed. R. Civ. P. 23(e)(1)(C)). Each of these factors weighs heavily in favor of

approval of these four settlements.

In reviewing a proposed class settlement, the court does "not decide the

merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands,

Inc.*,450 U.S. 79, 88 n.14 (1981). A court also should "not substitute its business

judgment for that of the parties." *Rankin v. Rots,* No. 02-71045, 2006 WL

1876538, at *3 (E.D. Mich. June 28, 2006). Rather, the court considers "whether

the settlement, taken as a whole, is so unfair on its face to preclude judicial

approval." *Id.* (internal quote omitted). "Being a preferred means of dispute

resolution, there is a strong presumption by courts in favor of settlement." *In re*

*Telectronics Pacing Sys., Inc.,* 137 F. Supp. 2d 985, 1008-09 (S.D. Ohio 2001).

As a preliminary matter, Plaintiffs note that this Court has previously found similar settlements that recovered two percent of the total Registered Nurse Wages paid by a Settling Defendant to be fair, adequate and reasonable. ECF Nos. 717-719. These percentage recoveries are well within the range of settlements approved in other antitrust cases. *See, e.g., In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 344 (E.D. Pa. 2007) (approving settlement representing approximately one and a half percent of relevant sales); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (approving settlement representing approximately 1.6 percent of sales); *Fischer Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving a settlement representing 0.2 percent of the defendant's sales, and noting that earlier approved settlements represented 2.4 percent, 0.88 percent, 0.65 percent, 0.3 percent, 0.2 percent, and 0.1 percent of other settling defendants' sales).

## A. The Risk of Fraud or Collusion

This Court has had ample opportunity, both directly and through the Court-appointed Special Master, to observe the intensely adversarial nature of this litigation and of the negotiation of these settlements. There is no favoring of the Named Plaintiffs or any other basis for believing that these settlements are anything other than the result of hotly contested negotiations among experienced

counsel acting in the best interest of the class and their clients.

## B.  The Complexity, Expense and Likely Duration of the Litigation

It has been observed that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003); *see also Wesely v. Spear*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (noting that antitrust class actions are "notoriously complex, protracted and bitterly fought.") The complexity and risk does not end with the trial. "[A]ntitrust litigation in general, and class action litigation in particular, is unpredictable … [T[he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeed at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998). Such a high degree of uncertainty, complexity, expense, and duration favors approval of these substantial settlements because under such circumstances "a bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

## C. The Amount of Discovery Engaged in by the Parties

This factor weighs heavily in favor of approval. Because of this Court's decision not to bifurcate discovery, these settlements were finalized after all parties had a deep understanding of the strengths and weaknesses of their cases, had

completed fact and expert discovery, and fully briefed *Daubert* and summary judgment motions. All were negotiated after the Court's hearing on summary judgment and three were signed after the Court ruled on summary judgment.

### D. The Likelihood of Success on the Merits

In light of the continuing litigation against one Defendant, Plaintiffs are wary about discussing this factor in any detail but suffice it to say that litigation is always subject to uncertainty. *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) ("Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation."). While Plaintiffs are extremely confident as to the validity of their remaining Rule of Reason claim, Defendants (including Vanguard) have vigorously defended this matter.

### E. The Opinions of Class Counsel and Class Representatives

In deciding whether a proposed settlement warrants approval, "[t]he Court should also consider the judgment of counsel and the presence of good faith bargaining between the contending parties." *Rankin*, 2006 WL 1876538, at *3. *See, also, Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 502 (E.D. Mich. 2000); *In re Packaged Ice Antitrust Litig*, 2011 U.S. Dist. LEXIS 150427, at *58 (E.D. Mich. Dec. 13, 2011). Plaintiffs' Counsel here has extensive experience in handling antitrust cases and other complex litigation. As previously discussed,

