## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PAT CASON-MERENDA and
JEFFREY A. SUHRE, on behalf of
themselves and others similarly
situated,

      Plaintiffs,                           Case No. 06-15601

v.                                        Hon. Gerald E. Rosen

VHS OF MICHIGAN, INC., *et al.,*

      Defendants.
_____/

## OPINION AND ORDER REGARDING
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____September 13, 2013_____

PRESENT: Honorable Gerald E. Rosen
                 Chief Judge, United States District Court

## I. INTRODUCTION

In this federal antitrust suit, the Plaintiff registered nurses ("RNs"), Pat Cason-

Merenda and Jeffrey A. Suhre, seek to recover on behalf of themselves and a class of RNs

against eight Detroit-area hospitals, alleging in their two-count Third Corrected Class

Action Complaint that the Defendant health care providers have violated § 1 of the

Sherman Act, 15 U.S.C. § 1, by (i) conspiring among themselves and with other local

hospitals to hold down the wages of RNs employed by these institutions (the "*per se*

claim"), and (ii) exchanging compensation-related information among themselves in a

manner that has reduced competition among Detroit-area hospitals in the wages paid to

RNs (the "rule of reason claim"). In prior rulings in this case, the Court has (i) granted in

part and denied in part Defendants' motions for summary judgment, determining that

Plaintiffs could go forward with their rule of reason claim but not their *per se* claim, *see*

*Cason-Merenda v. Detroit Medical Center,* 862 F. Supp.2d 603 (E.D. Mich. 2012), and

(ii) rejected Defendants' challenge under Fed. R. Evid. 702 and *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct 2786 (1993), to the testimony of

Plaintiffs' expert, Orley Ashenfelter, Ph.D., *see Cason-Merenda v. Detroit Medical*

*Center,* No. 06-15601, 2013 WL 1721651 (E.D. Mich. Apr. 22, 2013). In addition, the

Court has granted final approval of settlements reached between Plaintiffs and three of

the Defendant hospitals — St. John Health, Oakwood Healthcare Inc., and Bon Secours

Cottage Health Services — and has preliminarily approved Plaintiffs' settlements with

four additional Defendant hospitals — Henry Ford Health System, Mount Clemens

General Hospital, Inc., William Beaumont Hospital, and Trinity Health Corp. — leaving

Defendant VHS of Michigan, Inc.[1] as the sole remaining health care institution against

which Plaintiffs are litigating their antitrust claims.

      In the present opinion, the Court now turns to Plaintiffs' pending motion for class

---

[1]This party is referenced in Plaintiffs' pleadings as the Detroit Medical Center, but the Court recently entered a July 10, 2013 stipulated order substituting VHS of Michigan, Inc. in place of the Detroit Medical Center.

certification.  Through this motion, Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3) of a class consisting of "[a]ll registered nurses who provided direct patient care in short term acute care facilities, exclusive of supervisory, managerial and advanced practice nurses, while employed by Defendants within the Detroit, Michigan [metropolitan area] at any time from December 12, 2002 through the present." (Plaintiffs' Motion for Class Certification at 1.)  Defendants oppose this request for class certification,[2] arguing primarily that the core elements of Plaintiffs' antitrust claims — including fact of injury (or "impact"), causation, and damages — cannot be established through common proof, and that individual issues instead predominate over issues common to the class with respect to these elements.

Plaintiffs' motion has been fully and thoroughly briefed by the parties.  In addition, the Court held a September 12, 2013 hearing on this motion, at which counsel advanced further arguments in support of their clients' positions.  Having reviewed the parties' briefs and the accompanying, voluminous record, and having carefully considered the arguments of counsel at the September 12 hearing, the Court now is prepared to rule on Plaintiffs' motion for class certification.  This opinion and order sets forth the Court's rulings on this motion.

---

[2]More specifically, Defendants Trinity Health Corp., Henry Ford Health System, William Beaumont Hospital, Mount Clemens General Hospital, Inc. and VHS of Michigan, Inc. (formerly the Detroit Medical Center) filed a joint response in opposition to Plaintiffs' motion.  Although, as noted, Plaintiffs have reached settlements with each of these Defendants except VHS of Michigan, these settlements have not yet been finally approved.  For the remainder of this opinion, then, the Court will continue to refer to "Defendants" as the parties opposing Plaintiffs' motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts of this case have been thoroughly set forth in the Court's ruling on Defendants' summary judgment motions, *see Cason-Merenda,* 862 F. Supp.2d at 606-23, and need not be repeated here.  Briefly, the two Plaintiff registered nurses ("RNs"), Pat Cason-Merenda and Jeffrey A. Suhre, allege that the Defendant health care institutions operating in the Detroit metropolitan area have violated § 1 of the federal Sherman Act, 15 U.S.C. § 1, by agreeing to regularly exchange compensation-related information among themselves in a manner that has reduced competition among Detroit-area hospitals in the wages paid to RNs.[3]

### A.     The Record of Defendants' Regular Exchanges of Compensation-Related Information

As observed by the Court in its summary judgment ruling, the record produced by Plaintiffs in discovery evidences "Defendants' repeated exchanges — through both direct contacts and third-party surveys — of (i) detailed, current information as to the wages paid to their RN workforces, (ii) their planned future pay increases, and (iii) their overall philosophies and targets in setting RN wages." *Cason-Merenda,* 862 F. Supp.2d at 629 (citations to record omitted).  The Court further noted that a "fair number of these

---

[3]As noted earlier, apart from this rule of reason claim, Plaintiffs also have alleged that the Defendant health care providers committed a *per se* violation of § 1 of the Sherman Act by conspiring among themselves and with other Detroit area hospitals to hold down the wages of RNs employed by these institutions.  In a March 22, 2012 opinion and order, however, the Court found that Defendants were entitled to summary judgment in their favor as to this *per se* claim, *see Cason-Merenda,* 862 F. Supp.2d at 628-41, leaving Plaintiffs' rule of reason claim as the sole remaining basis for recovery going forward in this litigation.

exchanges violated one or more of the criteria set forth in the DOJ/FTC Guidelines,[4] including the recommendations (i) that wage surveys should be managed by a third party, (ii) that survey participants provide information that is more than three months old, and (iii) that the survey data be reported in a sufficiently aggregated form such that it would not allow recipients to identify the compensation paid by any particular provider."  862 F. Supp.2d at 629 (internal quotation marks, alteration, and citation omitted).

As Defendants have emphasized, however — and as recognized by the Court in its summary judgment opinion — the DOJ/FTC Guidelines are intended to establish "safety zones" within which health care providers may operate without attracting the attention of these two federal agencies, and are not meant to "defin[e] the limits of joint conduct that is permissible under the antitrust laws."  862 F. Supp.2d at 630 (internal quotation marks and citation omitted).  Moreover, the exchange of wage data among the Defendant hospitals, even outside the "safety zones" of the DOJ/FTC Guidelines, is not *per se* unlawful and "does not invariably have anticompetitive effects" — as one of Plaintiffs' own experts has testified, such information exchanges may be pro-competitive and may lead to either an increase or a reduction in RN wages.  862 F. Supp.2d at 642 (internal quotation marks and citations omitted).  Finally, the discovery record fails to disclose the "uniform circulation, participation in, or receipt of [wage] surveys by the Defendant

---

[4]In its summary judgment ruling, the Court referred frequently to the "DOJ/FTC Guidelines," an August 1996 statement issued by the U.S. Department of Justice and the Federal Trade Commission that spells out the antitrust enforcement policies of these two federal agencies with respect to certain forms of joint activity in the health care industry.  *See Cason-Merenda,* 862 F. Supp.2d at 607 n.6.

hospitals," but to the contrary reveals that Defendants used these surveys "in different ways and to different degrees in their compensation setting."  862 F. Supp.2d at 635 (internal quotation marks and citation to record omitted).

**B.      The Characteristics of the Proposed Plaintiff Class**

The class that Plaintiffs seek to certify in the present motion includes over twenty thousand RNs, exclusive of supervisory, managerial, and advanced practice nurses, who are or were employed by the eight Defendant hospitals from December 12, 2002 to the present.  In Plaintiffs' view, the nurses in this proposed class are "homogeneous as to their basic pay structure," and the class "consists entirely of similarly qualified bedside caregivers who the [Defendant] hospitals themselves recognize as a distinct, well-defined[] category of nurse employees who are all paid based upon the same small set of defined pay scales."  (Plaintiffs' Motion, Br. in Support at 10, 12.)  Plaintiffs note, for example, that of the class members employed by Defendant VHS of Michigan, 99.8 percent (all but 25 nurses) share the single job title of "staff nurse," and thus are subject to the same pay scale.  (*See* Plaintiffs' Motion, Ex. 15, Table of Job Titles.)  Similarly, 100 percent of the class members employed at Defendant Trinity's Livonia and Macomb Hospitals, 98.2 percent of the class members who work for Defendant Mount Clemens, and 82 percent of the class members employed by Defendant Oakwood share the same job title ("registered nurse," "RN," and "staff nurse," respectively), and the remaining class members at the latter two Defendant hospitals consist almost entirely of contingent

6

nurses.  (*See id.*)[7]  Plaintiffs also have produced evidence that when the Defendant hospitals made their periodic (typically annual or semi-annual) adjustments to their respective pay scales, they generally applied uniform increases across the entire scale — *e.g.,* by raising all minimums, maximums, or step levels by the same percentage rate. (*See* Plaintiffs' Motion, Exs. 18, 19, 22, 23, 24.)

