UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA and
JEFFREY A. SUHRE, on behalf of
themselves and others similarly
situated,

    Plaintiffs,                                    Case No. 06-15601

v.                                                     Hon. Gerald E. Rosen

VHS OF MICHIGAN, INC., *et al.,*

    Defendants.
_____/

**OPINION AND ORDER REINSTATING
THE COURT'S SEPTEMBER 13, 2013 OPINION
ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on         March 7, 2014        

PRESENT: Honorable Gerald E. Rosen
                       Chief Judge, United States District Court

In an opinion and order dated September 13, 2013, the Court granted Plaintiffs' motion for class certification. The lone Defendant that has not yet reached a settlement with Plaintiffs, VHS of Michigan, Inc. ("VHS"), sought leave to appeal this ruling pursuant to Fed. R. Civ. P. 23(f). Although the Sixth Circuit denied VHS's petition for leave to appeal, it nonetheless vacated the Court's September 13, 2013 ruling and directed the Court to reconsider its class certification decision in light of the Supreme Court's recent opinion in *Comcast Corp. v. Behrend,* 133 S. Ct. 1426 (2013). *See In re VHS of*

*Michigan, Inc.,* No. 13-0113, Order at 3 (6th Cir. Jan. 6, 2014).

In the wake of this Sixth Circuit order, Plaintiffs and Defendant VHS have filed briefs with the Court stating their views as to the implications of *Comcast* to the Court's class certification ruling. Having reviewed the parties' submissions and the *Comcast* decision, the Court finds that its class certification analysis is unaffected by this Supreme Court ruling, and that the Court's September 13, 2013 opinion and order granting Plaintiffs' motion for class certification should be reinstated in full.

## I.     The Supreme Court's Decision in *Comcast Corp. v. Behrend*

In *Comcast,* 133 S. Ct. at 1430, the plaintiff subscribers to defendant Comcast's cable television services filed a class action antitrust suit against Comcast, alleging that the defendant cable company had entered into unlawful "swap agreements," in violation of § 1 of the federal Sherman Act, 15 U.S.C. § 1, and had monopolized or attempted to monopolize cable services in the Philadelphia metropolitan area, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[1]  In order to established the requisite "antitrust impact" element of their antitrust claims — *i.e.,* the "existence of individual injury resulting from" the antitrust violations alleged in their complaint — the plaintiffs advanced "four theories

---

[1] The Supreme Court explained that the "swap agreements" giving rise to the plaintiffs' § 1 claim consisted of arrangements through which Comcast pursued a "strategy of concentrating operations within a particular region" — also described as "clustering" — by "acquiring competitor cable providers in the region and swapping their own systems outside the region for competitor systems located in the region." *Comcast,* 133 S. Ct. at 1430. As a result of these transactions, Comcast's share of subscribers in the Philadelphia metropolitan area "allegedly increased from 23.9 percent in 1998 to 69.5 percent in 2007." 133 S. Ct. at 1430 (citation omitted).

of antitrust impact:"

> First, Comcast's clustering made it profitable for Comcast to withhold local sports programming from its competitors, resulting in decreased market penetration by direct broadcast satellite providers. Second, Comcast's activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates. Third, Comcast reduced the level of "benchmark" competition on which cable customers rely to compare prices. Fourth, clustering increased Comcast's bargaining power relative to content providers. Each of these forms of impact, [plaintiffs] alleged, increased cable subscription rates throughout the Philadelphia [metropolitan area].

*Comcast,* 133 S. Ct. at 1430-31.

