UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA and
JEFFREY A. SUHRE on behalf of
themselves and others similarly
situated,

                           Plaintiffs,

          v.

VHS of MICHIGAN, INC., d.b.a.
DETROIT MEDICAL CENTER, et al.,

                           Defendants.

Case No. 06-15601

Hon. Gerald E. Rosen

---

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT
WITH VHS OF MICHIGAN, INC., d.b.a. DETROIT MEDICAL CENTER
AND FOR APPROVAL OF PLAN OF ALLOCATION**

Plaintiffs move the Court for an Order approving the terms of the Settlement

Agreement between members of the certified Class and VHS of Michigan, Inc.,

d.b.a. Detroit Medical Center ("DMC"). The Settlement provides for a payment to

members of the Class of $42 million. This settlement was reached just weeks before

trial after years of vigorous litigation including extensive fact and expert discovery

and through multiple, lengthy processes involving arms-length negotiations. This

settlement was negotiated in part with the assistance of the Court and following

multiple negotiation sessions overseen by the Court-appointed Settlement Master,

Judge Layn Phillips (ret). The Settlement provides significant benefits to the Class,

while removing the risk and delay associated with continuing the litigation against

DMC. For the Court's convenience, a copy of the Settlement Agreement is attached as Exhibit 1 to the Declaration of Raymond Farrow in Support of Plaintiffs' Motion for Final Approval of Settlement and in Support of Plan of Allocation ("Farrow Decl.").

Plaintiffs also seek Court approval of a proposed Plan of Allocation for the money collected through this Settlement. Plaintiffs propose that a Plan identical to that used to distribute the money from previous settlements be applied to this Settlement – distribution *pro rata* based on earnings during the Class Period.

DATED December 11, 2015.

Respectfully submitted:

KELLER ROHRBACK L.L.P.

By: /s/Mark A. Griffin
Mark A. Griffin
Lynn Lincoln Sarko
Raymond J. Farrow
Tana Lin
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1200
Fax: (206) 623-3384

E. Powell Miller (P39487)
Sharon S. Almonrode
MILLER LAW FIRM
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200

Daniel A. Small

COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.,
Suite 500 West
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

David P. Dean
JAMES & HOFFMAN
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

Joseph Goldberg
FREEMAN, BOYD, HOLLANDER,
GOLDBERG, URIAS,
& WARD, P.A.
20 First Plaza, Suite 700,
Albuquerque, NM  87102
Tel: (505) 244 7520

Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Daniel M. Cohen
CUNEO GILBERT & LADUCA LLP

3

106-A S. Columbus Street
Alexandria, VA 22314
Tel: (202) 789-3960
Fax: (202) 789-1813

**Attorneys for Plaintiffs**

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

|  |  |
|---|---|
| PAT CASON-MERENDA and JEFFREY A. SUHRE on behalf of themselves and others similarly situated, | Case No. 06-15601 |
| Plaintiffs, | Hon. Gerald E. Rosen |
| v. |  |
| VHS of MICHIGAN, INC., d.b.a. DETROIT MEDICAL CENTER, et al., |  |
| Defendants. |  |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF SETTLEMENT WITH VHS of MICHIGAN, INC., d.b.a. DETROIT
MEDICAL CENTER
AND FOR APPROVAL OF PLAN OF ALLOCATION**

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................1

II.     BACKGROUND ......................................................................................1

        A.      The Litigation ..............................................................................1

        B.      The Settlement .............................................................................2

                1.      Settlement Negotiations and Investigation ..............................2

                2.      The Settlement Amount ...........................................................2

                3.      The Releases ...........................................................................3

        C.      Preliminary Approval and Notice to the Class....................................3

III.    THE COURT SHOULD APPROVE THE SETTLEMENT........................4

        A.      The Risk of Fraud or Collusion...........................................................6

        B.      The Complexity, Expense and Likely Duration of the
                Litigation .........................................................................................6