12

Keller Rohrback and Cohen Milstein Sellers & Toll are national leaders in this area of complex litigation and James and Hoffman brings unique experience in litigating employment-related class actions as well as having played a critical role in this matter. These three firms are also counsel in the related nurse wage antitrust actions pending in various other cities, giving them a truly unique understanding of the legal and factual issues underlying the proposed class's claims. *See*, previously filed Declarations of Mark Griffin, Daniel Small, and David Dean (ECF Nos. 693-695). Lead Counsel was, therefore, in a strong position to evaluate the strengths and weaknesses of this case. The Class Representatives, who have been actively involved in this litigation throughout, including attending multiple settlement conferences and hearings, fully recognize their duty to do the best they can for their fellow-nurses, and have also evaluated and agreed to these settlements.

### F.  The Reaction of Absent Class Members

Because the deadline for filing objections has not yet passed, Plaintiffs cannot fully report on the reaction of absent class members at this time. However, the fact that only 21 out of approximately 23,000 nurses have opted out of the Settlements suggests that Detroit nurses are satisfied with these settlements.

As to the issue raised by Ms. Grigsby (ECF No. 804 and Farrow Decl. Ex. 5), her concern is not with the adequacy of any of the settlement terms but with the scope of the settlement classes, which she believes should include Advanced

Practice Nurses ("APNs") like her.[10] Ms. Grigsby presents, in her letter and in more detail in her original communications with Plaintiffs' Counsel, (Farrow Decl. Ex 5), a description of how she claims to have first-hand knowledge of how these same Defendant hospitals engaged in anticompetitive conduct aimed at Certified Registered Nurse Anesthetists (CRNAs) like her.[11] She quotes managers at Beaumont who explicitly stated that the hospitals had an agreement to keep CRNA pay "in-line" with each other. *Id*. This evidence amounts to the type of direct evidence of an express agreement over pay that the Court noted Plaintiffs had not provided in dismissing Plaintiffs' *per se* claim regarding staff nurses on summary judgment. It also directly supports Plaintiffs' rule of reason claim by demonstrating an agreement not to compete on pay that was the direct result of the information exchange that Plaintiffs have uncovered as to other nurses. Ms. Grigsby, based on this evidence of the same type of conspiracy aimed at CRNAs as Plaintiffs have uncovered as to staff nurses, challenges the fact that APNs are "excluded from any

---

[10] Plaintiffs note that strictly speaking Ms. Grigsby almost certainly lacks standing to raise any objection to these settlements since she is not a member of any of the settlement classes and so any claim she might have against these hospitals is unaffected by these settlements. *Geyer v. USX Corp.*, 896 F. Supp. 1440, 1446 (E.D. Mich. 1994) (non-party to settlement lacks standing to challenge that settlement absent "formal legal prejudice"). Despite this, since Ms. Grigsby raises a significant issue and provides useful information through her correspondence, Plaintiffs believe the best recourse is to fully and substantively respond to her comment to explain why her concern raises no issue requiring the Court to question the adequacy of these settlements.

[11] CRNAs are one type of APN – others job titles considered to be APNs include Nurse Practitioners, Nurse Midwives, and Clinical Nurse Specialists.

of the four settlements." ECF No. 804.

Plaintiffs first note that they have found no authority where a court ordered that a class be expanded beyond that defined in a settlement agreement. Indeed, it is unclear what source of authority might allow a court to issue such an order.

Plaintiffs also note that both rounds of Notices issued to nurses explain in some detail how the settlements affect APNs and instruct those nurses to contact counsel if they wish to pursue claims.[12] Because the original complaints defined the term "nurse" broadly to encompass APNs, the filing of that complaint served to toll the claims of any such nurses under the *American Pipe* doctrine. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). The releases in the settlement agreements at issue were all carefully negotiated to ensure that the claims of APNs were not being released by any of the settlements. Therefore, there is nothing that precludes Ms. Grigsby or any other APN from filing claims based on the evidence she presents. While Ms. Grigsby's correspondence includes reference to conduct she claims to have observed that strongly supports her suggestion that "CRNAs were not allowed to compete in a fair market, were injured and deserve compensation," the exclusion of those APNs from these settlement classes in no way interferes with her right to pursue such a claim.