Plaintiffs further assert that the homogeneity of the proposed class is demonstrated through the wage surveys and information exchanges conducted among the Defendant hospitals.  As Plaintiffs observe, nearly all of these information exchanges sought "information about the pay of a group of nurses variously described as 'staff nurses' or 'registered nurses,' described in a manner that matches the class defined here." (Plaintiffs' Motion, Br. in Support at 11; *see also* Plaintiffs' Motion, Ex. 16 (compilation of surveys of wages paid to "staff nurses," "registered nurses," or a similar job title).) Indeed, the very fact that the Defendant hospitals participated in these exchanges of wage data — and presumably believed that it served their business interests to do so — indicates that the information obtained must have been useful for comparison to the recipient hospital's pay structure and scale for its own RN workforce.

Not surprisingly, Defendants take issue with Plaintiffs' view as to the homogeneity of the proposed RN class, contending that the record reveals that "Defendants'

---

[7]As explained by Plaintiffs, contingent nurses "work flexible schedules or assignments and perform the same essential duties as regular staff nurses," and their pay "is extremely closely linked to that of the identically qualified staff nurses with whom they work side by side." (Plaintiffs' Motion, Br. in Support at 10 n.14.)

compensation structures are extraordinarily diverse." (Defendants' Response Br. at 12.)
Most notably, Defendants observe that some hospitals set RN base wages through "step
pay" or similar pay structures in which RNs regularly move up the steps of the pay scale,
while other hospitals determine base pay in part by reference to individual performance
and merit matrices. Defendants also note that Mount Clemens, alone among the
Defendant health care institutions, has a nurses union, and they assert that the collective
bargaining process through which the wages of this hospital's RN workforce are
determined introduces an additional disparity into the compensation-setting processes
used by the Defendant hospitals.

Even as to those Defendant hospitals that use a step pay structure, there are
differences among these hospitals as to the number and size of these steps, and some of
the hospitals have made changes to the number of steps or jumps between steps during the
class period. As a result, Defendants point to disparities in the wage increases achieved
by RNs at different hospitals after the same number of years of service — the record
reveals, for example, that in 2004, a fifth-year RN at St. Joseph Macomb was making 19
percent more than her counterpart at the same hospital with only one year of experience,
while RNs at Mount Clemens experienced only a 6.6 percent wage gain as they moved
from one to five years of experience. Indeed, even among RNs with the same years of
experience and employed at a single Defendant health care institution, the record
discloses differences in base pay — *e.g.,* Defendants point to evidence that in 2004, a
staff nurse with seven years of experience earned $24.26 per hour in base pay at one

8

Henry Ford hospital (Wyandotte) but $27.24 at another (Bi-County).

Defendants further explain that the wages paid to their RNs feature "significant non-base components" that "differ from hospital to hospital" and are "in large part" a function of the choices made by each individual nurse.  (Defendants' Response Br. at 12.) The Defendant hospitals state that they use these non-base components to compete for, reward, and retain high-performing RNs, to provide incentives to work particular shifts or in certain units, to secure RNs with special skills needed by a particular hospital at a particular time, and to address fluctuations in patient care needs.  These non-base components take a number of forms, including such familiar and typical elements as overtime and shift differentials for night, weekend, or holiday work.  However, certain of the individual Defendant hospitals also offer non-base components that are less typical and differ more widely from the non-base benefits offered by other institutions, such as merit bonuses, tuition reimbursement, referral and retention bonuses, pension contributions, professional development pay, and department-based incentives.

Defendants also opine that for a majority of the Defendant hospitals, non-base pay comprises 25 percent or more of total compensation for at least half of the hospital's RN workforce.[8]  Moreover, the record discloses a wide variation among RNs in the non-base

---

[8]According to Plaintiffs, Defendant's expert, Dr. Edward A. Snyder, retreated from this claim at his deposition, testifying that his initial calculations inaccurately treated a nurse's vacations, holidays, and other compensated time off as non-base pay.  Plaintiffs' expert, Dr. Ashenfelter, has opined that if these elements of compensated time off are properly recorded as base pay, then the median percentage of total compensation accounted for by non-base pay ranges from 9 to 20 percent, in contrast to the 17 to 32 percent range set forth in Dr. Snyder's report.  (*See* Ashenfelter Rebuttal Report at ¶¶ 83-84.)

compensation they receive — the total compensation received by some RNs includes a substantial non-base component, while other RNs earn very little non-base pay.  To more graphically illustrate the impact of these various differences among the Defendant hospitals in pay structures, non-base components, and other wage-related factors, Defendants and their experts have prepared a number of charts which, in their view, show "substantial variation in pay between nurses, with no common or systematic pattern even when controlling for factors such as age (used as an approximate proxy for years of experience), department . . . , and hospital of employment."  (Defendants' Response Br. at 16 (including, by way of example, a scatterplot of total compensation paid in 2005 to intensive care unit ("ICU") nurses in the putative class, organized by age and Defendant hospital).)

Finally, Defendants challenge Plaintiffs' assertion that the exchange of wage data among the Defendant health care institutions evidences the homogeneity of the proposed RN class.  In Defendants' view — and as previously discussed in the Court's summary judgment ruling, *see Cason-Merenda,* 862 F. Supp.2d at 635 — there is "no common evidence here" as to how the Defendant hospitals used this wage data, where the record reflects (i) that "there is no single survey . . . that was used by all Defendants," (ii) that "[n]ot all hospitals commissioned surveys," (iii) that "[n]o two hospitals used the same market information in the same way," and (iv) that "[m]arket information from surveys . . . was only one input into compensation decision making."  (Defendants' Response Br. at 22-23.)  Against this backdrop, Defendants contend that their exchange of wage data was

10

not akin to "circulating a price list," and that "the complexity of RN compensation, the wide array of surveys, the varying participation, circulation and receipt of information, and the combination of factors that actually yielded compensation decisions at the hospitals, will all need to be examined at trial — survey by survey, hospital by hospital, decision by decision [—] to determine first whether the survey caused wages to be suppressed, then to determine the impact, if any, on each individual nurse." (*Id.* at 25.)

### III. <u>ANALYSIS</u>

**A.     The Standards Governing Plaintiffs' Motion**

Through the present motion, Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3) of a class of RNs employed at the eight Defendant hospitals at any time from December 12, 2002 through the present.  To secure the requested certification, Plaintiffs must establish as a threshold matter that:

> (1)  the class is so numerous that joinder of all members is impracticable;

> (2)  there are questions of law or fact common to the class;

> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These "four requirements — numerosity, commonality, typicality, and adequate representation — effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct.

11

2541, 2550 (2011) (internal quotation marks and citations omitted).

Once Plaintiffs have satisfied each of the four prerequisites of Rule 23(a), they must then show that their proposed class action "qualif[ies] under at least one of the three categories set forth in subsection (b)" of the Rule. *In re Northwest Airlines Corp. Antitrust Litigation,* 208 F.R.D. 174, 216 (E.D. Mich.), *leave to appeal denied,* 310 F.3d 953 (6th Cir. 2002). In this case, Plaintiffs rely solely on subsection (b)(3) of Rule 23, which entails a finding by the Court "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Randleman v. Fidelity National Title Insurance Co.,* 646 F.3d 347, 352-53 (6th Cir. 2011). Yet, the "mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Powers v. Hamilton County Public Defender Commission,* 501 F.3d 592, 619 (6th Cir. 2007) (internal quotation marks and citation omitted).