In ruling on the plaintiffs' request for class certification, the district court "accepted the overbuilder theory of antitrust impact as capable of classwide proof and rejected the rest." 133 S. Ct. at 1431.[2] The district court "further found that the damages resulting from overbuilder-deterrence impact could be calculated on a classwide basis." 133 S. Ct. at 1431. To prove these damages, the plaintiffs relied solely on the testimony of an expert who "designed a regression model comparing actual cable prices in the Philadelphia [metropolitan area] with hypothetical prices that would have prevailed but for [Comcast's] allegedly anticompetitive activities." 133 S. Ct. at 1431. The plaintiff's expert acknowledged, however, that his model "did not isolate damages resulting from any one theory of antitrust impact," but instead "calculated damages resulting from the

---

[2]As noted by the Supreme Court, "the District Court did not hold that the three alternative theories of liability failed to establish antitrust impact, but merely that those theories could not be determined in a manner common to all the class plaintiffs." 133 S. Ct. at 1431 n.3. Thus, these remaining theories of liability potentially remained "available for the plaintiffs to pursue as individual actions." 133 S. Ct. at 1431 n.3.

alleged anticompetitive conduct as a whole." 133 S. Ct. at 1431, 1434 (internal quotation marks and citation omitted).

The Supreme Court held that the plaintiffs "class action was improperly certified under [Fed. R. Civ. P.] 23(b)(3)." 133 S. Ct. at 1432. In so ruling, the Court began its analysis "with an unremarkable premise:"

> If [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3). Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation. And for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so.

133 S. Ct. at 1433 (internal quotation marks and citations omitted).

The Court then found that the damages calculation put forward by the plaintiffs' expert could not withstand this rigorous analysis:

> There is no question that the model failed to measure damages resulting from the particular antitrust injury on which [Comcast's] liability in this action is premised. The scheme devised by [the plaintiffs'] expert, Dr. McClave, sought to establish a "but for" baseline — a figure that would show what the competitive prices would have been if there had been no antitrust violations. Damages would then be determined by comparing to that baseline what the actual prices were during the charged period. The "but for" figure was calculated, however, by assuming a market that contained none of the four distortions that [the plaintiffs] attributed to [Comcast's] actions. In other words, the model assumed the validity of all four theories of antitrust impact initially advanced by [the plaintiffs]:

> decreased penetration by satellite providers, overbuilder deterrence, lack of benchmark competition, and increased bargaining power. At the evidentiary hearing, Dr. McClave expressly admitted that the model calculated damages resulting from the alleged anticompetitive conduct as a whole and did not attribute damages to any one particular theory of anticompetitive impact.

133 S. Ct. at 1433-34 (internal quotation marks, citation, and footnote omitted).

The Supreme Court reasoned that this expert "methodology might have been sound, and might have produced commonality of damages, if all four of those alleged [market] distortions remained in the case." 133 S. Ct. at 1434. This was no longer true, however, in the wake of the district court's determination that the plaintiffs could proceed with their class action only as to the "overbuilder deterrence" theory of antitrust impact. Under these circumstances, Dr. McClave's benchmark approach could have provided a viable measure of damages only if it "reflect[ed] the conditions that would have prevailed in the Philadelphia [metropolitan area] but for the alleged reduction in overbuilding," while in all other respects "reflect[ing] the actual conditions" in this market. 133 S. Ct. at 1434 (internal quotation marks and citation omitted). Otherwise, the Supreme Court explained that Dr. McClave's approach would impermissibly rest upon "a methodology that identifies damages that are not the result of the wrong:"

> For all we know, cable subscribers in Gloucester County may have been overcharged because of [Comcast's] alleged elimination of satellite competition (a theory of liability that is not capable of classwide proof); while subscribers in Camden County may have paid elevated prices because of [Comcast's] increased bargaining power vis-à-vis content providers (another theory that is not capable of classwide proof); while yet other subscribers in Montgomery County may have paid rates produced by the combined effects of multiple forms of alleged antitrust harm; and so on.

5

> The permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless.
>
> In light of the model's inability to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding, Rule 23(b)(3) cannot authorize treating subscribers within the Philadelphia cluster as members of a single class. Prices whose level above what an expert deems "competitive" has been caused by factors unrelated to an accepted theory of antitrust harm are not "anticompetitive" in any sense relevant here. The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event.* The District Court and the Court of Appeals ignored that first step entirely.