        C.      The Amount of Discovery Engaged in by the Parties........................8

        D.      The Likelihood of Success on the Merits...........................................8

        E.      The Opinions of Class Counsel and Class
                Representatives................................................................................10

        F.      The Reaction of Absent Class Members...........................................11

        G.      The Public Interest...........................................................................11

IV.     THE PROPOSED PLAN OF ALLOCATION SHOULD BE
        APPROVED. ...........................................................................................12

        A.      The Proposed Plan of Allocation and Proposed Claim
                Forms................................................................................................12

1.    Distribution to persons who already filed claims ...................12

2.    Distribution to other Class members ......................................13

3.    The role of the Claims Administrator. ....................................16

B.    The Plan of Allocation Is Fair, Reasonable, and
Adequate..............................................................................................16

V.    CONCLUSION...........................................................................................17

## STATEMENT OF ISSUES PRESENTED

1.      Whether the Court should approve the Settlement with DMC.

2.      Whether the Court should approve the proposed plan of allocation of

the settlement fund.

**<u>Plaintiffs' response to all questions</u>:**

      **YES**

# STATEMENT OF
# MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

*Int'l Union v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)

*Rankin v. Rots*, No. 02-71045, 2006 WL 1876538 (E.D. Mich. June 27, 2006).

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In Re Auto. Refinishing Paint Antitrust Litig.*,
617 F. Supp. 2d 336 (E.D. Pa. 2007)............................................................5

*In Re Cardizem CD Antitrust Litig.*,
218 F.R.D. 508 (E.D. Mich. 2003).......................................................8, 12, 17

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981)............................................................................5

*Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*,
No. 12-2048 (W.D. Okla. 2015) ............................................................7

*In Re Chambers Dev. Sec. Litig.*,
912 F. Supp. 822 (W.D. Pa. 1995)..........................................................8

*Fischer Bros., Inc. v. Mueller Brass Co.*,
630 F. Supp. 493 (E.D. Pa. 1985) ..........................................................6

*In Re Flonase Antitrust Litig.*,
951 F. Supp. 2D 739 (E.D. Pa. 2013) ......................................................7

*Int'l Union v. General Motors Corp.*,
497 F.3d 615 (6th Cir. 2007) ...............................................................4

*Kogan v. Aimco Fox Chase, L.P.*,
193 F.R.D. 496 (E.D. Mich. 2000) ........................................................10

*In Re Linerboard*,
292 F. Supp. 2d 568 (E.D. Pa 2003)........................................................6

*In Re Linerboard Antitrust Litig.*,
321 F. Supp. 2d 619 (E.D. Pa. 2004).......................................................6

*In Re Nasdaq Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ..........................................................7

*In Re Packaged Ice Antitrust Litig.*,
2011 U.S. DIST. LEXIS 150427 (E.D. Mich. Dec. 13, 2011)...........................10

*Rankin v. Rots*,
   NO. 02-71045, 2006 WL 1876538 (E.D. Mich. June 27, 2006) ..................5, 10

*Taft v. Ackermans*,
   NO. 02-7951, 2007 WL 414493 (S.D.N.Y. Jan 31, 2007) .................................17

*In Re Telectronics Pacing Sys., Inc.*,
   137 F. Supp. 2D 985 (S.D. Ohio 2001) ...............................................................5

*Thacker v. Chesapeake Appalachia, L.L.C.*,
   695 F. Supp. 2D 521 (E.D. Ky. 2010) ...............................................................17

*U.S. Football League v. Nat'l Football League*,
   644 F. Supp. 1040 (S.D.N.Y. 1986), *Aff'd*, 842 F.2D 1335 (2d Cir.
   1988) ....................................................................................................................7

*Wesely v. Spear*, *Leeds & Kellogg*,
   711 F. Supp. 713 (E.D.N.Y. 1989) .....................................................................6