---

[12] These notices were sent to APNs because Oakwood insisted on inclusion of APNs in its settlement class. Ms. Grigsby's letter demonstrates that these instructions were effective in communicating to these nurses that they were not part of the settlements at issue here.

Finally, the classes as defined in these settlements, which are the same as Plaintiffs have sought to represent in the ongoing litigation, have been carefully defined based on an understanding of the issues required to meet the standards of Rule 23. This understanding of issues that make certification of a class that encompasses both staff nurses and APNs challenging results from the lessons learned in parallel nurse wage litigation in other courts, as well as from evidence developed in this litigation about the structure of these markets including similarities and dissimilarities between staff nurses and APNs.

While Ms. Grigsby correctly notes that APNs "are practicing registered nurses," it is also true that APNs differ in certain respects from a typical staff nurse in ways that some courts have found bar certification of a class including both staff nurses and APNs. Even though Plaintiffs do not believe that these differences are preclusive of certification of a class that includes APNs, Judge McAvoy, for instance, found the fact of these differences persuasive in causing him to deny certification of classwide damages claims where the class was defined to include APNs. *Fleischman v. Albany Med. Ctr.*, No. 06-765, 2008 WL 2945993 (N.D.N.Y. July 28, 2008). As just some examples of the differences identified by defendants in other litigation or apparent here: APNs hold advanced graduate degrees (whereas registered nurses need not even hold an undergraduate degree); APNs are paid considerably more than staff nurses – anywhere from two to four times as

much as a staff nurse; and, while Ms. Grigsby states that CRNAs "held hourly wage status" at Beaumont during the time period in question, Plaintiffs have seen evidence that some of the CRNAs employed by some defendant hospitals were salaried rather than hourly employees. Farrow Decl. ¶ 9. Indeed, the largest part of Prof. Robert Willig's expert report opposing class certification in *Fleischman*— which Judge McAvoy cited repeatedly in his decision certifying a limited class there—was aimed at showing how inclusion of APNs in the class made the case improper for certification. *Id*. Finally, Plaintiffs note that it is unclear that Prof. Ashenfelter's damages methodology can be applied to evaluate damages for APNs because evidence uncovered in discovery suggests that not all of the defendant hospitals used agency APNs.

For all these reasons, while Ms. Grigsby raises important issues, none bear on the question whether these settlements on behalf of the classes that Plaintiffs have sought to represent in this litigation should be approved.

### G. The Public Interest

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources." *Cardizem*, 218 F.R.D. at 530 (internal quote omitted). Against this public interest, Plaintiffs are unaware of any interest that counsels against approval.

## IV.    Certification of the Settlement Classes Is Warranted.

As part of approving the Settlements, the Court must also certify the proposed Settlement Classes. This Court has already issued findings in support of the Court's certification of these classes as part of the Court's Orders on Preliminary Approval of these settlements, ECF Nos. 784, 785, 798, 799 at ¶¶ 3-5, and as part of the Court's ruling of Final Approval of the St. John, Oakwood and Bon Secours Settlements. ECF. Nos. 717-719.

Rather than repeat at length their previous analysis showing why certification is appropriate for these classes, Plaintiffs here emphasize the import of the Court's recent *Daubert* decision and the Sixth Circuit's recent *Whirlpool* decision, and incorporate by reference the arguments from prior preliminary approval motions (ECF Nos.746, 759, 786, and 789).

### A. The Requirements of Rule 23(a) Are Readily Satisfied Here.

23(a)(1) – Numerosity: With over 23,000 nurses in the settlement classes, numerosity is satisfied under any standard articulated by the courts, especially given the reality that these nurses may be wary about suing their current employer. *Whirlpool,* 2013 WL3746205 at *9 (class of "thousands" satisfies numerosity).