The Supreme Court recently emphasized that "Rule 23 does not set forth a mere pleading standard," and that "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that

there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."
*Dukes,* 131 S. Ct. at 2551.  A trial court must conduct a "rigorous analysis" to confirm
that the requirements of Rule 23 have been met, and this inquiry may entail "prob[ing]
behind the pleadings" and addressing "the merits of the plaintiff's underlying claim."
*Dukes,* 131 S. Ct. at 2551 (internal quotation marks and citations omitted).  Moreover, the
court's "obligation to consider all relevant evidence and arguments" bearing upon class
certification "extends to expert testimony," and such "opinion testimony should not be
uncritically accepted as establishing a Rule 23 requirement."  *In re Hydrogen Peroxide
Antitrust Litigation,* 552 F.3d 305, 307, 323 (3d Cir. 2008).  Yet, the requisite "rigorous
analysis" of the record and consideration of the merits must be focused on and limited to
the question whether the Rule's requirements have been established, *In re Whirlpool
Corp. Front-Loading Washer Products Liability Litigation,* 722 F.3d 838, 851-52 (6th
Cir. 2013); *see also Blades v. Monsanto Co.,* 400 F.3d 562, 567 (8th Cir. 2005), and a
court must take care not to "turn the class certification proceedings into a dress rehearsal
for the trial on the merits," *Messner v. Northshore University Healthsystem,* 669 F.3d
802, 811 (7th Cir. 2012).  As pertinent to Plaintiffs' request here to certify a class under
Rule 23(b)(3), the Supreme Court very recently instructed that "Rule 23(b)(3) requires a
showing that *questions* common to the class predominate, not that those questions will be
answered, on the merits, in favor of the class."  *Amgen Inc. v. Connecticut Retirement
Plans & Trust Funds,* 133 S. Ct. 1184, 1191 (2013).

**B.     Plaintiffs Have Established the Four Prerequisites of Rule 23(a).**

In opposing Plaintiffs' request for class certification, Defendants focus almost exclusively on the requirements of Rule 23(b)(3) — and, more specifically, the necessity that questions of law or fact common to the class must predominate over questions affecting only individual members of the class — and have little to say about Rule 23(a)'s four prerequisites of numerosity, commonality, typicality, and adequacy of representation. Accordingly, the Court moves rather quickly through the requirements of Rule 23(a), and then conducts a more searching inquiry under Rule 23(b)(3).

### 1.     Numerosity

Turning first to the numerosity requirement of Rule 23(a), the Sixth Circuit has stated that "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Bacon v. Honda of America Manufacturing, Inc.,* 370 F.3d 565, 570 (6th Cir. 2004). In this case, Plaintiffs and their expert, Dr. Orley Ashenfelter, have estimated that the proposed class has over twenty thousand members. (*See* Plaintiffs' Motion, Ex. 1, Ashenfelter Report at ¶ 33.) Under this record, the Court is satisfied that Rule 23(a)'s numerosity requirement has been met.

### 2.     Commonality

Next, while Rule 23(a)(2) speaks of "questions" of law or fact "in the plural," the Sixth Circuit has held that "there need only be one question common to the class." *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir. 1998). "Complete identity of issues is not required; rather, it is enough if the resolution of one particular issue will

14

affect all or a significant number of the members of the putative class." *Northwest Airlines,* 208 F.R.D. at 217. "For example, where the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected." *Northwest Airlines,* 208 F.R.D. at 217 (internal quotation marks, alteration, and citation omitted). "What we are looking for is a common issue the resolution of which will advance the litigation." *Sprague,* 133 F.3d at 397.

Plaintiffs' rule of reason claim raises a number of such common issues, and Defendants do not contend otherwise. For example, to prevail on this claim, each member of the proposed RN class must show that the Defendant hospitals "agreed upon a common course of action," *Northwest Airlines,* 208 F.R.D. at 217, to exchange wage information among themselves for use in their RN wage determinations. Each member of the class also must show antitrust injury — that is, a depression in RN wages flowing from an anticompetitive aspect of Defendants' exchange of wage data. *See Cason-Merenda,* 862 F. Supp.2d at 641-42. In addition, because Plaintiffs' theory of damages rests exclusively upon the benchmark analysis of Plaintiffs' expert, Dr. Ashenfelter, *see Cason-Merenda,* 2013 WL 1721651, at *2-*3 (describing this benchmark approach), the claim of each class member depends upon the common question whether this benchmark analysis offers a viable and permissible measure of the wage loss suffered by this particular member of the RN class. Accordingly, the Court finds that the prerequisite of commonality is satisfied here.

15

### 3.   Typicality

The typicality element of Rule 23(a) is intended to "limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. v. EEOC,* 446 U.S. 318, 330, 100 S. Ct. 1698, 1706 (1980).  A named plaintiff's claim "is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.,* 511 F.3d 554, 561 (6th Cir. 2007) (internal quotation marks and citation omitted).  "The premise of the typicality requirement is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class." *Sprague,* 133 F.3d at 399.  As this Court has previously explained, the "'commonality' and 'typicality' inquiries overlap to a degree," but "commonality focuses on similarities, while typicality focuses on differences." *Northwest Airlines,* 208 F.R.D. at 218 (internal quotation marks and citation omitted).

Another district court in this Circuit has stated that "[i]n the antitrust context, typicality is established when the named plaintiffs and all class members allege[] the same antitrust violation by defendants." *In re Foundry Resins Antitrust Litigation,* 242 F.R.D. 393, 405 (S.D. Ohio 2007).  This is so, reasoned the court, because the named plaintiffs "must prove a conspiracy, its effectuation, and damages therefrom — precisely what the absent class members must prove to recover." *Foundry Resins,* 242 F.R.D. at 405.  As Plaintiffs observe, this standard is met in this case, where the claims of the named Plaintiffs and those of the remaining members of the proposed class "all arise from

16

the same conspiracy and are based on the same theory of liability under the Sherman

Act." (Plaintiffs' Motion, Br. in Support at 18.)

In arguing that typicality is lacking here, Defendants broadly contend that **no**

member of the proposed RN class — whether a named Plaintiff or any other — may be

viewed as "typical" because the class members' "situations and their compensation vary

so dramatically." (Defendants' Response Br. at 61.) In support of this proposition,

Defendants merely reiterate the argument developed at length earlier in their response

brief — namely, that individual issues will predominate over common ones in a trial of

Plaintiffs' antitrust claims. The Court addresses this question below, upon conducting the

inquiry called for under Rule 23(b)(3).

### 4.   Adequacy of Representation

The fourth and final requirement of Rule 23(a) is that "the representative parties

will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). To

satisfy this prerequisite to certification, Plaintiffs must show "that the representatives

have interests in common with, and not antagonistic to, the interests of the unnamed

members of the class, and that the representatives will vigorously prosecute these

interests through qualified counsel." *Northwest Airlines,* 208 F.R.D. at 225. "The

adequacy of representation requirement is designed to protect class members who are not

named as parties to the action but nevertheless . . . will be bound by a subsequent

judgment." *Foundry Resins,* 242 F.R.D. at 406.

Defendants do not claim that either of the two named Plaintiffs has any interests

17

that are antagonistic to or in conflict with those of the remaining class members.  To the
contrary, Plaintiffs Cason-Merenda and Suhre have interests in common with these
unnamed class members, having worked as hospital nurses for over 20 and 17 years,
respectively.  In addition, each of these named Plaintiffs, like the remainder of the class,
seeks to recover his or her damages caused by the Defendant hospitals' alleged
conspiracy to exchange compensation data in a manner that has depressed RN wages.
Finally, Plaintiffs Cason-Merenda and Suhre have amply demonstrated both their ability
and their willingness to vigorously pursue the interests of the RN class throughout this
lengthy litigation, as evidenced by their active participation in discovery and settlement
negotiations — the latter efforts having produced tentative or final settlements with all
but one of the Defendant hospitals, resulting in a sizable recovery to date by the members
of the RN class — and by their attendance at numerous court proceedings.  Accordingly,
the Court finds that the "adequacy of representation" prong of Rule 23(a) is satisfied in
this case.[9]

_____

[9]As observed by the court in *Foundry Resins,* 242 F.R.D. at 407, while courts previously
examined the qualifications of class counsel as part of their Rule 23(a)(4) inquiry, this practice
arguably has been altered as a result of the 2003 enactment of Rule 23(g), which specifies the
factors a court must consider in appointing class counsel.  Thus, in the brief in support of their
motion, Plaintiffs have separately addressed the ability of their proposed class counsel to "fairly
and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).