133 S. Ct. at 1434-35 (internal quotation marks, citation, and footnote omitted) (emphasis in original).[3]

The Supreme Court emphasized that its decision in *Comcast* "turns on the straightforward application of class-certification principles." 133 S. Ct. at 1433. Likewise, the dissenters in *Comcast* opined that the majority opinion "breaks no new ground on the standard for certifying a class action under Federal Rule of Civil Procedure 23(b)(3)." 133 S. Ct. at 1436 (Ginsburg and Breyer, JJ., dissenting). Indeed, the dissenters asserted that "[t]he Court's ruling is good for this day and case only," in light of the "oddity" that the plaintiffs "never challenged" the "need to prove damages on a classwide basis through a common methodology," despite the "well nigh universal"

---

[3]The Court further observed that the lack of fit between the overbuilder deterrence theory of antitrust impact and the calculation of damages by the plaintiffs' expert posed a danger of over- or under-recovery by the members of the plaintiff class. "Any contention that the plaintiffs should be allowed to recover damages attributable to all four theories [of antitrust impact] in this class action would erroneously suggest one of two things — either that the plaintiffs may *also* recover such damages in individual actions or that they are precluded from asserting those theories in individual actions." 133 S. Ct. at 1431 n.3 (emphasis in original).

6

recognition in the case law and class action treatises that "individual damages calculations do not preclude class certification under Rule 23(b)(3)." 133 S. Ct. at 1437 (Ginsburg and Breyer, JJ., dissenting).

## II. Analysis

In its supplemental brief following the Sixth Circuit's order calling for this Court to reconsider its class certification ruling in light of *Comcast,* Defendant VHS maintains that the damages model offered in this case by Plaintiffs and their expert, Dr. Orley Ashenfelter, poses "the exact problem that the Supreme Court found fatal to class certification in *Comcast.*" (VHS's 2/14/2014 Suppl. Br. at 1 (emphasis in original).) In particular, while Plaintiffs' complaint asserts two theories of recovery under § 1 of the federal Sherman Act, 15 U.S.C. § 1 — namely, claims that the Defendant hospitals (i) conspired among themselves and with other local hospitals to hold down the wages of registered nurses ("RNs") employed at these hospitals (the "*per se*" claim), and (ii) exchanged compensation-related information among themselves in a manner that has reduced competition among Detroit-area hospitals in the wages paid to RNs (the "rule of reason" claim) — VHS points out that Dr. Ashenfelter has produced only a single calculation of the damages suffered by the Plaintiff class of RNs, rather than a separate calculation for each of Plaintiffs' two § 1 claims. Because the Court has awarded summary judgment in Defendants' favor on Plaintiffs' *per se* claim, and is allowing only their rule of reason claim to go forward, *see Cason-Merenda v. Detroit Medical Center,* 862 F. Supp.2d 603, 641, 649 (E.D. Mich. 2012), VHS contends that Plaintiffs' damages

7

model here, like the model put forward by the plaintiffs and their expert in *Comcast,* fails to properly isolate and measure only those "damages resulting from the particular antitrust injury on which [the Defendant hospitals'] liability in this action is premised," *Comcast,* 133 S. Ct. at 1433 — *i.e.,* Defendants' alleged rule of reason violation — and instead impermissibly encompasses the separate and additional damages arising from an alleged *per se* violation that is no longer a part of this class action suit. Although VHS's argument perhaps has some superficial appeal, the Court finds that it cannot withstand closer scrutiny under the particular facts and circumstances presented in this case.