## Other Authorities

Fed. R. Civ. P. 23(e)...............................................................................................1, 4

Fed. R. Civ. P. 23(e)(1)(c) .........................................................................................4

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §
   12.10 (3d ed. 1992) ...........................................................................................17

# I.    INTRODUCTION

Pursuant to Fed. Rule Civ. P. Rule 23(e), Plaintiffs Pat Cason-Merenda and Jeffrey Suhre ("Named Plaintiffs"), on behalf of themselves and the certified Class (collectively "Plaintiffs"), respectfully submit this Memorandum in support of their motion for final approval of the final settlement in this litigation, with VHS of Michigan, Inc., d.b.a. Detroit Medical Center ("DMC"). This Settlement secures a cash payment of $42 million for the Class which is in addition to approximately $48 million already collected from the other seven defendants

For the reasons set forth below, this Settlement is fair, reasonable, adequate, and in the best interest of the Class, and Plaintiffs respectfully request that the Court grant their request for final approval of the Settlement.

In addition, Plaintiffs seek the Court's approval of their proposal to allocate all the money collected from this Settlement using the same *pro-rata* allocation previously approved by the Court for distributing prior settlement funds.

# II.    BACKGROUND

## A.    The Litigation

Plaintiffs filed this lawsuit in December of 2006, amending the Complaint in June of 2007. Since that time, this case has proceeded through intense litigation. This Settlement was achieved just weeks before a scheduled trial against the last remaining defendant, DMC, and after the Court had ruled on multiple summary judgment motions, on class certification, on multiple *Daubert* motions, and after

1

holding a hearing on over two dozen motions in *limine* filed by the parties. In addition, this Court's decision to certify the class had been unsuccessfully challenged before the Sixth Circuit Court of Appeals three times. A more detailed recounting of this history is included in the accompanying motion for an award of attorneys' fees, reimbursement of costs and award of incentive payments.

**B.     The Settlement**

    **1.     Settlement Negotiations and Investigation**

The Settlement Agreement was the result of extensive arm's-length negotiations between experienced counsel assisted by the Court, and after multiple prior negotiations assisted by the Court-appointed Settlement Master, Judge Layn Phillips, ret. These discussions were based on a full understanding of the strengths and weaknesses of the case against DMC at a point in time when each side had conducted all but the very last steps in preparing to present its case to a jury.

    **2.     The Settlement Amount**

The Settlement Agreement provides that DMC will pay $42 million in cash for the benefit of the certified Class, which is defined as:

> All registered nurses who provided direct patient care in short term acute care facilities exclusive of supervisory, managerial, and advanced practice nurses, and who were employed by Defendants within the Detroit Michigan Metropolitan Statistical Area at any time from December 12, 2002 through December 12, 2006 ["Class Period"].

Settlement Agreement at ¶ 2.

### 3.    The Releases

In exchange for the above consideration, Plaintiffs have agreed for themselves and on behalf of the certified Class to release and discharge DMC from any and all claims against it arising out of the facts, occurrences, transactions, or other matters alleged in the Complaint that relate in any way to any anticompetitive conduct by DMC concerning Class members' monetary compensation, non-monetary compensation, recruitment, employment and/or retention in short-term acute-care facilities in Detroit. Settlement Agreement at ¶¶ 37-39.[1]

## C.    Preliminary Approval and Notice to the Class

On September 14, 2015 the Court entered an order granting preliminary approval of the Settlement. ECF No. 955. Pursuant to the dates established in the Order, on October 23, 2015, 24,524 copies of the Court-approved Notice were mailed to Class members using the address information provided by Defendants as part of the discovery in this matter supplemented by use of various additional sources.[2] Declaration of Stacey Roe (ECF No. 800) at ¶¶ 9-10. The Notice approved

---

[1] The Agreement carefully does not release claims arising from any Class member's period of employment at any Defendant hospital as a registered nurse in a position outside those included in the Class -- such as when employed as an advanced practice nurse or in a managerial or supervisory position.