23(a)(2) & (a)(3) – Commonality and Typicality: "These two concepts of typicality and commonality typically tend to merge." *Id*. at *10. "[T]here need be only one common question to certify a class," *id.,* and commonality is satisfied if

resolution of that common issue "will advance the litigation by resolving [that] issue 'in one stroke' for all members of the class." *Id*. at *12. Here, the existence of the conspiracy is a common issue whose resolution will advance the claims of all class members. As to typicality, this "is met if the class members' claims are fairly encompassed by the named plaintiffs' claims." *Id*. at *9 (internal quote omitted). "In the antitrust context, typicality is established when the named plaintiffs and all class members alleged the same antitrust violations by defendants." *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 405 (S.D. Ohio 2007). This principle directly applies to the conspiracy claim here.

23(a)(4) – Adequacy: As to adequacy, this factor addresses "concerns about the competency of class counsel and any conflicts of interest that may exist." *In re Whirlpool,* 2013 WL3746205, at *10. No Defendant has even suggested the presence of any conflict or other reason for questioning the adequacy of the Named Plaintiffs or their counsel.

## B. The Requirements of Rule 23(b)(3) Are Readily Satisfied Here.

As to Rule 23(b)(3)'s predominance requirement:

> In "the mine run of cases, it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members."

*Id.*, at *18 (quoting *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1437 (2013)). As

19

applied to antitrust conspiracy cases, the Sixth Circuit has explained that because

proving the existence of an antitrust conspiracy raises so many complex questions

that are all common to members of the class, application of this rule means that:

> [E]ven where there are individual variations in damages,
> the requirements of Rule 23(b)(3) *are satisfied* if the
> plaintiffs can establish that the defendants conspired to
> interfere with the free-market pricing structure.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (emphasis

added). That is exactly what Plaintiffs would seek to establish here and is

consistent with decades of authority recognizing that the common questions arising

from proof of the existence of the alleged conspiracy will invariably predominate

over individual inquiries that might arise as to proof of impact and damages.

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997) ("Predominance is a

test readily met in certain cases alleging … violations of the antitrust laws");

*Foundry Resins*, 242 F.R.D. at 408 ("[C]ourts have consistently found that

common issues regarding the existence and scope of the conspiracy predominate

over questions affecting only individual members."). As this Court has noted

before "the Court's inquiry [when evaluating predominance] is directed towards

the issue of liability [and the fact that] a single set of operative facts establishes

liability" weighs in favor of certification under Rule 23(b)(3). *In re Delphi Corp. Sec., Derivative &"ERISA" Litig.*, 248 F.R.D. 483, 495 (E.D. Mich. 2008).[13]

As to the remaining elements of Plaintiffs' antitrust damages claim, impact and damages, Plaintiffs have demonstrated, through Prof. Ashenfelter's analysis, how each can be resolved on a class-wide basis, as this Court has already recognized. As to the question of proving impact, as this Court has already noted, "so long as Dr. Ashenfelter is able to persuade the trier of fact that his benchmark provides a truly conservative estimate of but-for RN wages … this will suffice to establish that Defendants' alleged antitrust violations had a common impact on the members of the plaintiff class." Opinion and Order Denying Defendants' Motion to Exclude the Expert Testimony of Orley Ashenfelter (ECF No. 793), at 21. And as to damages, this Court has further already stated that "[any] imprecision in Dr. Ashenfelter's approach does not preclude him from testifying with sufficient reliability as to the damages suffered by the plaintiff class." *Id*. at 21-22. As Prof. Ashenfelter explained:

> In my initial report I explained how fees paid by the defendant hospitals to nursing agencies that supply RNs that do work that would otherwise be performed by members of the class can serve as a conservative benchmark for what members of the class would be paid in a competitive market. This demonstrates that it is possible to show

---

[13] *See also, In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 267-68 (3d Cir. 2009) (certifying class, holding that elements of an antitrust claim "focus on the conduct of the defendants" and hence reflect predominant common questions.)