The Court need not dwell on this question at any length, because it is clear that the
proposed class counsel in this case have the experience, knowledge, and resources to fairly and
adequately represent the interests of the proposed class.  Indeed, given that counsel are actively
involved in the litigation of similar antitrust claims of depressed RN wages in other cities around
the country, they are able to bring a unique degree of knowledge and experience to bear in
pursuing the claims in this case.  Moreover, two of the three firms proposed as class counsel

**C.   Plaintiffs Have Demonstrated That Questions Common to the Class Predominate over Individual Issues, Such That Class Certification Is Warranted Under Rule 23(b)(3).**

Beyond satisfying the four prerequisites to class certification set forth in Rule 23(a), Plaintiffs also "must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Products. Inc. v. Windsor,* 521 U.S. 591, 614, 117 S. Ct. 2231, 2245 (1997). In this case, Plaintiffs seek certification of a class under subsection (3) of Rule 23(b), which mandates a finding by the Court "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "To satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *Beattie,* 511 F.3d at 564 (internal quotation marks, alteration, and citations omitted). "Put differently, the proposed class must be sufficiently cohesive to warrant adjudication by representation." *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 535 (6th Cir. 2008) (internal quotation marks and citation omitted).

---

were active participants in the initial pre-suit investigation and evaluation that led to the claims asserted in this case. Finally, class counsel, like the named Plaintiffs, have played a determined, persistent, and vital role in the lengthy and challenging settlement negotiations that have spanned several years of this litigation, and these efforts have already achieved a substantial settlement for the benefit of the RN class. The Court readily concludes, therefore, that proposed class counsel meet the standards for appointment set forth in Rule 23(g).

19

As Plaintiffs observe, the Sixth Circuit has expressed a favorable view of class certification in antitrust conspiracy cases, stating that "predominance is a test readily met in certain cases alleging violations of the antitrust laws, because proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case." *Scrap Metal,* 527 F.3d at 535 (internal quotation marks, alterations, and citations omitted). Similarly, other courts have recognized that the existence and scope of an alleged conspiracy are matters susceptible to class-wide proof, and thus tend to support a finding that common issues predominate over individual ones as to at least the first element of an antitrust conspiracy claim. *See, e.g., Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 105 (2d Cir. 2007); *Blades,* 400 F.3d at 572; *In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 136 (2d Cir. 2001); *In re Blood Reagents Antitrust Litigation,* 283 F.R.D. 222, 234 (E.D. Pa. 2012); *Reed v. Advocate Health Care,* 268 F.R.D. 573, 581 (N.D. Ill. 2009); *In re Urethane Antitrust Litigation,* 251 F.R.D. 629, 634 (D. Kan. 2008); *Foundry Resins,* 242 F.R.D. at 408.

Yet, as Defendants point out, the existence of common issues as to the first element of Plaintiffs' antitrust claim — namely, a conspiracy in violation of § 1 of the Sherman Act — is unavailing to Plaintiff's request for class certification if these common issues are overcome by a proliferation of individualized questions as to the remaining elements of this claim. In particular, Defendants oppose Plaintiffs' present motion principally on the ground that Plaintiffs cannot establish the second element of their antitrust claim — antitrust impact, sometimes referred to as "fact of damage," *see*

20

*Messner,* 669 F.3d at 816; *Hydrogen Peroxide,* 552 F.3d at 311 — through proof common to the class.  And, indeed, the courts have recognized that "[i]n antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."  *Hydrogen Peroxide,* 552 F.3d at 311; *see also Blades,* 400 F.3d at 572 (explaining that although evidence of the existence of an antitrust conspiracy "would perforce be evidence common to all class members for proving the conspiracy," such common "proof of conspiracy is not proof of common injury"); *In re Mercedes-Benz Antitrust Litigation,* 213 F.R.D. 180, 187 (D.N.J. 2003) ("Antitrust defendants resisting class certification routinely argue that the complexity of their particular industry makes it impossible for common proofs to predominate on the issue of antitrust impact."). Accordingly, the Court turns to this issue at the heart of Defendants' opposition to Plaintiffs' request for class certification.

> ### 1.    The Decisions of Other Courts Denying Class Certification in Antitrust Suits Involving Allegations of Wage Suppression Are Distinguishable.

As their initial challenge on this point, Defendants urge this Court to follow the lead of other courts that have declined to certify classes in antitrust suits featuring allegations of wage suppression.  In *Reed,* 268 F.R.D. at 577, for instance, the plaintiff RNs alleged that the defendant Chicago-area hospitals "agreed to regularly exchange detailed and non-public information about the compensation each is paying or will pay to its RNs," and that this exchange of wage data "had the effect of suppressing

compensation for hospital RNs in the Chicago area." The court denied the plaintiffs'

motion for class certification, holding that the plaintiffs had failed to show that common

proof would predominate as to either antitrust impact or damages. *See Reed*, 268 F.R.D.

at 594-95. In so ruling, the court expressed frustration that the "plaintiffs have been coy

about their theory of common impact and their proposed damages methodology," and it

found that the analysis of the plaintiffs' expert was "vague and inscrutable" and that the

plaintiffs' "superficial presentation" on this point "comes close to asking us to take [the

expert's] analysis on faith." 268 F.R.D. at 589. The court further faulted the analysis of

the plaintiffs' expert for its "reliance on averages," explaining that "[m]easuring average

base wage suppression does not indicate whether each putative class member suffered

harm from the alleged conspiracy," and thus did not provide "a methodology common to

the class that can determine impact with respect to each class member." 268 F.R.D. at

590-91. Finally, the court found that the plaintiffs' expert had not "applied econometric

principles and methods reliably to the facts of this case," rendering his proposed expert

testimony as to antitrust impact and damages "essentially inadmissible." 268 F.R.D. at

594.

Defendants next point to the denial of class certification in another wage

suppression suit brought by RNs employed at hospitals in the Albany, New York

metropolitan area. In *Fleischman v. Albany Medical Center,* No. 06-765, 2008 WL

2945993, at *6-*7 (N.D.N.Y. July 28, 2008), the court determined that class certification

was appropriate as to the question whether the defendant hospitals had conspired to

regularly exchange RN compensation information in violation of federal antitrust law, but found that a class could not be certified as to antitrust impact or damages.[10]  Regarding the issue of antitrust impact, the court reasoned that "[i]nterchangeability and job mobility in the nursing profession, and the reasons affecting the wage of a particular nurse or class of nurses, though contested, involve too many variables and provide too much ambiguity to carry a motion for class certification on the issue of injury-in-fact." *Fleischman,* 2008 WL 2945993, at *6.  On the issue of damages, the court found that the analysis of the plaintiffs' expert was "overly generalized," "too speculative," and rested impermissibly on averages that ignored "differences over time, nurse performance and merit, bonuses, and non-wage compensation, and that the expert's benchmark derived from RN wages in other cities relied upon unfounded assumptions that any deviations among these different markets could be counted as harm to the plaintiff class.  *Id.* at *6-*7.

Although the plaintiff RNs in *Fleischman* sought to revisit this ruling following a full period of discovery and in light of the analysis of a new expert — Dr. Ashenfelter, the same expert whose opinion has been offered in the present suit to demonstrate that antitrust impact and damages may be established through common proof — the court declined to amend its earlier order certifying a class as to only the first element of the

_____

[10]As noted by Plaintiffs, the court in *Fleischman* addressed the question of predominance on an issue-by-issue basis, in accordance with Second Circuit precedent that authorizes the courts to certify a class as to a particular issue regardless of whether a plaintiff's claim as a whole satisfies the Rule 23(b)(3) requirement of predominance.  *See Fleischman,* 2008 WL 2945993, at *6 (citing *Cordes & Co.,* 502 F.3d at 108-09).  The Sixth Circuit has yet to decide whether such an issue-by-issue inquiry into predominance is appropriate.  *See Randleman,* 646 F.3d at 356.

plaintiffs' federal antitrust claim.  *See Fleischman,* 2010 WL 681992, at *3, *7 (N.D.N.Y.

Feb. 16, 2010), *petition for leave to appeal dismissed,* 639 F.3d 28 (2d Cir. 2011).  First,

the court held that the plaintiffs' request was procedurally improper, where they had not

demonstrated a true change in circumstances since the court's prior ruling, but instead had

"merely adopted a new 'benchmark' from previously discoverable data" in order to

"present[] a new formula addressing the Court's prior concerns."  *Id.* at *3.  The court

further determined that Dr. Ashenfelter's expert analysis did not sufficiently obviate the

need for individualized inquiries as to antitrust impact and damages, in light of the "many

pay elements" that contribute to a nurse's total compensation, and given the multiple

factors that cause RN wages to vary, such as "experience, tenure, job title, hospital,

education and training, unit of care, part-time versus full-time employment status, and

alternative employment opportunities."  *Id.* at *6 (internal quotation marks and citations

omitted).