The lynchpin of VHS's appeal to *Comcast* is that Dr. Ashenfelter, in VHS's view, has produced an "aggregated" calculation of damages that combines the purportedly separate injuries allegedly inflicted upon the Plaintiff RN class as a result of the Defendant hospitals' alleged *per se* and rule of reason violations, rather than isolating and measuring the harm attributable to one violation versus the other. (*See* VHS's Suppl. Br. at 1-2.) If this were so, then *Comcast* would indicate that Dr. Ashenfelter's damages methodology would not provide a suitable basis for a class-wide calculation of damages, because "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to" the sole theory of liability that has survived this Court's summary judgment ruling, *see Comcast,* 133 S. Ct. at 1433 — *i.e.,* Plaintiffs' rule of reason claim of RN wage suppression flowing from the Defendant hospitals' exchange of compensation-related information. Yet, it plainly is not enough for VHS to merely assert by *ipse dixit* that Dr. Ashenfelter has aggregated distinct harms inflicted on

8

the Plaintiff RN class through discrete antitrust violations having separate anticompetitive impacts. Rather, VHS must identify a basis in the record for this characterization of Dr. Ashenfelter's methodology.

VHS's effort to support this argument rests almost exclusively on Dr. Ashenfelter's deposition testimony. Specifically, VHS points to the following passage from Dr. Ashenfelter's deposition:

> Q: Now, would you agree that an analysis of competitive effects of information exchange may yield different results whether you're talking about information exchanged in aid of collusion versus information exchanged without any collusive element?
>
> A: Yes.
>
> Q: Okay. And just for clarity, when you're saying "collusion," you mean collusion as to actual compensation; correct?
>
> A: Yes.
>
> Q: Okay. Now, I'm a little unclear in your report as to which analyses relate to information exchange in aid of hypothetical collusion and which relate to information exchange in the absence of collusion. Can you tell me whether there's any distinction at all drawn in your report in that regard?
>
> A: I haven't tried to characterize the information exchanges with respect to the impact of the exchange on wages. I've simply used the information I had to characterize what the nature of the exchanges was.
>
> * * * *
>
> Q: Okay. How would you analyze — well, let me ask you a different question. Can you point to any — if I asked you as to anything in your report, is there anything in your report that is specifically focused on the effects of information exchange in aid of collusion

          versus the effects of information exchange separated from collusion?

A:     I haven't distinguished between those two, no.

Q:     Do you think everything you say in this report is equally applicable in both cases?

A:     Well, and they may be. I mean, I should characterize it again maybe just to say what I did before. My report of the information exchanges and the comparison of those with, for example, the FTC/DOJ safe harbor statement about them is really in the nature of a description of what I could find in the documents I had about information exchanges. I didn't try to conclude from them whether a particular information exchange led to a suppression of wages or not.

Q:     I mean, that's an interesting answer in itself, but I'm not sure it's what I was getting at. Let me try again. Is — do you believe that your analysis in your report, everything in it is equally applicable to an information exchange in aid of collusion versus an information exchange that is in a situation where collusion is absent?

A:     Well, I didn't say that.

Q:     Excuse me?

A:     I didn't say that.

Q:     Well, I'm asking you: Is that true or not?

A:     No, I haven't — I don't know whether or not the information about those exchanges is more applicable to one issue or another because I haven't actually used the exchanges to study whether — what the effect of the exchange was on wages. I don't — I haven't made that connection. So I don't — it's never been necessary for me to distinguish between those two issues in this analysis.

(Ashenfelter 1/6/2009 Dep. at 23-26.) In VHS's view, this testimony reflects Dr.

Ashenfelter's "conce[ssions]" that "his model did <u>not</u> isolate damages attributable solely

to the information exchange claim," and that "<u>he could not say</u> that the damages under the

10

wage fixing claim and the information exchange claim would be the same." (VHS's Suppl. Br. at 1 (emphasis in original).)