[2] These sources have been previously described, and include data obtained from the Michigan Department of Community Health from which entity Plaintiffs purchased a database that provided both more current addresses than those available through the Defendants' databases produced to Plaintiffs and addresses for a significant number of Class members for whom address information was missing from

by this Court explained the procedures by which Class members could object to the Settlement and provided notice of the January 27, 2016, hearing on final approval of the Settlement and related matters.

Plaintiffs' Counsel have not yet received any objection to the proposed Settlement from any member of the Class, although the deadline for filing such objections is not until January 7, 2016.

### III.   THE COURT SHOULD APPROVE THE SETTLEMENT.

Pursuant to Fed. R. Civ. P. 23(e), a class action settlement must be approved by the Court before a case may be dismissed or compromised.

> Before approving a settlement, a district court must conclude that it is "fair, reasonable, and adequate." Several factors guide the inquiry: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Int'l Union v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting Fed. R. Civ. P. 23(e)(1)(C)). Each of these factors weighs heavily in favor of

---

Defendants' databases. In addition, the Court-appointed Claims Administrator updated all address information provided by use of the National Change of Address Database maintained by the U.S. Postal Service. Declaration of Stacey Roe at ¶ 9 (ECF No. 800). Plaintiffs had also obtained updated address information directly from each previous Settling Defendant and from DMC using that data to update previous address lists. Farrow Decl. ¶ 3. Most recently, Plaintiffs had obtained updated address information for some Class members through the claims process associated with distributing funds from the previous settlements. *Id.*

approval of the Settlement with DMC.

In reviewing a proposed class settlement, the court does "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands*, *Inc.*, 450 U.S. 79, 88 n.14 (1981). A court also should "not substitute its business judgment for that of the parties." *Rankin v. Rots*, No. 02-71045, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006). Rather, the only question for a court is "whether the settlement, taken as a whole, is so unfair on its face to preclude judicial approval." *Id*. (internal quote omitted). "Being a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement." *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1008 (S.D. Ohio 2001).

As a preliminary matter, Plaintiffs note that this Court has previously found settlements that recovered far less from each of seven other defendants to be fair, adequate and reasonable. ECF Nos. 717-719, 824. The recovery from DMC exceeds the total amount recovered for the Class through the four largest previous settlements combined.[3] *See, e.g., In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 344 (E.D. Pa. 2007) (approving settlement representing approximately 1.5% of

---

[3] As the Court is aware the other settlement amounts were computed as a percentage of each settling defendant's nurse wage bill during the Class Period, with all but one settlement recovering 2% of that defendant's wage bill (the exception was the Bon Secours settlement reflecting the fact that Bon Secours had already exited the Detroit market by the time of this settlement). While the DMC Settlement was not computed on this same basis, the amount DMC has agreed to pay is over 7.1% of its wage bill during the Class Period.

relevant sales); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (approving settlement representing approximately 1.6% of sales); *Fischer Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving a settlement representing 0.2% of the defendant's sales, and noting that earlier approved settlements represented 2.4%, 0.88%, 0.65%, 0.3%, 0.2%, and 0.1% of other settling defendants' sales).

## A.    The Risk of Fraud or Collusion

This Court has had ample opportunity, both directly and through the Court-appointed Special Master, to observe the intensely adversarial nature of this litigation and of the negotiation of this Settlement. There is no favoring of the Named Plaintiffs or any other basis for believing that this Settlement is anything other than the result of hotly contested negotiations among experienced counsel acting in the best interest of the Class and their clients.