> that all (or almost all) members of the class were harmed without
> needing to inquire into their individual circumstances.

Rebuttal Report of Orley Ashenfelter at ¶ 18 (Farrow Decl. Ex 16). As he further

explained, by applying his methodology he was able to estimate damages for each

individual in the class and to determine that "actual earnings were [on average]

19.4 percent below the 'but for' level … [and] total lost earnings for all defendants

over the class period were $596.2 million." *Id*. at ¶¶ 68-69; *see also*, Report of

Orley Ashenfelter (Farrow Decl. Ex. 17) ¶¶ 103-122 (detailing one of three

proposed methodologies for demonstrating impact on a classwide basis and

methodology for computing damages on a classwide basis).

 Further, proof that the scope of the conspiracy extended to all members of

the class alone is sufficient to prove common impact, *Foundry Resins*, 242 F.R.D.

409-10, and it remains well-established law that even if some individual issues

exist as to computing damages, that is no bar to class certification under Rule

23(b)(3)[14]. *In re Whirlpool,* 2013 WL 3746205, at *182011 U.S. Dist. LEXIS

---

[14] In addition, as countless previous courts have explained, impact may be shown
by common methods of proof even in the presence of disparate individual prices
if the starting point for those prices is a common price list. *See*, Plaintiffs' Motion
for Class Certification at 28 n. 34; *In re Insur. Brokerage Antitrust Litig*., 579
F.3d 241, 267-68 (3d Cir. 2009). This directly applies here where the evidence
shows that Defendants' conduct eliminated competition, affecting the fixed pay
scales and differentials under which all nurses at each hospital were paid.

150427, at *58 (E.D. Mich. Dec. 13, 2011).[15]

As to those aspects of superiority relevant here (excluding "manageability," *see*, *Amchem Prods.,* 521 U.S. at 620), numerous courts have recognized that antitrust damages claims are most efficiently litigated through the class action device avoiding the enormous expense, duplication of effort, burden on the Courts, and denial of recovery to almost all absent class members, that would follow from a denial of certification. *In re Foundry Resins*, 242 F.R.D. at 411-12; *Carnegie v. Household Int'l., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). These considerations are even more important in a matter where absent the class device individuals would be required to sue their individual employer.[16] *Rosiles-Perez v. Superior Forestry Serv., Inc.*, 250 F.R.D. 332, 348 (M.D. Tenn. 2008) (fact that plaintiffs were employees subject to fear of retaliation is relevant to a superiority analysis).

### V.    The Proposed Plan of Allocation Should Be Approved.

Plaintiffs also seek the Court's approval of a plan for allocating among class members whatever amount of the total recovery to date is permitted to be distributed consistent with the terms of the St. John Settlement Agreement (ECF

---

[15] *See, also Levya v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (same, relying on *Comcast Corp. v Behrend*, 133 S. Ct. 1426 (2013)).

[16] The Court already found that "the service provided by [the Named Plaintiffs] who were willing to step forward and represent the class is particularly important in a context where almost all class members are employed by Defendant hospitals and its likely that fear of retaliation would deter a substantial number of these individuals from filing their own actions. Order Awarding Reimbursement of Costs and Incentive Payments (ECF No. 720) at 4.

No.577-A). The portion potentially available for distribution to class members is the total cash amounts for the seven settlements ($48,059,400), plus accrued interest, minus the amounts awarded to counsel for attorneys' fees and expense reimbursement, minus the amounts awarded to the named plaintiffs as incentive payments, and minus the future costs of administering the claims process by which settlement funds will be distributed to class members (the "Net Settlement Fund"). Out of this sum, Plaintiffs are constrained by the terms of the Settlement Agreement with St. John from seeking Court approval for any distribution of the monies associated with the settlement, as stated in Paragraph 49: "no monies from the [St. John] Settlement Fund will be distributed until after the Court has ruled on Class Certification or the court has approved Settlements with all Non-Settling Defendants." The amount at issue here is $13,583,475, so that absent any ruling from the Court on class certification, only $34,475,925 (net of the above listed deductions and additions) is available for distribution at this time. If the Court rules prior to the date of the distribution and grants the pending Motion for Class Certification, then $48,059,400 (net of the above listed additions and deductions) can be distributed. Finally, if the Court rules prior to the date of the distribution and denies class certification, then $37,876,335 (net of the above listed additions and deductions) can be distributed.[17]