Defendants also direct the Court's attention to a third case involving antitrust

claims that the exchange of wage data allegedly resulted in depressed employee pay,

albeit in the oil rather than the health care industry.  Specifically, in *In re Compensation*

*of Managerial, Professional & Technical Employees Antitrust Litigation,* MDL No. 1471,

2003 WL 26115698, at *1 (D.N.J. May 27, 2003) ("*In re MPT*"), the court denied the

plaintiffs' request to certify a nationwide and industry-wide class of salaried managerial,

professional, and technical workers who had been employed by any of the fourteen

defendant oil companies at any time since January of 1990.  The court found that the

plaintiffs could not establish that common issues would predominate over individual ones, where the relevant job market that the plaintiffs had to identify in support of their rule of reason claim "varies significantly *depending on an employee's position,*" and where "the same individualized inquiries that preclude plaintiffs from establishing a relevant labor market for all [managerial, professional, and technical] employees through common proof also make it impossible to prove the fact of injury" through common evidence. *In re MPT,* 2003 WL 26115698, at *3-*4 (emphasis in original). The court observed, for example, that "[t]he relevant job market for an attorney will differ from that of an accountant or a geologist or project engineer, all positions, along with many others, that comprise the putative class." *Id.* at *3.[11]

The Court agrees with Plaintiffs that each of these cases is distinguishable on one or more grounds. First, and as even Defendants acknowledge, (*see* Defendants' Response Br. at 30 n.24), the proposed class here is not remotely as heterogenous or diverse as the

---

[11]The court in that case revisited the question of class certification in a later ruling, with the plaintiffs seeking to limit their proposed class to current employees only, and requesting only injunctive or declaratory relief rather than an award of damages. *See In re MPT,* 2006 WL 38937, at *1 (D.N.J. Jan. 5, 2006). The court again concluded that the proposed class was insufficiently cohesive to warrant certification and that the plaintiffs' claims instead "raise[d] a number of individualized issues," where even the more limited class proposed by the plaintiffs "includes approximately forty-thousand (40,000) members, and encompasses more than four-thousand (4,000) different jobs (including, for example, attorneys, geologists, pilots and engineers) and a wide range of education levels (ranging from high school to Ph.D. degrees)." *Id.* at *6. Although the plaintiffs sought to bridge this evidentiary gap through the opinion of an expert in labor economics who proposed to derive benchmarks from cross-industry salary surveys, the court found that this expert opinion failed to "address the main question confronting the Court — whether members of the Proposed Class are sufficiently cohesive with respect to the employment opportunities available to them." *Id.* at *10.

class for which certification was sought in *In re MPT,* whether as to geographical region, occupation, job market, educational background, or myriad other considerations.  In addition, it does not appear that the plaintiffs' expert in that case actually prepared a study or report through which the plaintiffs could establish the antitrust impact of the exchange of compensation data among the defendant oil companies; rather, plaintiffs and their expert merely suggested that data from cross-industry salary surveys "***could be used*** to examine whether or not" employee pay was reduced by these information exchanges, and that the plaintiffs then "***could construct***" benchmarks that would enable them to produce an estimate of the extent of the purported underpayment of oil industry workers.  *In re MPT,* 2006 WL 38937, at *10 (emphasis added) (internal quotation marks and citations omitted).  Here, in contrast, Plaintiffs' expert, Dr. Ashenfelter, has not simply described the broad outlines of a benchmark methodology through which harm to the proposed class could (theoretically) be examined and measured, but he has actually produced a report in which he applies his benchmark approach to the record in this case.  Accordingly, *In re MPT* is wholly inapposite here.

Similarly, Dr. Ashenfelter's expert report serves to distinguish this case from *Reed,* 268 F.R.D. at 590-94, in which the court faulted the analysis of the plaintiffs' expert for its "reliance on averages," its imprecision and failure to control for "all of the wide variance in RN base wages," and its failure to "appl[y] econometric principles and methods reliably to the facts of this case."  As discussed at length in this Court's prior opinion upholding Dr. Ashenfelter's proposed expert testimony against a *Daubert*

26

challenge, and as addressed again below, Dr. Ashenfelter does not rely on averages to demonstrate antitrust impact or to measure the harm allegedly suffered by the proposed RN class, but instead has derived what he and Plaintiffs characterize as a "conservative estimate" of the "but-for" hourly pay rate that each member of the proposed RN class would have received, at a minimum, in the absence of Defendants' alleged agreement to regularly share RN compensation data. *See Cason-Merenda,* 2013 WL 1721651, at *9-*10. This benchmark approach does not seek to deny that "RN wages vary widely within a hospital, or even a single department," *id.* at *9, nor does it employ averaging as a means of accounting for these variations while ensuring that the total award of damages does not exceed the aggregate wage loss suffered by the members of the proposed class. Rather, Dr. Ashenfelter purports to offer a "lower bound estimate" of the loss suffered by each member of the proposed RN class — an approach which might understate the harm to some of these class members, such as particularly experienced or specialized nurses, but is designed to ensure that "the Defendant hospitals will not be called upon to pay damages in excess of the harm inflicted on the plaintiff class as a result of their alleged antitrust violations." *Id.* at *10. The expert analysis in this case, then, does not pose the concern expressed in *Reed,* 268 F.R.D. at 591, that "[m]easuring average base wage suppression does not indicate whether each putative class member suffered harm from the alleged conspiracy."

Likewise, *Fleischman's* adverse ruling on the plaintiffs' initial request for class certification is distinguishable on essentially the same grounds. As observed earlier, this

27

initial decision rested in part on the court's disapproval of an averaging approach to the calculation of damages, *see Fleischman,* 2008 WL 2945993, at *7, but Dr. Ashenfelter does not employ such averaging here.  On the question of antitrust impact, the plaintiff's initial expert in *Fleischman,* Professor Henry Farber, presented a structural argument that turned upon evidence of "[i]nterchangeability and job mobility in the nursing profession," but the court found that this analysis was plagued by "too many variables" and "too much ambiguity to carry a motion for class certification on the issue of injury-in-fact."  *Id.* at *5-*6.  Again, while Defendants remain free to challenge Dr. Ashenfelter's benchmark approach before the trier of fact, and while the trier of fact remains free to reject this analysis on any of the several grounds urged by Defendants, there is no denying that this conservative approach obviates the need to determine antitrust impact by resort to individualized factors that cause one RN to earn more than another, or by conducting a detailed market analysis in which such considerations as elasticity of supply or job mobility might play a more prominent role.  *See Cason-Merenda,* 862 F. Supp.2d at 647-49 (reasoning that Dr. Ashenfelter's benchmark analysis, "if credited, serves as direct proof of a detrimental impact upon the wages paid to RNs by the Defendant hospitals," and thus renders a detailed market analysis unnecessary).[12]

---

[12]To be sure, the court in *Fleischman* adhered to its decision to deny class certification as to the issues of antitrust impact and damages, even after the plaintiffs in that case retained Dr. Ashenfelter as an additional expert whose benchmark analysis offered a means by which the plaintiffs could potentially establish antitrust impact and damages through common proof.  This ruling, however, was based in part on procedural considerations that are not pertinent here.  *See Fleischman,* 2010 WL 681992 at *3 (holding that the plaintiffs were not permitted to present a new benchmark analysis from Dr. Ashenfelter that rested upon previously discoverable data).

2. **The Benchmark Approach of Plaintiffs' Expert, Dr. Ashenfelter, Provides a Basis for Plaintiffs To Show Antitrust Impact Through Common Evidence, and Defendants' Various Challenges To This Approach Must Be Resolved by the Trier of Fact.**

As their next line of attack on Plaintiffs' proposed showing of predominantly common issues that warrant class certification under Rule 23(b)(3), Defendants renew several challenges to Dr. Ashenfelter's benchmark approach that they first asserted in their *Daubert* motion seeking the exclusion of this expert's testimony.  The Court finds no merit in these challenges, for reasons largely identified in its prior *Daubert* ruling.

By its express design, Dr. Ashenfelter's benchmark methodology purports to allow Plaintiffs to establish through common evidence both the antitrust impact of Defendants' alleged conspiracy to exchange RN wage data and the losses suffered by each member of the proposed RN class as a result of this alleged conspiracy.  *See Cason-Merenda,* 2013 WL 1721651, at *2-*3 (describing the elements of Dr. Ashenfelter's benchmark approach).  More specifically, Dr. Ashenfelter assesses impact and calculates damages by reference to the fees paid by the Defendant hospitals for agency nurses, with these fees used as a basis for determining the "marginal revenue product" of RNs performing the jobs assigned to the agency nurses.  *Id.* at *2 (internal quotation marks and citation

---

To the extent that the court further concluded that individualized inquiries into the discrete components of each RN's total compensation would remain necessary even in light of Dr. Ashenfelter's benchmark approach, *see id.* at *6, this Court respectfully takes a different view of the necessity of individualized proofs as to the non-base-wage elements of RN compensation under Dr. Ashenfelter's proposed approach, for reasons noted already and addressed at greater length below.

omitted).  Once he has made certain adjustments to these agency nurse fees, Dr.