The Court has no quarrel with VHS's proffered reading of this deposition testimony, so far as it goes. Yet, neither the above-quoted testimony nor VHS's interpretative gloss on it establishes the further propositions that would trigger the application of *Comcast* — namely, that each of the two theories of liability asserted in Plaintiffs' complaint, if proven, would bring about a ***separate and distinct*** harm to the members of the Plaintiff class, and that Dr. Ashenfelter's calculation of damages reflects the ***aggregation*** of these distinct harms. This, after all, was the situation presented in *Comcast* — the plaintiffs in that case identified four separate means by which Comcast's "clustering" strategy allegedly inflicted antitrust injury on customers in the Philadelphia market for cable television services, and the plaintiffs' expert acknowledged that his model "calculated damages resulting from the alleged anticompetitive conduct as a whole and did not attribute damages to any one particular theory of anticompetitive impact." *Comcast,* 133 S. Ct. at 1430-31, 1434 (internal quotation marks and citation omitted); *see also Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 800 (7th Cir. 2013) (explaining that "it was not the existence of multiple theories in [*Comcast*] that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact — the injury — of which the plaintiffs were complaining"). According to Plaintiffs, it is precisely this aspect of the situation presented in *Comcast* that is missing here: in Plaintiffs' view, they have "pursued two ***mutually exclusive*** theories of harm,

11

rather than the four *complementary* theories of causation presented in *Comcast*." (Plaintiffs' 2/14/2014 Suppl. Br. at 2 (emphasis in original).)[4]

Notably, whether Plaintiffs are correct as to the mutually exclusive nature of their two theories of liability and harm, or whether this case is more akin to *Comcast,* where each of the plaintiffs' four theories of antitrust impact made a discrete contribution to the overall injury suffered by the plaintiff class, the Court cannot look to Dr. Ashenfelter's deposition testimony to resolve this question. This is because Dr. Ashenfelter's analysis suffers from a more fundamental "deficiency," for lack of a better word, that precludes any reliance on his expert report or testimony to determine whether Plaintiffs' theories of antitrust impact are mutually exclusive (as they maintain) or complementary (as VHS contends). As the Defendant hospitals pointed out in their summary judgment motion, and as the Court recognized in its ruling on this motion, neither Dr. Ashenfelter nor

---

[4]VHS asserts that the Court should reject out of hand this claim of mutually exclusive theories, where the Sixth Circuit purportedly "did not find this argument persuasive." (VHS's Suppl. Br. at 7.) More generally, VHS suggests at various points in its supplemental brief that the Sixth Circuit's order should bind this Court through its "observations," its "reject[ion]" of arguments advanced by Plaintiffs, or its purported findings as to the nature of Dr. Ashenfelter's damages methodology. (VHS's Suppl. Br. at 2-3.) The Court, however, reads the Sixth Circuit's order as expressing no view as to the applicability of *Comcast* here; to the contrary, the Sixth Circuit expressly stated that it would be "premature for us to accept an appeal" on this ground, in light of "the absence of any reference to *Comcast* by the district court and the parties' failure to analyze the issue before the district court." *In re VHS of Michigan, Inc.,* No. 13-0113, Order at 3 (6th Cir. Jan. 6, 2014).

This order, in the Court's view, directs this Court to determine of its own accord how or if *Comcast* should apply in this case. Otherwise, under VHS's own logic, if the Sixth Circuit were persuaded by VHS's appeal to *Comcast,* it could have simply granted VHS's petition for leave to appeal and decided on its own how *Comcast* should affect this Court's class certification ruling. Instead, this task has been left for this Court to perform in the first instance.

Plaintiffs' other expert, Gregory Vistnes, made any effort to investigate a possible causal connection between either of Plaintiffs' two theories of liability and antitrust injury suffered by the Plaintiff class. *See Cason-Merenda,* 862 F. Supp.2d at 642. Rather, Dr. Ashenfelter was asked by Plaintiffs' counsel to simply assume that Plaintiffs could prove "either or both" of the two antitrust claims asserted in their complaint. (Ashenfelter 11/24/2008 Report at ¶ 4.) He then computed the damages to the Plaintiff RN class by reference to a benchmark designed to generate a conservative estimate of what the members of the class would have earned in a competitive market. *See Cason-Merenda v. Detroit Medical Center,* 2013 WL 1721651, at *2-*3 (E.D. Mich. Apr. 22, 2013). At no time, however, did Dr. Ashenfelter attempt to marshal any evidence to demonstrate that either of the two antitrust violations alleged by Plaintiffs actually caused or contributed to the harm measured in his benchmark analysis, whether alone or in combination with Plaintiffs' other theory of liability.[5]