## B.    The Complexity, Expense and Likely Duration of the Litigation

It has been observed that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard*, 292 F. Supp. 2d at 639 (internal quote omitted); *see also Wesely v. Spear*, *Leeds & Kellogg,* 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (noting that antitrust class actions are "notoriously complex, protracted and bitterly fought."). The complexity and risk does not end with the trial. "Antitrust litigation in general, and class action litigation in particular, is

unpredictable … [T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeed at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998). *See, also, In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 748 (E.D. Pa. 2013) ("Even if Plaintiffs had succeeded in proving liability at trial, there is no guarantee they would have recovered damages."); *U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) ("the jury chose to award plaintiffs only nominal damages, concluding that the USFL had suffered only $1.00 in damages"), *aff'd*, 842 F.2d 1335, 1377 (2d Cir. 1988). Indeed, in recent months antitrust plaintiffs prevailed at trial against Cox Communications, Inc., on issues of antitrust liability, only for the jury to award a small fraction of the damages estimated by the plaintiffs' expert. Farrow Decl.  Ex. 2 (jury awarded $6.3 million where expert estimated damages of over $49 million).[4] Such a high degree of uncertainty, complexity, expense, and duration favors approval of this substantial settlement because under such circumstances "a bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F.

---

[4] Even that favorable result was subsequently overturned by the trial judge who issued a post-trial Judgment as a Matter of Law, a decision that is now on appeal. *Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, No. 12-2048, *slip op.* (W.D. Okla. Jan 12, 2015). Farrow Decl. Ex. 3. Even if the *Cox* plaintiffs succeed in that appeal, the reduced damages award will likely stand.

Supp. 822, 838 (W.D. Pa. 1995).

## C.   The Amount of Discovery Engaged in by the Parties

This factor weighs heavily in favor of approval since not only was all discovery completed, but this case had proceeded through class certification, summary judgment, and rulings on dozens of evidentiary motions.

## D.   The Likelihood of Success on the Merits

Plaintiffs believed that they had a very strong case for presentation at trial, but all cases bear risk, and this one was no exception. *See, generally, In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) ("Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation."). Some of those risks are explicitly discussed in this Court's ruling on summary judgment. Following that ruling, Plaintiffs faced the unusual circumstance of going to trial in pursuit of an information sharing claim governed by the Rule of Reason.[5] Trials of any type of Rule of Reason claim are rare, and those cases that have been tried have proven difficult for plaintiffs. Rule of Reason claims involve many more

---

[5] This Court noted repeatedly that its decision dismissing Plaintiffs' *per se* claim was one with which reasonable jurists might disagree, and Plaintiffs have previously noted their disagreement with that decision in filing their motion for reconsideration of the Court's dismissal of this claim. However, the path to resurrecting that claim is undoubtedly a long and tortuous one, with no certain outcome.

elements for a plaintiff to prove than the more common (but still rather rarely tried) *per se* antitrust claim, and would have allowed DMC to present many defenses not available in trials of *per se* claims. DMC has disputed essentially every element of Plaintiffs' claim and raised numerous defenses. Further, as explained above, even had Plaintiffs prevailed on liability, there would have been great uncertainty as to the amount the jury might have awarded as damages, particularly given DMC's unique circumstances among defendants, and the jury's possible reluctance, no matter what the law says about joint and several liability, to award damages attributable to the conduct of all eight hospitals against one defendant at trial.

In addition, there can be little serious doubt that even had Plaintiffs prevailed at trial, DMC would have pursued many avenues for appeal, not least of this Court's ruling on class certification (as evidenced by DMC's three failed efforts to seek review of that ruling before trial). Even had Plaintiffs continued to prevail at the Sixth Circuit on class certification and had also prevailed as to whatever liability or damages issues DMC would have raised on appeal, DMC would likely have continued to pursue appeals all the way to the Supreme Court, which has shown a particular interest in both class action appeals and antitrust appeals in recent years. At the very least, this would have added yet more years of delay to collection of any judgment.