---

[17] In this case, the additional contingent sum of $10,183,065 may still be

Plaintiffs estimate that the amount to be distributed to members of the class will be: in excess of $24 million absent any ruling from the Court on class certification and assuming counsel's pending motion for fees is granted; in excess of $33 million (if the Court certifies the litigation class before the date of the distribution and approves a fee award of 30% from the then-applicable Common Fund); or in excess of $26 million if the Court denies certification prior to the date of distribution and awards the requested fees.[18]

In light of the above uncertainty, and the potential need for future distributions, Plaintiffs and their Counsel have carefully considered the costs and benefits of a distribution at this time. Weighing heavily in favor of distributing these funds now is the fact that a significant part of these nurses' money has now been held in escrow since mid-2009, earning minimal interest in the low interest rate environment that has existed for the last four years.  Since distributing Notices of those settlements, Plaintiffs' Counsel have fielded constant queries from members of the class asking when this money would be distributed, indicating a genuine interest and desire by those nurses that they receive their money as soon as feasible. On the other hand, there is the obvious cost of making multiple distributions. While Plaintiffs and their Counsel would certainly prefer to avoid

distributed at a later date depending on the result of any possible appeal of the Court's ruling.

[18] As noted above, in this case potentially another $7 million (assuming a 30% fee award) might be distributed to class members later.

those costs, they believe that the process they propose for distribution serves to minimize the cost of multiple distributions. Because Plaintiffs propose that all monies are to be distributed *pro rata* based on pay earned during the relevant period (as explained further below), once it is established through the proposed claims process what each class member's share of the total distribution is to be, that same share can then be applied—without the need for any further action by class members—to all future monies to be distributed. Therefore, while future distributions will require certain costs of processing (computing taxes, writing checks, and mailing, with all attendant costs arising from dealing with address changes and other such matters), Plaintiffs do not anticipate that any future claims process will have to be conducted.

A.      **The Proposed Plan of Allocation and Proposed Claim Forms**

Plaintiffs' plan is to send by first-class mail a claim form to those individuals to whom the Notice of the Settlement was mailed. Plaintiffs would send each individual one of the following types of claim forms: (a) a customized claim form (a proposed form is attached as Farrow Decl. Ex. 6); (b) an Advanced Practice Nurse ("APN") claim form[19] (*Id*. Ex. 7); (c) a 2007-only claim form[20] (*Id*. Ex. 8); or (d) a generic claim form (*Id*. Ex.. 9). These claims forms are based on those

---

[19] These individuals are only part of the Oakwood Settlement Class.

[20] These individuals are people hired between December 12, 2006 and June 15, 2007 who are only members of the Beaumont and Trinity Settlement Classes.

used successfully to manage a similar claims process in Albany. *Id*. ¶ 14.

The customized form would be sent to all individuals who are members of every one of the seven settlement classes – *i.e.* people who worked as a staff nurse between December of 2002 and December of 2006 – and for whom the Defendants have produced payroll data. This form would state the total amount of their relevant pay according to Defendants' data. Class members would have the option either to accept this figure or to dispute it and provide documentation to support another amount of relevant pay claimed.

The APN claim form would be mailed to the approximately one-thousand four hundred individuals who worked as an APN at one of the Defendant hospitals who are only members of the Oakwood Settlement Class. This form would also state the total amount of their relevant pay according to Defendants' data, which amount these class members could either accept or dispute by providing documentation to support another amount of relevant pay claimed.