Ashenfelter opines that the resulting figures provide a conservative measure of the but-for

wages that would be paid to RNs in a competitive market.  *Id.* at *3-*4.  Because this

calculation "shows that almost all of the members of the class actually earned less than

they would have in the 'but-for' world," Dr. Ashenfelter concludes "that all or almost all

of the class was harmed by the alleged conspiracy and that this can be shown using

evidence that is common to the class."  *Id.* at *3 (internal quotation marks, alteration, and

citation omitted).

Against this backdrop, the Court turns to Defendants' various challenges to

Plaintiffs' effort to demonstrate the predominance of common issues by resort to Dr.

Ashenfelter's expert opinion.  Defendants first assert that Dr. Ashenfelter has adopted a

"one size fits all" approach that disregards the wide range of wages actually paid to the

members of the RN class, and likewise disregards the myriad factors, such as experience,

specialized skills, and department, that contribute to these wage disparities.  As a result,

"[t]he most experienced RNs have the smallest amount of injury under [Dr. Ashenfelter's]

model," (Defendants' Response Br. at 35), and Defendants argue that this failure to

accurately assess the harm to particular class members disqualifies Dr. Ashenfelter's

approach as a means to demonstrate impact upon the class through common proof.

Yet, as Plaintiffs emphasize in their reply in further support of their motion,

(Plaintiffs' Reply Br. at 6-8), and as this Court likewise recognized in its *Daubert*

opinion, *see Cason-Merenda,* 2013 WL 1721651, at *9-*10, Defendants' critique of Dr.

30

Ashenfelter's approach overlooks the admittedly conservative nature of Dr. Ashenfelter's estimate of the "but-for" wages that RNs would be paid in a competitive market. "Because Dr. Ashenfelter's benchmark rests upon the fees paid by the Defendant hospitals for agency nurses, it measures only the value of 'generic' nursing services provided by these agency nurses, and Dr. Ashenfelter has acknowledged that this may result in understating the losses of experienced nurses as compared to the losses suffered by their less experienced counterparts." *Id.* at *10 (internal quotation marks and citations omitted). Likewise, Dr. Ashenfelter has incorporated only base pay into his calculation of but-for RN compensation, and has assumed that non-base elements of pay would make no contribution to these but-for wages, (*see* Ashenfelter Report at ¶ 116; Ashenfelter Rebuttal Report at ¶ 6), so it is immaterial to his analysis that non-base pay might make up a significant portion of the compensation currently paid to members of the RN class. Consequently, "so long as Dr. Ashenfelter is able to persuade the trier of fact that his benchmark provides a truly conservative estimate of but-for wages — an assertion that Defendants, of course, are free to challenge, both through cross-examination and through the testimony of their own experts — this will suffice to establish that Defendants' alleged antitrust violations had a common impact on the members of the plaintiff class, even if this benchmark might not accurately measure the precise harm suffered by each individual class member[]." *Id.; see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9, 89 S. Ct. 1562, 1571 n.9 (1969) ("[A plaintiff's] burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful

31

conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.").

As this Court emphasized in its *Daubert* ruling, Defendants need not accept Plaintiffs' contention that Dr. Ashenfelter has developed a truly conservative measure of the harm to the class, but their challenge on this point does not lead to the conclusion that Plaintiffs' showing of antitrust impact will entail predominantly individualized inquiries directed at the characteristics of each member of the proposed class. Indeed, to a considerable extent, Defendants' critique of Dr. Ashenfelter's benchmark approach itself entails common rather than individualized scrutiny — Defendants argue, for example, that the adjustments made by Dr. Ashenfelter to the hospitals' agency nurse fees do not fully capture all of the differences between wages paid to RN employees and fees paid for agency nurses, and this contention, in turn, rests in large part upon the analysis of Defendants' expert and underlying data that does not vary among individual RNs. *See Gintis v. Bouchard Transportation Co.,* 596 F.3d 64, 67 (1st Cir. 2010) (observing that the effort of the defendant in that case to discredit the methodology of the plaintiff's economic expert "apparently portends a fight over admissibility and weight that would be identical in at least a high proportion of cases if tried individually"); *Blood Reagents,* 283 F.R.D. at 244 (noting that the testimony of the defendant's expert, while "persuasive," "did not rebut the fundamental point that standard costs, demand, and market structure are all *common* variables that [the defendant] asserts plaintiffs should have included in their *common* damages formula"). Accordingly, while Defendants need not accept the validity

of Dr. Ashenfelter's agency fee benchmark, the Court finds that it provides a viable basis for Plaintiffs to establish antitrust impact through common proof. *See Cordes & Co.,* 502 F.3d at 107 (explaining in a price-fixing case that "[i]f the plaintiffs' single formula can be employed to make a valid comparison between the but-for fee and the actual fee paid, then it seems to us that the injury-in-fact question is common to the class").

Defendants' remaining challenges to Dr. Ashenfelter's benchmark approach merely incorporate by reference the contentions made in Defendants' *Daubert* motion, (*see* Defendants' Response Br. at 36-37), and the Court has already addressed these points in its ruling on this motion. In particular, the Court has already dealt with Defendants' objections (i) that Dr. Ashenfelter failed to adequately investigate the temporary nurse agency industry that is the source of his benchmark, *see Cason-Merenda,* 2013 WL 1721651, at *7; (ii) that Dr. Ashenfelter failed to identify an evidentiary basis for his determination that the Defendant hospitals make extensive use of agency nurses, *see id.* at *11; (iii) that Dr. Ashenfelter's benchmark is undermined by computational and analytical errors, *see id.* at *7-*9; and (iv) that Dr. Ashenfelter's approach rests upon a theory of "collusive price discrimination" that lacks support in the record, *see id.* at *11. While the Court recognizes that the "rigorous analysis" called for under Rule 23 does not permit the "uncritical[] accept[ance]" of expert testimony as a basis for concluding that the requirements of the Rule have been met, *Hydrogen Peroxide,* 552 F.3d at 323, the Court is confident that its thorough *Daubert* analysis, along with its careful examination of the record in connection with both its *Daubert* and its summary judgment rulings,

33

suffices to support the conclusion that Dr. Ashenfelter's benchmark approach serves as a suitable and permissible foundation upon which Plaintiffs may demonstrate antitrust impact through common evidence. *See Messner,* 669 F.3d at 812 (explaining that "[w]hen an expert's report or testimony is critical to class certification, we have held that a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification" (internal quotation marks and citations omitted)).

3.    **Plaintiffs Have Identified a Sufficient Evidentiary Basis for Their Effort to Indirectly Prove Common Impact to the RN Class by Reference to Commonalities in the Defendant Hospitals' Pay Structures.**

As an alternative to Plaintiffs' proof of antitrust impact through Dr. Ashenfelter's benchmark approach — an approach which, if credited by the trier of fact, would provide a direct means of establishing fact of damage through common evidence — Plaintiffs also point to purported commonalities in the pay structures of the Defendant hospitals as a means of indirectly proving antitrust impact through common evidence.[13]  In particular, Dr. Ashenfelter has opined that "[c]lass members at each of the defendant[] [hospitals] were subject to administered compensation systems, which either determined the class member's wage or linked that wage to a reference point or range," and that "cooperation

_____

[13]In light of the Court's determination that common issues predominate as to Plaintiffs' proposed direct method of proving antitrust impact through Dr. Ashenfelter's benchmark approach, Plaintiffs correctly observe that it is not necessary for them to show that they can indirectly establish this impact through proof common to the class.  Nonetheless, for the sake of completeness, the Court addresses the parties' arguments on this question.

among the defendants" via the alleged conspiracy "would have caused adjustments to the compensation systems" and thereby "affected the compensation of all or almost all individual class members." (Ashenfelter Report at ¶ 53.) Defendants challenge this purported common proof of antitrust impact, arguing that the record fails to provide a factual basis for Plaintiffs' claim of commonalities in the pay structures of the Defendant hospitals.