Because Dr. Ashenfelter was not asked to opine on this question of causation, it follows for present purposes that nothing in his expert report or testimony will shed any light on the complementary or mutually exclusive nature of the theories of antitrust impact pursued by Plaintiffs in this case. Dr. Ashenfelter was asked, in effect, to assume the existence of a "black box" of antitrust violations, and to measure the injury inflicted

---

[5] As observed in the Court's summary judgment ruling, the absence of expert testimony on this point leaves Plaintiffs to face "thorny issues of proof" in establishing the requisite causal link between an alleged antitrust violation and injury to the Plaintiff class, but the Court nonetheless could not conclude "as a matter of law that Plaintiff[s] cannot make this showing." *Cason-Merenda,* 862 F. Supp.2d at 646.

upon the Plaintiff class as a result of these assumed violations. It is immaterial to this analysis whether only one of the items in this "black box," to the exclusion of all others, could have operated to produce this injury, or whether multiple items in this "black box" could have contributed in tandem to the injury measured through Dr. Ashenfelter's benchmark approach. As a result, VHS's attempt to rebut Plaintiffs' claim of mutually exclusive theories of liability by reference to purported "concessions" or "admissions" in Dr. Ashenfelter's expert report or testimony is doomed to failure.

Upon consideration of the overall nature of Plaintiffs' two theories of recovery, however, the Court is persuaded that Plaintiffs' claim of mutually exclusive theories of liability is correct, and that *Comcast* therefore does not apply here. Under Plaintiffs' *per se* theory, the Defendant hospitals are alleged to have agreed among themselves to depress the compensation of RNs employed at Detroit-area hospitals. *See Cason-Merenda,* 862 F. Supp.2d at 624. In support of their rule of reason claim, by contrast, Plaintiffs have alleged that the Defendant hospitals' exchange of wage-related information has led to a softening of competition that has held RN wages below a true competitive level. *See Cason-Merenda,* 862 F. Supp.2d at 605, 643-45. As Plaintiffs observe in their supplemental brief addressing the impact of *Comcast,* "[i]f there was a *per se* [wage]-fixing conspiracy among Detroit hospitals and wages were set pursuant to such an agreement[,] then it could not also be true that wages were set independently in a market with softened competition (because by definition there was no competition to soften and wages were not set independently)." (Plaintiffs' Suppl. Br. at 9.) By the same

14

token, if Plaintiffs were to prove their rule of reason claim, this would entail the Defendant hospitals' use of shared wage information to make independent wage-setting decisions under conditions of softened competition, and such independent decision-making is inconsistent with an agreement to set wages as alleged under Plaintiffs' *per se* theory. (*See id.* at 9 n.13.)

As Plaintiffs cogently observe, "[u]nder no circumstance could any underpayment for any nurse be in part because the hospitals agreed on the wages they would pay their nurses (the dismissed *per se* claim) and in part because they set pay independently but agreed to exchange wage data (the surviving Rule of Reason claim) . . . . Either wages were set pursuant to the terms of an agreement or they were set through each hospital's independent decision-making process." (*Id.* at 2-3 (footnote omitted).) Against this reasoning, VHS does not even attempt to explain how the two types of anticompetitive conduct alleged by Plaintiffs could operate side-by-side to contribute to an aggregate depression of RN wages. *Compare Comcast,* 133 S. Ct. at 1434 (positing ways in which the evidence in that case might show that cable subscribers in one county were overcharged due to one of the plaintiffs' theories of antitrust impact, while cable subscribers in another county were overcharged due to another theory).