**E.      The Opinions of Class Counsel and Class Representatives**

In deciding whether a proposed settlement warrants approval, "[t]he Court should also consider the judgment of counsel and the presence of good faith bargaining between the contending parties." *Rankin*, 2006 WL 1876538, at *3. *See, also, Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 502 (E.D. Mich. 2000); *In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150427, at *58 (E.D. Mich. Dec. 13, 2011). Class Counsel and other Plaintiffs' Counsel here have extensive experience in handling antitrust cases and other complex litigation. As previously discussed, Keller Rohrback and Cohen Milstein Sellers & Toll are national leaders in this area of complex litigation and James & Hoffman brings unique experience in litigating employment-related class actions as well as having played a critical role in this matter.[6] In addition to the highly experienced law firms named as Class Counsel, other lawyers who were to lead the trial of this case, Joseph Goldberg of Freeman, Boyd, Hollander, Goldberg, Urias & Ward. P.A., and Daniel Gustafson of Gustafson Gluek. PLLC, are among the most experienced trial lawyers in the country, particularly in the area of antitrust class actions. Each of those lawyers, as well as E. Powell Miller, a highly experienced Michigan trial lawyer, support this settlement.

---

[6] These three firms are also counsel in the related nurse wage antitrust actions pending in various other cities, giving them a truly unique understanding of the legal and factual issues underlying the proposed class's claims. *See* previously filed Declarations of Mark Griffin, Daniel Small, and David Dean (ECF Nos. 693-695).

Given the advanced state of this litigation at the time of settlement, Counsel was in a strong position to evaluate the strengths and weaknesses of this case.[7] The Class Representatives, who have maintained an active involvement in this litigation throughout, including attending multiple settlement conferences and numerous hearings, fully recognize their duty to do the best they can for their fellow-nurses, and have also evaluated and agreed to these settlements.

**F.    The Reaction of Absent Class Members**

The deadline for the filing of objections to these settlements has not yet passed, hence Plaintiffs cannot fully report on the reaction of absent class members at this time.[8]

**G.    The Public Interest**

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources." *Cardizem*, 218 F.R.D. at 530 (internal quote omitted). Against this public interest, Plaintiffs are unaware of any interest that counsels against approval.

---

[7] In addition, Class Counsel had a good understanding of the sense of urgency of many absent Class members and their preference to receive a certain sum sooner rather than a speculative sum much later as a result of the process of administering distribution of prior settlements, during which process Class Counsel and their staff have spoken directly with a large number of absent class members.

[8] However, no class member objected to any previous settlement.

## IV.   THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED.

Plaintiffs also seek the Court's approval of a plan for allocating a portion of the total recovery to date among Class members. The portion available for distribution to Class members is the total cash amount from the settlement plus any accrued interest, minus the amounts awarded to Class Counsel for attorneys' fees and expense reimbursement, minus the amounts awarded as incentive payments, and minus the future costs of administering the claims process by which settlement funds will be distributed to class members (the "Net Settlement Fund"). Plaintiffs estimate that the Net Settlement Fund will be $26,039,443.74 (if counsel's pending motion for fees, cost reimbursement, and incentive payments is granted).

### A.   The Proposed Plan of Allocation and Proposed Claim Forms

In general terms, Plaintiffs propose that all money be distributed on a *pro rata* basis, just as was done for all previous settlements. This means that each nurse's proportionate share will reflect her pay earned during the Class Period, so that if nurse A earned twice as much between December 12, 2002 and December 12, 2006 as did nurse B, then A will receive twice as much from the Net Settlement Fund as will B.