The 2007-only claim form would be mailed to the approximately nine-hundred and fifty individuals who are only members of the Trinity and Beaumont Settlement Classes, and would state the total amount of their relevant pay earned during the first six months of 2007 according to Defendants' data. Class members would have the option either to accept this figure or to dispute it and provide documentation to support another amount of relevant pay claimed.

Finally, the generic form would be mailed to those of the persons on the most recent mailing list who were sent a Notice even though Plaintiffs cannot determine with certainty that they can be matched with an individual in the class list compiled from Defendants' payroll data produced during the litigation. For the most part these are people who appeared on the updated address lists provided by Defendants but who cannot be matched with certainty to a record in the hospital's payroll data. It is likely that these people received duplicate notices as a result of an address or name change resulting in them being included in the mailing database more than once,[21] although some may reflect other issues with Defendants' payroll data.[22] This form would require a claimant to state his or her relevant pay and provide supporting documentation.

All of the claim forms would require claimants to certify their membership in the Settlement Class and the accuracy of the information they provide, and to submit to this Court's jurisdiction for resolution of any disputes related to the claim form. The forms also allow claimants to comment on the proposed allocation. Plaintiffs propose for the Claims Administrator to mail the claim forms to all

---

[21] As explained above, rather than delete entries, in order to ensure that all those who previously received notice are mailed claim forms, Plaintiff are mailing such individuals generic claim forms. Because claimants must provide valid social security numbers in order to be eligible to receive a distribution, however, there is no risk of duplicative recoveries.

[22] Some hospital's data was not entirely complete. For example Bon Secours, which had exited the market prior to the time when it produced payroll data, produced data that sometimes lacked complete information.

persons on the current class list within 20 business days after the Court has granted final approval to the Settlements with Beaumont, Mount Clemens, Henry Ford and Trinity and ruled on the attached claim forms and the plan of allocation, and to require that completed and signed claim forms be mailed to the Claims Administrator postmarked within 45 days after the date of the mailing.

Plaintiffs propose to distribute the Net Settlement Funds to all members of the Settlement Classes who timely submit valid claim forms in proportion to the amount of their relevant pay. For example, if class member A earned twice as much relevant pay as class member B, then class member A would receive twice as much of the Net Settlement Funds as class member B.[23] This same method would apply whether the amount to be distributed includes all or any part of the $13,583,165 in St. John money or not. If any part of the St. John money is not distributed now but becomes available after the distribution is completed, the Claims Administrator would be able to mail additional monies to all claimants based on the allocation established in this claims process.

The Court-appointed Claims Administrator, supervised by Class Counsel,

---

[23] The exceptions would be for the APN and 2007-only Settlement Class Members. As the APN claim form explains, APNs are only entitled to a *pro rata* share of the Oakwood Settlement (*i.e.* $7,183,000, net of a proportionate amount of attorneys' fees, expenses and plaintiff incentive awards). Similarly, the 2007-only claim form explains that individuals hired after December 12, 2006 are only entitled to a *pro rata* share of the Beaumont and Trinity Settlements (*i.e.* $16,487,161, net of a proportionate amount of attorneys' fees, expenses and plaintiff incentive awards).

would administer the claims process. Specifically, the Claims Administrator would receive, review and identify any deficiencies in completed claim forms, notify the claimants in question of the deficiencies, set deadlines for the claimants to cure the deficiencies, recommend to Class Counsel and the Court the acceptance or rejection of each claim, and calculate each claimant's share of the Net Settlement Funds in accordance with this plan of allocation. Promptly after the Claims Administrator has completed this process, and Class Counsel has reviewed the Administrator's work, Class Counsel would present the Administrator's conclusions to the Court in a motion to distribute the Net Settlement Funds.

**B.      The Plan of Allocation is Fair, Reasonable, and Adequate.**

The standard for approval of a plan of allocation is that it must be "fair and reasonable." *See, e.g.*, *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 534 (E.D. Ky. 2010). Further, if the plan of allocation is "formulated by 'competent and experienced counsel, an allocation plan need only have a 'reasonable, rational basis.'" *Taft v. Ackermans*, No. 02-7951, 2007 WL 414493, at *9 (S.D.N.Y. Jan 31, 2007) (citations omitted).