As discussed earlier, the parties advance diametrically opposed views as to the homogeneity (or lack thereof) of the pay structures by which the compensation of each member of the proposed RN class is determined. Plaintiffs rely first and foremost on the record showing that the vast majority of members of the proposed class that are employed at a particular hospital share the same job title, typically "staff nurse" or "registered nurse." Plaintiffs have also produced evidence that when the Defendant hospitals adjust their pay scales, they typically applied uniform increases across an entire scale, so that the pay rates for different levels within a given hospital's pay structure retain their rigid relationships — *e.g.,* "the pay scale for an RN II at Henry Ford is set at a level that is rigidly 5% above the pay scale for an RN I (and the RN III scale is set 6% above the RN II scale)." (Plaintiffs' Reply Br. at 21 (footnote with citations to record omitted).) Finally, Plaintiffs observe that the Defendant hospitals presumably would not have devoted considerable time and resources to exchanging information among themselves as to wages paid to "staff nurses" or "registered nurses" if this data did not map onto the recipient hospital's pay structure and provide useful information as to what other

hospitals were paying comparable employees.  *See Cason-Merenda,* 862 F. Supp.2d at 643 (concurring in Plaintiffs' observation that the Defendant hospitals "would hardly have spent thousands of dollars a year to commission surveys and devoted extensive resources to completing these surveys if they never used them" (internal quotation marks, alteration, and citation omitted)).

For their part, Defendants have produced evidence of the considerable diversity of the compensation structures used by the Defendant hospitals, where some of these institutions have adopted pure "step pay" systems while others determine base pay by reference to individualized considerations such as performance.  Even as to the hospitals that use similar step pay systems, Defendants point to changes made by individual hospitals during the class period in the number of steps in their pay scales or the distance between each step of a scale.  Beyond these distinctions in the processes by which RN base pay is determined, Defendants note the wide variety of non-base-pay components that may contribute to the overall compensation of a given member of the proposed class, with these components differing from one Defendant hospital to another.  Finally, Defendants have produced graphic illustrations of the substantial variations in pay among members of the proposed class, with no evident pattern to this distribution even when controlling for such factors as age, department, and hospital of employment.

Upon reviewing this record, the Court agrees with Plaintiffs that the variations in certain components of the Defendant hospitals' pay structures and the disparities in amounts of compensation received by the members of the proposed class do not defeat

36

Plaintiffs' effort to indirectly establish antitrust impact through common proof of shared or similar features among the wage structures implemented by each of the Defendant hospitals. The evidence produced by Plaintiffs reveals that at all but one of the hospitals operated by Defendants, the vast majority of the members of the proposed class either share a single job title with other class members at the same facility or work under a small handful of similar job titles. (*See* Plaintiffs' Motion, Ex. 15 (summarizing job titles of proposed class members).)[14] Moreover, while the pay structure at each of the Defendant hospitals differs in certain respects from those at other hospitals, each of these pay schemes is fairly rigid, highly regularized, and largely grid-driven, so that the base pay of class members is largely determined by reference to a small number of considerations without the need for significant individualized inquiry. (*See* Ashenfelter Report at ¶¶ 54-94 (summarizing the pay structures at the Defendant hospitals).) And, again, a certain degree of commonality and comparability among the pay schemes at the Defendant hospitals may be inferred from the fact that each of these hospitals deemed it worthwhile to exchange RN compensation data with other Detroit-area hospitals.

To be sure, Defendants have highlighted the diversity in certain aspects of their pay structures, and the substantial variations in the compensation paid to the members of the proposed class. Yet, as Plaintiffs observe, so long as the points of commonality among the pay structures of the Defendant hospitals are uniformly affected to some

---

[14]The sole exception to this rule is Henry Ford Hospital, but the record reveals that nearly all of the various RN job titles at this facility map onto the same pay scales.

degree by Defendants' alleged conspiracy to exchange RN wage data, and so long as the

pay of all or nearly all class members at a given hospital is determined through a fairly

regularized and rigid scheme that downplays individual distinctions  — matters which are

susceptible of proof through evidence common to the class — it may reasonably be

inferred that all or nearly all of the members of the RN class will be adversely impacted

by the alleged conspiracy, even if the pay scales of the Defendant hospitals do not move

in lock-step with one another, and even if there are significant differences in the overall

compensation received by individual class members.  *See Messner,* 669 F.3d at 819 ("By

requiring uniformity of nominal price increases within and across contracts, the district

court misread Rule 23(b)(3) to require a greater showing of common evidence than is

contemplated by that rule."); *Hydrogen Peroxide,* 552 F.3d at 325 (recognizing that "a

conspiracy to maintain prices could, in theory, impact the entire class despite a decrease

in prices for some customers in parts of the class period, and despite some divergence in

the prices different plaintiffs paid"); *Urethane Antitrust Litigation,* 251 F.R.D. at 638

("Certainly, individualized negotiations and a diversity of prices paid do not

automatically foreclose class action treatment.").[15]  As one court has observed in a case

---

[15]Moreover, to the extent that variations in compensation among the individual members
of the RN class are a function of non-base elements of their pay, the Court observed earlier that
Dr. Ashenfelter's theory of antitrust impact and damages seeks to ameliorate the effect of
differences in non-base pay by altogether omitting any possible components of non-base pay
from his determination of the but-for wages RNs would receive in the absence of the alleged
conspiracy.  Again, while Defendants are free to challenge this benchmark approach, it provides
a mechanism for Plaintiffs to establish antitrust impact and damages through class-wide proof
without the need to address the more individualized inquiries that are inherent in the divergent
non-base-pay elements adopted by the various Defendant hospitals.

involving allegations of price-fixing by car dealers, "[v]ariations in the negotiating skill of the purchaser would not eliminate the injury; the hard bargainer might have gained a good price, but would have done better yet in the absence of the conspiracy." *Mercedes-Benz,* 213 F.R.D. at 189.  So too here, where an individual RN's ability to secure larger wage increases than some of her colleagues — whether due to merit, education, expertise, negotiating power, willingness to take on more demanding duties or a less desirable shift, or myriad other factors — does not preclude Plaintiffs from establishing through common proof that this RN, like most or all of the other nurses in the proposed class, would have attained a still higher wage in the absence of the alleged conspiracy.

> **4.     To the Extent That Plaintiffs Must Establish the Rough Contours of the Relevant Product and Geographic Markets, These Inquiries May Be Resolved Through Common Proof.**

As their next effort to demonstrate the need for individualized inquiries in order to resolve Plaintiffs' rule of reason claim, Defendants argue that Plaintiffs cannot establish the relevant product or geographic markets through common proof.  As a threshold matter, however, Plaintiffs observe that in light of their direct evidence of anticompetitive effect — namely, Dr. Ashenfelter's benchmark analysis — they need not engage in a detailed market analysis, and the Court has concurred in this view of the law in its summary judgment ruling.  *See Cason-Merenda,* 862 F. Supp.2d at 648 (finding that Plaintiffs need only "show the rough contours of a relevant market" (internal quotation marks and citation omitted)).

Moreover, despite their various contentions about disparities among members of

39

the proposed RN class, Defendants have failed to suggest how Plaintiffs' proof of the relevant product and geographic markets could entail individualized inquiries.  As stated by Plaintiffs, "[d]efining a relevant market cannot, by definition, *ever* be an individual question — there is not one relevant market for Ms. Cason-Merenda, another for Mr. Suhre, and yet another for a third nurse," and "[d]efining a relevant market is, by virtue of the very concept of a 'market,' an aggregate question."  (Plaintiffs' Reply Br. at 27.)  This Court made a similar observation in an earlier case, explaining that the defendants' "quibbles" with the market definitions proposed by the plaintiffs and their experts in that case did not "render Plaintiffs' claims any less susceptible to class-wide or generalized proof."  *Northwest Airlines,* 208 F.R.D. at 220.  Finally, in its *Daubert* and summary judgment rulings in this case, the Court has already determined that Dr. Ashenfelter's market analysis passes muster under Fed. R. Evid. 702, *see Cason-Merenda,* 2013 WL 1721651, at *13, and that Plaintiffs' and their expert's analyses of the relevant product and geographic markets are sufficient to withstand summary judgment in Defendants' favor on Plaintiffs' rule of reason claim, *see Cason-Merenda,* 862 F. Supp.2d at 648-49. Against this backdrop, the Court cannot say that the market analysis needed to support Plaintiffs' antitrust claim will entail any significant degree of individualized inquiry.

     **5.**     **Plaintiffs' Showing of Causation Rests upon Common Rather Than Individualized Proof.**

As another argument incorporated from an earlier motion — in this case, their summary judgment motion — Defendants contend that Plaintiffs have failed to produce

any evidence, common or otherwise, that could establish the requisite causal link between an alleged antitrust violation and so-called "antitrust injury" — that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S. Ct. 690, 697 (1977). Again, however, while the Court recognized in its summary judgment ruling that there were "obstacles in the evidentiary paths by which Plaintiffs seek to traverse the gap between a claimed antitrust violation and antitrust injury," it nonetheless "concluded that "the record is sufficient to allow the trier of fact to hear Plaintiffs' evidence and decide the issue of causation." *Cason-Merenda,* 862 F. Supp.2d at 643.