The Court need not linger long over VHS's remaining challenges to Plaintiffs' claim of mutually exclusive theories of liability. In particular, VHS contends — in the course of two short sentences, and without further explication — that it is "self-evident" that the damages arising from Plaintiffs' *per se* and rule of reason claims would be

15

different, and that it is "simply implausible" to assert, as Plaintiffs purportedly did before the Sixth Circuit, that the damages under these two theories of liability "would be identical to the penny." (VHS's Suppl. Br. at 7-8 (emphasis in original).) This, however, mischaracterizes Plaintiff's theory of damages, in a manner that the Court already addressed in its ruling on Defendants' motion to exclude Dr. Ashenfelter's expert testimony. In particular, Defendants argued in that motion that Dr. Ashenfelter's benchmark approach provides an impermissible "one size fits all" measure of damages that does not properly account for wage variations among RNs in a given hospital, or even a single department, based on such factors as experience and training. *See Cason-Merenda,* 2013 WL 1721651, at *9. The Court rejected this contention, noting that Dr. Ashenfelter's benchmark approach produces "an admittedly conservative estimate of 'but-for' RN wages," and finding that this measure of damages was sufficiently reliable even though it "might not accurately measure the precise harm suffered by each individual class member[]." 2013 WL 1721651, at *10. Likewise, in the present context, so long as Dr. Ashenfelter's but-for calculation of RN wages in a competitive market reflects a conservative measure of the harm to the class, whether as a result of a *per se* or rule of reason violation, it does not matter that a more "true" measure of these damages might be different, nor that this "true" measure would disclose different damages flowing from the two sorts of violations.[6]

---

[6]In its supplemental brief, VHS seeks to revive Defendants' "one size fits all" critique of Dr. Ashenfelter's approach as purportedly running afoul of *Comcast*'s supposed "holdings" that

16

Finally, it bears emphasis that in the wake of this Court's summary judgment ruling and the dismissal of Plaintiffs' *per se* claim, this case does not pose the concern of a double recovery that the *Comcast* Court cited as additional support for its ruling. As the Supreme Court observed, because the district court in *Comcast* did not altogether dismiss the plaintiffs' three other theories of liability, but "merely [held] that those theories could not be determined in a manner common to all the class plaintiffs," this left open the possibility that these "other theories of liability may well be available for the plaintiffs to

---

"a district court must determine, at the certification stage, whether damages can be measured on a classwide basis," and that this inquiry "requires a 'close look' at the plaintiffs' damages model." (VHS's Suppl. Br. at 8.) Yet, as expressly acknowledged in *Comcast* itself, the Supreme Court's discussion on these points rested upon "the straightforward application of class-certification principles," as evidenced by the fact that the Court cited its existing precedents as recognizing a district court's "duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast,* 133 S. Ct. at 1432-33 (internal quotation marks and citation omitted); *see also In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation,* 722 F.3d 838, 860 (6th Cir. 2013) (observing that *Comcast* is "premised on existing class-action jurisprudence").

By directing this Court to revisit its class certification decision in light of *Comcast,* the Sixth Circuit presumably did not mean to invite VHS to reassert any and all desired arguments previously advanced by Defendants in their summary judgment, *Daubert,* and class certification submissions. Accordingly, the Court declines to address VHS's arguments in its supplemental brief regarding the purportedly "unjust, speculative, and utterly arbitrary" nature of Dr. Ashenfelter's benchmark approach, (VHS's Suppl. Br. at 8), as these matters are beyond the scope of the Sixth Circuit's order and represent an untimely request for reconsideration of this Court's prior rulings in this case. In any event, the Court fully stands by and adheres to these rulings, observing that its class certification decision, in particular, recognized the Court's obligation to "conduct a rigorous analysis to confirm that the requirements of Rule 23 have been met," and then proceeded to perform this requisite analysis in determining that Dr. Ashenfelter's benchmark approach provides a viable basis for Plaintiffs to establish damages on a classwide basis. *Cason-Merenda v. VHS of Michigan, Inc.,* __ F.R.D. __, 2013 WL 5106520, at *6, *14-*15 (E.D. Mich. Sept. 13, 2013). To the extent that *Comcast* imposes any new duties upon a district court as it addresses a Rule 23 motion for class certification, the Court is confident that its class certification ruling in this case reflects the proper exercise of these duties.