#### 1.   Distribution to persons who already filed claims

As part of the Plan, Plaintiffs request that the Court approve distribution to all persons who already submitted all the materials required to support their claim in

12

association with the previous settlements without requiring those people to provide any additional paperwork. Instead, Plaintiffs propose that these persons should simply be sent a check based on the information already provided for their previous claim. Because any claims procedure requiring Class members to take affirmative steps can act to discourage claims, Plaintiffs and Class Counsel believe it is important that people who have already gone through that process once not be asked to do so again, since this will only serve to reduce participation in the settlement without providing any offsetting benefit. Plaintiffs propose that these people simply be sent a brief letter at the same time that claim forms are distributed to other class members (a copy of the proposed text is attached as Farrow Decl. Ex. 4). The intent in sending such a letter is to assuage any concern these people might otherwise have when they hear of colleagues receiving claim forms when they have not.[9]

## 2. Distribution to other Class members

Class members who have not made a claim before will be given another opportunity to submit a claim, requiring provision of all the same supporting documentation required during the earlier claims process. As to those persons, as before, Plaintiffs' plan is to send by first-class mail a claim form to the same individuals to whom the Notice of the Settlement was mailed. Plaintiffs would send

---

[9] While there is some small cost associated with sending that letter, this is almost certainly far smaller than the cost that would be incurred responding to hundreds of queries from nurses wondering why they did not get a claim form.

each individual one of the following types of claim forms: (a) a Custom Claim Form (a proposed form is attached as Farrow Decl. Ex. 5); or (b) a Generic Claim Form (*id*. Ex. 6). These proposed forms are essentially identical to those used for the previous claims process, except that they provide some additional information and instruction based on Class Counsel's previous experience administering settlements in this litigation.

The Custom Claim Form would be sent to all individuals who are members of the Class but did not previously submit an approved claim and for whom the Defendants have produced payroll data. This form would state the total amount of their relevant pay according to Defendants' data. Class members would have the option either to accept this figure or to dispute it and provide documentation (in the form of pay stubs or W2 tax forms) to support another amount of relevant pay claimed.

The Generic Claim Form would be mailed to those persons on the most recent mailing list who were sent a Notice even though Plaintiffs cannot determine with certainty that they can be matched with an individual in the Class list compiled from Defendants' payroll data produced during the litigation. For the most part, these are people who appeared on an updated address list provided by one of the previous Defendants but who cannot be matched with certainty to a record in the hospital's

14

payroll data.[10] It is likely that these people received duplicate notices as a result of an address or name change, resulting in them being included in the mailing database more than once,[11] although some may reflect other issues with Defendants' payroll data.[12] This form would require a claimant to state his or her relevant pay and provide supporting documentation in the form of pay stubs or W2 forms.

All of the claim forms would require claimants to certify their membership in the Class and the accuracy of the information they provide and to submit to this Court's jurisdiction for resolution of any disputes related to the claim form. Plaintiffs propose that the Claims Administrator mail the claim forms to all persons on the current class list within 14 days after the Court has both granted final approval to the Settlement and ruled on the attached claim forms and the plan of allocation, and to

---

[10] Based on their previous experience with these updated address lists, Plaintiffs ensured that the updated lists from DMC contained sufficient information to be able to match new addresses to entries in the existing class list, so this issue does not arise as to that updated data file.

[11] As explained previously, rather than delete entries, in order to ensure that all those who previously received notice are mailed claim forms, Plaintiffs are mailing such individuals generic claim forms. Because claimants must provide valid social security numbers in order to be eligible to receive a distribution, however, there is no risk of duplicative recoveries.

[12] Some hospitals' data was not entirely complete. For example Bon Secours, which had exited the market prior to the time when it produced payroll data, produced data that sometimes included a name and pay data but was missing address information and produced some data that could not be interpreted because no one capable of explaining the workings of the Bon Secours database was still employed by any Defendant (including defendants which had taken over Bon Secours facilities) by the time of this data production.

require that completed and signed claim forms be mailed to the Claims Administrator postmarked within 60 days after the Court's ruling.