Here the proposed allocation method precisely matches the method by which each settling Defendants' settlement amount was computed (except Bon Secours which was subject to a "poverty settlement"), as a percentage of its nurse wage bill. Settlement distributions, such as this one, that apportion available settlements

funds on an objective, *pro rata* basis to approved claimants, without favoring any class member over another, have consistently been deemed fair, reasonable, and adequate by numerous courts. *See, e.g., In re Cardizem*, 218 F.R.D. at 531 (approving plan of allocation where each member's damages was based on actual purchases and provided a "fair and reasonable method for determining each Class Members' *pro rata* share of the Net Settlement Fund."); Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 12.10 (3d. ed. 1992) (noting that settlement agreements may provide for *pro rata* distributions); Manual for Complex Litig., Third § 30.47 (2003). Accordingly, Plaintiffs respectfully request that the Court approve this Plan of Allocation and the proposed claim forms.

## VI.   Conclusion

Each of these Settlements represents an excellent result for the Settlement Classes in this complex and hard-fought antitrust class action, and a *pro rata* allocation of these funds is fair and reasonable. Thus, Plaintiffs respectfully request that the Court grant their motion and enter an order approving each of four settlements and the proposed Plan of Allocation. Plaintiffs have provided the Court with a proposed form of Order including as Exhibit 1 a list of all persons who have requested exclusion from the Settlement Classes.

Dated this August 9, 2013

//

//

31

Respectfully submitted:

**KELLER ROHRBACK L.L.P.**

By: <u>s/ Mark A. Griffin</u>
Mark A. Griffin
Lynn L. Sarko
Raymond J. Farrow
Tana Lin
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1200
Fax: (206) 623-3384


Daniel A. Small
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.,
Suite 500 West
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699


Sharon K. Robertson
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine St., 14th Floor
New York, NY. 10005
Tel: (212) 758-3042
Fax: (212) 838-7745

David P. Dean
JAMES & HOFFMAN
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

Stephen Wasinger
STEPHEN F. WASINGER PLC
26862 Woodward Avenue, Suite 100
Royal Oak, MI 48067
Tel: (248) 544-5100
Fax: (248) 479-0391
Email: sfw@sfwlaw.com

Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Daniel M. Cohen
CUNEO GILBERT & LADUCA
106-A S. Columbus Street
Alexandria, VA 22314
Tel: (202) 789-3960
Fax: (202) 789-1813


Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
120 So. 6th Street, Ste. 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA and JEFFREY
A. SUHRE on behalf of themselves and
others similarly situated,

                                  Plaintiffs,

         v.

VHS of MICHIGAN, INC., d.b.a.
DETROIT MEDICAL CENTER, et al.,

                                  Defendants.

Case No. 06-15601

Hon. Gerald E. Rosen

Magistrate:  Donald A. Scheer

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2013 I served the attached document on

the parties listed below as indicated:

**VIA ECF:**

| | | |
|---|---|---|
| David B. Gunsberg | Rodger Young | Sara Klettke McWilliams |
| Sandra D. Hauser | Shari Ross Lahlou | David Marx, Jr. |
| David L. Hanselman, Jr. | Stephen Y. Wu | Terrence J. Miglio |
| Bruce L. Sendek | Michael R. Turco | Thomas M.J. Hathaway |
| Sheldon H. Klein | David A. Ettinger | Michael Shumaker |
| Jill L. Marr | Margo Weinstein | Christopher Q. King |
| Corey M. Shapiro | Mark T. Nelson | Fred K. Herrmann |

And I have mailed by United States Postal Service the paper to the following
non-ECF participants:  N/A

s/ Raymond J. Farrow
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Ph: 206-623-1900
rfarrow@kellerrohrback.com