The Court then proceeded to survey this record, which included (i) the "substantial evidence of the Defendant hospitals' regular exchanges of unmasked and disaggregated compensation-related information, both through direct contacts and through third-party surveys that failed to comport with the DOJ/FTC Guidelines in one or more respects," (ii) evidence that "this wage data . . . was routinely passed up to the hospitals' executive leadership for use in making wage determinations," (iii) evidence "suggesting that wage-related data exchanged among the Defendant hospitals . . . was actually relied upon and brought to bear in Defendants' decisions to reduce elements of their RN compensation packages below the levels that were contemplated before this data became available," (iv) the opinion of Plaintiffs' expert, Dr. Gregory S. Vistnes, that "information exchanges of the sort engaged in by the Defendant hospitals here can facilitate coordination and soften

41

competition, which in turn can affect prices (or, here, wages)," and (v) the opinion of Dr.

Ashenfelter that "RN wages at the Defendant hospitals have in fact been held below

competitive levels."  862 F. Supp.2d at 643-45 (internal quotation marks and citations

omitted).  To be sure, the Court acknowledged that "this body of evidence suffers from

weaknesses that undercut the inferences Plaintiffs wish to draw from it" — including that

it was "highly anecdotal," and that the evidence of Defendants' exchange of wage data

would bear on causation only to the extent that Plaintiffs could show that "the sub-

competitive wage levels identified by Dr. Ashenfelter were caused by a competition-

*reducing* aspect or effect of the Defendant hospitals' exchange."  862 F. Supp.2d at 645-

46 (internal quotation marks omitted).  Yet, it is clear that each of the above categories of

evidence put forward by Plaintiffs in support of their theory of causation is common to

the class, and does not entail any individualized inquiries.  Accordingly, the potential

weaknesses and pitfalls in Plaintiffs' showing of causation do not detract from Plaintiffs'

ability to address this element of their antitrust claim through common proof.

Indeed, as Plaintiffs' counsel pointed out at oral argument, much of the evidence

that Defendants would offer to rebut Plaintiffs' showing of causation would itself be

common to the class, albeit specific to a given Defendant hospital.  To the extent, for

example, that Defendants contend that the evidence of exchanges of wage data will vary

from one Defendant hospital to another, since not all Defendants participated in each

survey of RN wages and the Defendant hospitals used these surveys in different ways,

Plaintiffs correctly point out that "[t]he predominance requirement of Rule 23 addresses

the extent to which litigation of individual issues unique to each *plaintiff* will be required, not whether there may be some evidence that is unique to each *defendant.*"  (Plaintiffs' Reply Br. at 22-23.)  Likewise, evidence that a given hospital might have used wage information from other hospitals for a pro- rather than anti-competitive purpose would be specific to this Defendant hospital, but not individual class members.  For this reason, the courts have recognized that common issues often predominate as to the liability element of an antitrust conspiracy claim because "consideration of the conspiracy issue would, of necessity, focus on defendants' conduct, not the individual conduct of the putative class members."  *In re Flat Glass Antitrust Litigation,* 191 F.R.D. 472, 484 (W.D. Pa. 1999); *see also In re Flonase Antitrust Litigation,* 284 F.R.D. 207, 219 (E.D. Pa. 2012).  The Court is satisfied, then, that the trier of fact's consideration of the causation element of Plaintiffs' antitrust claim will be driven by predominantly class-wide rather than individualized evidence.

### 6.    Dr. Ashenfelter's Benchmark Approach Permits the Members of the Proposed Plaintiff Class to Establish Their Damages Through Common Proof.

Finally, Defendants again return to Dr. Ashenfelter's benchmark analysis, contending that his calculation of RN but-for wages fails to provide a plausible basis for quantifying the damages suffered by each member of the proposed RN class.  This argument, however, rests upon precisely the same "one size fits all" critique addressed earlier in this opinion and in the Court's *Daubert* ruling.  *See Cason-Merenda,* 2013 WL 1721651, at *9-*10.  As explained earlier, although Defendants remain free to challenge

43

Dr. Ashenfelter's benchmark approach at trial, and to urge the trier of fact to reject it, these challenges provide no basis for overcoming Plaintiffs' showing that the damage element of their antitrust claim is capable of being proven through evidence common to the class.

### 7.    Conclusion as to the Requirements of Rule 23(b)(3)

As is evident from the foregoing analysis, the Court finds that Plaintiffs have demonstrated that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  In particular, the Court is satisfied that all three elements of Plaintiffs' rule of reason claim — a violation of antitrust law, antitrust impact, and damages — may be established through predominantly common evidence, and that individualized inquiries will not play a significant role in Plaintiffs' showing as to these three elements of their claim.

This leaves only the question whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3). The Sixth Circuit has explained that "[u]se of the class method is warranted particularly" in cases where "class members are not likely to file individual actions" because "the cost of litigation would dwarf any potential recovery," *Whirlpool Corp.,* 722 F.3d at 861, and this standard is readily met here.  Defendants do not contend otherwise, but instead state in cursory fashion that a class action would be unmanageable in light of the "wealth of individualized inquiries needed to resolve the proposed class members' claims in one proceeding."  (Defendants' Response Br. at 61.)  This is simply a variation on

44

Defendants' argument as to predominance, and the Court has found this argument wanting.

At oral argument, counsel for the sole remaining non-settling Defendant, VHS of Michigan, suggested that any class action the Court might elect to certify could be made more manageable through the formation of subclasses of RNs employed at each Defendant hospital. Defendant VHS arguably has forfeited any such argument for subclasses, however, by virtue of its failure to propose this alternative at any earlier stage of this litigation despite ample opportunity to do so. In any event, VHS's proposal runs counter to the law governing antitrust conspiracy claims and, as pointed out by Plaintiffs' counsel at oral argument, reflects a fundamental misunderstanding of the nature of the claims actually asserted by Plaintiffs in this suit. Because Plaintiffs have alleged that the exchange of wage data among the Defendant hospitals affected the market as a whole — with the market in this case defined as RN jobs at hospitals in the Detroit metropolitan area — Plaintiffs necessarily must introduce evidence of regular, widespread exchanges of compensation information among all of the Defendant hospitals, and must show that these exchanges produced anticompetitive effects (*i.e.,* depressed wage levels) throughout the Detroit-area RN market. As Plaintiffs' counsel observed at oral argument, if Plaintiffs could show only that Defendant VHS (or another individual Defendant hospital) used the information obtained from other hospitals to hold down the wages of its own RNs, this presumably would not establish the injury to competition that is a prerequisite to recovery under antitrust law. *See Brunswick Corp.,* 429 U.S. at 488, 97 S. Ct. at 697. In light of

45

this required showing of market-wide activity and impact, the evidence that Plaintiffs would offer at a trial involving a VHS-only subclass would be precisely the same as the evidence Plaintiffs would offer on behalf of the entire proposed class, thereby defeating any claimed gain in manageability.

As noted by the Court at oral argument, perhaps counsel for Defendant VHS has proposed the formation of subclasses not to streamline the forthcoming trial — which, as explained, this proposal would not achieve — but as a means to limit the exposure of VHS as the sole remaining non-settling Defendant.  If so, counsel is insufficiently familiar with antitrust conspiracy law and, again, does not understand the nature of Plaintiffs' claims  here.  If Plaintiffs were to prevail on their antitrust conspiracy claim brought under § 1 of the Sherman Act, they could choose to collect the entirety of any resulting judgment from any Defendant hospital that had not yet settled with Plaintiffs and secured a release of liability, and this Defendant would have no recourse under antitrust law to seek contribution from any other co-defendant hospital.  *See Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 645-46, 101 S. Ct. 2061, 2069-70 (1981); *see also State of Washington v. American Pipe & Construction Co.,* 280 F. Supp. 802, 805 (S.D. Cal. 1968) (observing that an antitrust conspirator "must share the responsibility for any damages proved which were occasioned by the sales of co-conspirators, even though it may not have directly participated in, or benefited from, such activity").  Moreover, Defendant VHS seemingly overlooks the fact that it is being charged with liability not only for ***receiving*** RN wage data from other Defendant

hospitals that it then allegedly used to suppress the compensation of its own RN workforce, but also for *giving* wage data to other Defendant hospitals that was allegedly used to hold down the compensation paid to RNs at these other hospitals. Thus, the injury allegedly inflicted by Defendant VHS as a result of the alleged conspiracy is not limited to its own RNs, and there is no principled basis for proceeding to trial with only a subclass of VHS nurses. The Court, therefore, is satisfied that both the predominance and superiority prongs of the Rule 23(b)(3) standard for class certification are satisfied here.

## IV. <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' motion for class certification and appointment of class counsel (docket #384) is GRANTED.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  September 13, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 13, 2013, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135