17

pursue as individual actions." *Comcast,* 133 S. Ct. at 1431 n.3. Against this backdrop, if the plaintiffs were allowed a class action recovery based on a damages model that encompassed all four of the plaintiffs' theories of liability, this would "erroneously suggest one of two things — either that the plaintiffs may *also* recover such damages in individual actions or that they are precluded from asserting those theories in individual actions." 133 S. Ct. at 1431 n.3. Here, in contrast, any individual who joins the Plaintiff class is bound by the Court's dismissal of Plaintiffs' *per se* claim in its summary judgment ruling, and he or she will be limited to the single recovery (if any) secured in the class-wide trial of Plaintiffs' rule of reason claim.[7]

To be sure, VHS maintains that Dr. Ashenfelter's benchmark approach does not provide a proper, reliable measure of the harm suffered by the Plaintiff class as a result of the alleged information-sharing conspiracy giving rise to Plaintiffs' rule of reason claim. VHS remains free, however, to persuade the trier of fact to reject this theory of damages, whether as an inappropriate "one size fits all" approach, for lack of a sufficient causal connection between Plaintiff's theory of liability and the alleged injury measured by Dr. Ashenfelter, or on other grounds.[8] All that the Court has held to date is that the trier of

---

[7]If, on the other hand, an individual elects to opt out of the Plaintiff class in this case, he or she would not share in any class recovery, but also would not be "bound by anything in this case including the damages methodology." (Plaintiffs' Suppl. Br. at 2 n.2.)

[8]Alternatively, VHS perhaps could seek to convince the trier of fact that Plaintiffs' theory of damages should be rejected because it fails to account for other antitrust violations that, although previously dismissed by the Court or not pursued by Plaintiffs in this litigation, could nonetheless have produced or contributed to the sub-competitive RN wages identified in Dr. Ashenfelter's analysis. Although the Court is skeptical that VHS will pursue this line of

fact should decide these questions. In any event, VHS need not fear any sort of "Trojan horse" scenario in which the trier of fact might award damages inconsistent with Plaintiffs' theory of liability. Rather, because the Court has determined that only one of Plaintiffs' two theories of liability may go forward, the trier of fact will be given the straightforward task of determining whether Plaintiffs have proven this sole remaining antitrust violation and, if so, whether Dr. Ashenfelter's model is an appropriate measure of the damages flowing from this violation. In its class certification ruling, the Court found that these issues were susceptible of proof on a class-wide basis, and nothing in *Comcast* leads the Court to question this decision.

      For these reasons,

---

argument, nothing prevents it from doing so.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Court's September 13, 2013 opinion and order on Plaintiffs' motion for class certification is REINSTATED IN FULL.[9]

        s/Gerald E. Rosen
        Chief Judge, United States District Court

Dated: March 7, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 7, 2014, by electronic and/or ordinary mail.

        s/Julie Owens
        Case Manager, (313) 234-5135

---

[9] As noted in Plaintiffs' supplemental brief, (*see* Plaintiffs' Suppl. Br. at 10 n.16), the Court's class certification ruling must be amended in one respect. In particular, although the Court states near the outset of its opinion that Plaintiffs are seeking certification of a class consisting of RNs employed by the eight Defendant hospitals "at any time from December 12, 2002 through the present," *Cason-Merenda,* __ F.R.D. at __, 2013 WL 5106520, at *1 (internal quotation marks and citation omitted), this case has been litigated under the premise that any class recovery would not extend to the present, but only through December 12, 2006. Thus, the above-quoted passage stating "from December 12, 2002 through the present" is amended to read "from December 12, 2002 through December 12, 2006."