### 3.    The role of the Claims Administrator.

The Court-appointed Claims Administrator, Rust Consulting, would administer the claims process under the supervision of Class Counsel. Specifically, the Claims Administrator would receive and review all completed claim forms, identify any deficiencies in the claim forms, notify the claimants in question of the deficiencies, set deadlines for the claimants to cure the deficiencies, recommend to Class Counsel and the Court the acceptance or rejection of each claim, and calculate each claimant's share of the Net Settlement Funds in accordance with any Court-approved plan of allocation. Promptly after the Claims Administrator has completed this process, and Class Counsel has reviewed the Administrator's work, Class Counsel would present the Administrator's conclusions to the Court in a motion to distribute the Net Settlement Funds.

## B.    The Plan of Allocation Is Fair, Reasonable, and Adequate.

The standard for approval of a plan of allocation is the same as the standard for approving a settlement, namely, it must be "fair and reasonable." *See, e.g., Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 534 (E.D. Ky. 2010). Further, if the plan of allocation is "formulated by 'competent and experienced counsel, an allocation plan need only have a 'reasonable, rational

basis.'"" *Taft v. Ackermans*, No. 02-7951, 2007 WL 414493, at *9 (S.D.N.Y. Jan 31, 2007) (citations omitted).

Here, the proposed allocation method precisely matches the method by which previous settling Defendants' settlement amounts were computed—as a percentage of its nurse wage bill – and the way previous settlement funds were distributed. Settlement distributions, such as this one, that apportion available settlements funds on an objective, *pro rata* basis to approved claimants, without favoring any class member over another, have consistently been deemed fair, reasonable, and adequate by numerous courts. Such *pro rata* allocations are probably the most common means of allocating settlements like this one. *See, e.g., In re Cardizem,* 218 F.R.D. at 531 (approving *pro rata* plan of allocation based on each member's purchases of allegedly overpriced product); Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 12.10 (3d ed. 1992) (noting common use of *pro rata* distributions). Accordingly, Plaintiffs respectfully request that the Court approve this Plan of Allocation and the attached claim forms.

## V.    CONCLUSION

This Settlement represents an excellent result for the Class in this complex and hard-fought antitrust class action, and a *pro rata* allocation of the settlement funds is fair and reasonable. Thus, Plaintiffs respectfully request that the Court grant

their motion and enter an order approving the settlement and the proposed Plan of Allocation.

DATED December 11, 2015.

Respectfully submitted:

KELLER ROHRBACK L.L.P.

By: /s/ Mark A. Griffin
Mark A. Griffin
Lynn Lincoln Sarko
Raymond J. Farrow
Tana Lin
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1200
Fax: (206) 623-3384

E. Powell Miller (P39487)
Sharon S. Almonrode
MILLER LAW FIRM
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200

Daniel A. Small
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.,
Suite 500 West
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

David P. Dean
JAMES & HOFFMAN
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036-4748

18

Tel: (202) 496-0500
Fax: (202) 496-0555

Joseph Goldberg
FREEMAN, BOYD, HOLLANDER,
GOLDBERG, URIAS,
& WARD, P.A.
20 First Plaza, Suite 700,
Albuquerque, NM  87102
Tel: (505) 244 7520

Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Daniel M. Cohen
CUNEO GILBERT & LADUCA LLP
106-A S. Columbus Street
Alexandria, VA 22314
Tel: (202) 789-3960
Fax: (202) 789-1813

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PAT CASON-MERENDA and
JEFFREY A. SUHRE on behalf of
themselves and others similarly
situated,

                Plaintiffs,

    v.

VHS of MICHIGAN, INC., d.b.a.
DETROIT MEDICAL CENTER, et al.,

                Defendants.

Case No. 06-15601

Hon. Gerald E. Rosen

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2015, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the counsel of record for all parties for Civil Action No. 2:06-cv-15601-GER-DAS, and I hereby certify that there are no individuals entitled to notice who are non-ECF participants.

                s/ Mark A. Griffin
                Mark A. Griffin
                Keller Rohrback L.L.P.
                1201 Third Avenue, Suite 3200
                Seattle, WA 98101
                Tel: (206) 623-1900
                E-mail: mgriffin@kellerrohrback.com